# EXHIBIT 1



**Capitol Corporate Services, Inc.**
PO Box 1831
Austin, TX 78767
Phone: (800) 345-4647  Fax: (800) 432-3622
rassop@capitolservices.com

## Service Of Process Transmittal Notice

ABBY DIAZ
TYLER TECHNOLOGIES INC
ONE TYLER DR
YARMOUTH MAINE 04096

| | |
|---|---|
| **Date Processed:** | 05/21/2020 |
| **Completed By:** | MIKE WILLIS |
| **Delivery Method to Client:** | FEDEX 2 DAY LETTER |
| **Tracking Number:** | 137232904398 |

Enclosed please find legal documents received on behalf of the client named below. These documents are being forwarded in accordance with your instructions.

| **Date / Time Received** | **Transmittal #** | **Delivered to Agent by** |
|---|---|---|
| 05/21/2020  1:30 PM in CALIFORNIA | CA-187100 | PROCESS SERVER |

**With Regard to Client**

TYLER TECHNOLOGIES, INC.

**Title of Case or Action**

COUNTY OF KERN V. TYLER TECHNOLOGIES, INC., ET AL.

| **Case Number** | **Type of Document Served** |
|---|---|
| BCV-20-101197 | CITATION/SUMMONS |

**Court Name**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN

**Note**

1-187100B

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>TYLER TECHNOLOGIES, INC.;<br><br>AND DOES 1 THROUGH 20, INCLUSIVE<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br>COUNTY OF KERN | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)*<br><br>**ELECTRONICALLY FILED**<br>**5/19/2020 10:19 AM**<br>**Kern County Superior Court**<br>**By Ryan Baldwin, Deputy** |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN<br>Metropolitan Division<br>1415 Truxton Avenue<br>Bakersfield, California 93301 | **CASE NUMBER:**<br>*(Número de Caso):*<br>BCV-20-101197 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Eileen R. Ridley (CA Bar No. 151735)
Foley & Lardner LLP
555 California Street., Suite 1700,  San Francisco, CA 94104-1520 Telephone: (415) 434-4484

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)* | 5/19/2020 | TAMARAH HARBER-PICKENS | Clerk, by _____, Deputy<br>*(Secretario)* _____ *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*  TYLER TECHNOLOGIES, INC.
   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☒ by personal delivery on *(date):*

| | | | |
|---|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc.<br>www.FormsWorkflow.com | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Eileen R. Ridley (SBN 151735) Alan R. Ouellette (SBN 272745)<br>Foley & Lardner LLP<br>555 California Street., Suite 1700<br>San Francisco, CA 94104-1520<br>TELEPHONE NO.: (415) 434-4484    FAX NO.: (415) 434-4507<br>ATTORNEY FOR (Name): Plaintiff County of Kern | FOR COURT USE ONLY<br><br>**ELECTRONICALLY FILED**<br>5/19/2020 10:19 AM<br>**Kern County Superior Court**<br>**By Ryan Baldwin, Deputy** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **KERN**
STREET ADDRESS: 1415 Truxton Avenue
MAILING ADDRESS: 1415 Truxton Avenue
CITY AND ZIP CODE: Bakersfield, California 93301
BRANCH NAME: Metropolitan Division

CASE NAME: County of Kern v. Tyler Technologies, Inc..

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER:<br>BCV-20-101197 |
|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☒ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary  b. ☒ nonmonetary; declaratory or injunctive relief  c. ☒ punitive
4. Number of causes of action (specify): Seven (7)
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: May 18, 2020

Eileen R. Ridley                                        ▶ /s/ Eileen R. Ridley
_____          _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

| | FOR COURT USE ONLY |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF KERN**<br>BAKERSFIELD COURT<br>1415 TRUXTUN AVENUE<br>BAKERSFIELD CA 93301 | FILED<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF KERN<br><br>MAY 19, 2020<br>By *Ryan Baldwin* DEPUTY |

**PLAINTIFF/PETITIONER:**
  **COUNTY OF KERN**
**DEFENDANT/RESPONDENT:**
  **TYLER TECHNOLOGIES, INC.**

| **NOTICE OF ASSIGNMENT TO JUDGE FOR ALL PURPOSES AND**<br>**NOTICE OF ORDER TO SHOW CAUSE RE CRC RULE 3.110 AND**<br>**NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br><br>BCV-20-101197 |
|---|---|

By order of the presiding judge, the above entitled case is assigned to the Honorable David R. Lampe for all purposes. It will be managed on the direct calendar program in Bakersfield Department 11 until its conclusion. Peremptory challenges, if any, must be made within the times set out in CCP §170.6. Please include the initials **DRL** after the case number on all future pleadings filed in this case.

**TO PLAINTIFF AND PLAINTIFF'S COUNSEL:**
You are ordered to appear on **September 01, 2020** in **Bakersfield Department 11** at **8:30 AM** in the above entitled court to give any legal reason why sanctions shall not be imposed for failure to serve the complaint on all named defendants and file proof(s) of service with the court within sixty (60) days after the filing of the complaint pursuant to California Rules of Court, Rule 3.110. All appearances are mandatory, unless the court receives the required proof(s) of service five (5) court days prior to the hearing date, and then no appearance is necessary.

**TO EACH PARTY AND THEIR RESPECTIVE ATTORNEY(S) OF RECORD:**
This case is set for Case Management Conference, by the Honorable David R. Lampe on **November 16, 2020** at **8:30AM** in **Bakersfield Department 11** of the above entitled court.  Case management statements are to be filed at least fifteen (15) days prior to the conference in accordance with California Rules of Court, Rules 3.720 – 3.730.  All parties shall comply with California Rules of Court, Rules 3.720 – 3.730.

<div align="center">NOTICE TO PLAINTIFF'S COUNSEL</div>

**IMPORTANT: You are required to serve this Notice of Assignment and Notice of Order to Show Cause Date and Notice of Case Management Conference Date with the Summons, Complaint [Local Rule 3.7(a)], Alternative Dispute Resolution (ADR) Information Packet, and ADR Stipulation and Order Form ( California Rules of Court, Rule 3.221).**

<div align="center">NOTICE TO CROSS COMPLAINANT'S COUNSEL</div>

**IMPORTANT: If you are bringing a cross complaint against new parties, you are, likewise, required to serve this Notice of Assignment pursuant to California Rules of Court, Rule 3.110 and Notice of Order to Show Cause date and Notice of Case Management Conference date on the new cross defendants.**

<br>

**TAMARAH HARBER-PICKENS**
CLERK OF THE SUPERIOR COURT

Date:  May 19, 2020

By:  _____ *Ryan Baldwin* _____
  Ryan Baldwin, Deputy Clerk

COUNTY OF KERN VS TYLER TECHNOLOGIES, INC.
BCV-20-101197

The Clerk of the Superior Court's office has received a civil complaint from you for filing. Pursuant to the Trial Court Delay Reduction Act, your case has been assigned to the Honorable David R. Lampe as monitoring judge.

Judge David R. Lampe has instituted a direct calendaring system for all cases assigned to him/her as the monitoring judge.

All law and motion, case management and trial setting conferences, ex parte matters and trials will be scheduled before him/her in Bakersfield Department 11. This will involve all cases in which the clerk has assigned the initials DRL to the complaint at the time of filing. Counsel is expected to make the initials of the monitoring judge a part of the case number on all pleadings and papers.

Law & Motion and Ex-Parte hearing dates must be pre-cleared by contacting the Direct Calendaring Clerk at 661-868-5303. Tentative rulings can be located by visiting "http://www.kern.courts.ca.gov/", after 4:00 pm. Click on the Non-Criminal Case Information link to enter the case number. Please note, not all departments provide tentative rulings.

At the time of filing the complaint, plaintiff's counsel will be given a Notice of Case Management Conference which sets a conference approximately one hundred eighty (180) days after filing of the complaint. This notice must be served with the summons and complaint on all defendants. Defendants must serve the notice on all cross-defendants named. The notice must also be served on interveners and lien claimants.

Telephonic appearances for case management conferences and law and motion hearings are available through Court Call. The toll free telephone number for Court Call is (888) 88-COURT. Proper procedures must be complied with under California Rules of Court, Rule 3.670. Arrangements to make appearances through Court Call must be made at least five (5) court days prior to the hearing date.

Another judge will hear settlement conferences in cases assigned to Judge David R. Lampe. However, those cases that do not settle will be set for trial before him/her.

COUNTY OF KERN VS TYLER TECHNOLOGIES, INC.
BCV-20-101197

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF KERN
### SPECIAL RULES RELATING TO CASE MANAGEMENT CONFERENCES

At least fifteen (15) days prior to the case management conference, each party shall prepare, file and serve on each other party a case management conference statement providing the Court with the following information:

1. The "at-issue" status of the case including any new parties that may be contemplated;
2. A brief statement of the type of case and the general facts or contentions;
3. A description of the discovery done to date and that contemplated to be done;
4. Estimated time for trial and whether a jury is demanded;
5. Whether or not the case is entitled to priority in trial setting and if so, the legal authority thereof;
6. An evaluation of the case for alternative dispute resolution, including arbitration (judicial or binding), mediation or private judge handling;
7. If a person injury action, a description of the injuries sustained by each plaintiff and the elements of claimed damage;
8. A statement of any settlement negotiations undertaken thus far;
9. The name of the attorney primary responsible for the case on behalf of the party filing the statement.

More than one party may join in the filing of a single statement.

The case management conference shall be attended by the attorney primarily responsible for the case on behalf of each party or a member of his or her firm or counsel formally associated in the case.  The attorney attending shall be thoroughly familiar with the case, and be able to engage in meaningful discussions with court and counsel, and to enter into agreements on behalf of his or her client on the following subjects:

1. The "at-issue" status of the case including the dismissal of the unnamed doe defendants or cross-defendants by agreement of all parties;
2. Discovery conducted and remaining to be done;
3. Amenability of the case to alternative dispute resolution including, but no limited to, arbitration (judicial or binding), mediation, and private judge handling.
4. Delineation of issues including stipulation of facts not in substantial controversy;
5. Settlement prospects;
6. Setting the matter for trial, pre-trial conferences, settlement conference or further case management conference;
7. Any other matters relevant to the processing of the case to a final resolution.

Any violation of these rules shall result in the imposition of substantial sanctions which may include monetary, issue, termination, or other appropriate sanctions.

COUNTY OF KERN VS TYLER TECHNOLOGIES, INC.
BCV-20-101197

**CERTIFICATE OF POSTING**

The undersigned, of said Kern County, certify:  That I am a Deputy Clerk of the Superior Court of the State of California, in and for the County of Kern, that I am a citizen of the United States, over 18 years of age, I reside in or am employed in the County of Kern, and not a party to the within action, that I served the ***Notice of Assignment/Notice of Order to Show Cause Re CRC 3.110/Notice of Case Management Conference*** attached hereto on all interested parties and any respective counsel of record in the within action by posting true copies thereof,  to the Superior Court of California, County of Kern, Non-Criminal Case Information Portal (https://odyprodportal.kern.courts.ca.gov/portalprod).


Date of Posting:        May 19, 2020

Place of Posting:       Bakersfield, CA

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

                                                        **TAMARAH HARBER-PICKENS**
                                                        CLERK OF THE SUPERIOR COURT

Date:  May 19, 2020

                                   By:        _Ryan Baldwin_
                                                Ryan Baldwin, Deputy Clerk

Certificate of Posting - Notice of Assignment/Notice of Order to Show Cause Re CRC 3.110/Notice of Case Management Conference

Page **4** of **4**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN
ALTERNATIVE DISPUTE RESOLUTION (ADR)
INFORMATION PACKET



Kern County Superior Court encourages, and under certain circumstances, may require parties to try ADR before trial.  Courts have also found ADR to be beneficial when used early in the case process.  The courts, community organizations and private providers offer a variety of ADR processes to help people resolve disputes without a trial.  Below is information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local arbitrator, mediator or neutral evaluator. You may find more information about these ADR processes at www.courts.ca.gov/programs/adr.

## Possible Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial depending on the type of ADR process used as well as the particular type of case involved.

Possible Advantages:  Saves time; saves money; gives the parties more control over the dispute resolution process and outcome; helps to preserve and/or improve party relationships.

Possible Disadvantages:  May add additional time and costs to the litigation if ADR does not resolve the dispute; procedures such as discovery, jury trial, appeals, and other legal protections may be limited or unavailable.

## Most Common Types of ADR
Mediation:  A neutral person or "mediator" helps the parties communicate in an effective and constructive manner so the parties can try to resolve their dispute.  The mediator does not decide the outcome, but helps the parties to do so.  Mediation is generally confidential and may be particularly useful where ongoing relationships are involved, such as between family members, neighbors, employers/employees or business partners.

Settlement Conferences:  A judge or another neutral person assigned by the court helps the parties to understand the strengths and weaknesses of their case and to discuss settlement.  The judge or settlement conference neutral does not make a decision in the case but helps the parties to negotiate a settlement.  Settlement conferences may be particularly helpful when the parties have very different views about the likely outcome of a trial in their case.

Neutral Evaluation:  The parties briefly and informally present their facts and arguments to a neutral person who is often an expert in the subject matter of the dispute.  The neutral does not decide the outcome of the dispute, but helps the parties to do so by providing them with a non-binding opinion about the strengths, weaknesses and likely outcome of their case.  Depending on the neutral evaluation process, and with the parties' consent, the neutral may then help the parties try to negotiate a settlement.  Neutral evaluation may be appropriate when the parties desire a neutral's opinion about how the case might be resolved at trial; and, if the primary dispute is about the amount of damages or technical issues, the parties would like a neutral expert to resolve those disputes.

Arbitration:  The parties present evidence and arguments to a neutral person or "arbitrator" who then decides the outcome of the dispute.  Arbitration is less formal than a trial, and the rules of evidence are generally more relaxed.  If the parties agree to *binding* arbitration, they waive their right to a jury trial and agree to accept the arbitrator's decision.  With *nonbinding* arbitration, any party may reject the arbitrator's decision and request a trial.  Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time and expense of a trial, or desire an expert in the subject matter of their dispute to make a decision.

## Local Court ADR Programs

The Superior Court, County of Kern offers two types of ADR:  Arbitration in cases in which the amount in controversy as to each plaintiff is $50,000 or less; and DRPA mediation services on the day of the hearing, settlement conference or trial.

**Arbitration:**  The Superior Court of California, County of Kern does use Arbitrators in civil cases where the amount in controversy as to each individual plaintiff is $50,000 or less.  The Court may order the parties to Arbitration or the parties may agree to Arbitration any time before the first case management conference statement is filed.
See Local Rule 3.14 at www.kern.courts.ca.gov/local_rules_of_court.

**Dispute Resolution Program Act (DRPA):**  The Superior Court of California, County of Kern also offers mediation services in small claims and unlawful detainer, civil harassment, family law and probate matters.  The Court has contracted with the Better Business Bureau (BBB) under the Dispute Resolution Programs Act (DRPA) to provide these mediation services.  For more information about BBB Mediation Services go to http://go.bbb.org/ccie-mediation.

**ADR Coordinator:**
Although complaints about arbitrators and mediators are rare, the Superior Court of California, County of Kern does provide a complaint procedure in our Local Rules, Rule 3.14.7.  If you have a complaint or a concern with any of this Court's ADR programs, or simply have a question about ADR, please contact the ADR Administrator at ADRAdministrator@kern.courts.ca.gov or 661-868-5695.

**Resources:**
**California Department of Consumer Affairs:  www.dca.ca.gov/consumer/mediation_guides**
**Judicial Branch California Courts – ADR: www.courts.ca.gov/selfhelp-adr.htm**
**ADR Stipulation Form: www.kern.courts.ca.gov/documents/stipulation_and_order_form**

| ATTORNEY OR PARTY WITHOUT ATTORNEY  *(Name, state bar number, and  address):* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                          FAX NO *(Optional).:*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name)* : | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF:

DEFENDANT:

| ADR STIPULATION AND ORDER FORM | CASE NUMBER: |
|---|---|

1.  Pursuant to California Rule of Court 3.221(a)(4), the parties and their attorneys stipulate that all claims in

    this action will be submitted to the following alternative dispute resolution (ADR) process:

    a.  ☐  Private Mediation.

    b.  ☐  Neutral Evaluation.

    c.  ☐  Binding Arbitration.

    d.  ☐  Referee/Special Master.

    e.  ☐  Settlement Conference with Private Neutral.

    f.  ☐  Non-binding Judicial Arbitration pursuant to CCP§1141.10 et seq., and applicable Rules of Court.

    g.  ☐  Discovery will remain open until 30 days before trial.

    h.  ☐  Other:

2.  It is also stipulated that

    a.                                         (name of individual neutral, not organization)

        has consented to and will serve as

    b.                                    (neutral function/process) and that the session will take place on

    c.                        (enter a FIRM date) and that all persons necessary to effect a settlement
        and having full authority to resolve the dispute will appear at such session.

CEB | Essential
ceb.com | Forms

| PLAINTIFF: | CASE NUMBER: |
|---|---|
| DEFENDANT: | |

3.  Date:

    a.  On behalf of Plaintiff/s

_____        _____
(TYPE OR PRINT NAME)                            (SIGNATURE OF PLAINTIFF OR ATTORNEY)

_____        _____
(TYPE OR PRINT NAME)                            (SIGNATURE OF PLAINTIFF OR ATTORNEY)

    ☐ Continued on *Attachment 3a* (form MC-025).

    b.  On behalf of Defendant/s

_____        _____
(TYPE OR PRINT NAME)                            (SIGNATURE OF DEFENDANT OR ATTORNEY)

_____        _____
(TYPE OR PRINT NAME)                            (SIGNATURE OF DEFENDANT OR ATTORNEY)

    ☐ Continued on *Attachment 3a* (form MC-025).

4.  ORDER:

    a.  ☐ The ADR process is to be completed by

    b.  ☐ The Case Management Conference currently set for                    , at

            ☐ a.m. ☐ p.m. in Department                    :

        i.   ☐ Remains on calendar.

        ii.  ☐ Is hereby vacated.

    c.  ☐ Mediation Status Review.

    d.  ☐ Case Status Review re:

    e.  ☐ Final Case Management Conference is set for                    , at                    ☐ a.m.
            ☐ p.m. in Department                    .

    f.  ☐ Judicial Arbitration Order Review Hearing will be set by notice upon assignment of arbitrator.

**IT SO ORDERED.**

Date:                                           _____
                                                JUDICIAL OFFICER

CEB® | Essential Forms
ceb.com

ELECTRONICALLY FILED
5/18/2020 3:43 PM
Kern County Superior Court
By Ryan Baldwin, Deputy

1  EILEEN R. RIDLEY, CA Bar No. 151735
   eridley@foley.com
2  ALAN R. OUELLETTE, CA Bar No. 272745
   aouellette@foley.com
3  JAIME DORENBAUM, CA Bar No. 289555
   jdorenbaum@foley.com
4  **FOLEY & LARDNER LLP**
   555 CALIFORNIA STREET
5  SUITE 1700
   SAN FRANCISCO, CA 94104-1520
6  TELEPHONE:  415.434.4484
   FACSIMILE:   415.434.4507
7
   MARGO A. RAISON, COUNTY COUNSEL
8  **COUNTY OF KERN, STATE OF CALIFORNIA**
   By:  Andrew C. Thomson, Chief Deputy (SBN 149057)
9  Kern County Administrative Center
   1115 Truxtun Avenue, Fourth Floor
10 Bakersfield, CA 93301
   Telephone: 661.868.3800
11 Facsimile: 661-868-3805

12 Attorneys for Plaintiff County of Kern

13                SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                       FOR THE COUNTY OF KERN

15

16 COUNTY OF KERN,                        )  CASE NO:  BCV-20-101197
                                          )
17              PLAINTIFF,                 )  **COMPLAINT OF PLAINTIFF COUNTY OF**
                                          )  **KERN FOR:**
18         v.                             )
                                          )  **(1)  BREACH OF CONTRACT**
19 TYLER TECHNOLOGIES, INC., AND DOES 1   )  **(2)  INTENTIONAL**
   THROUGH 20, INCLUSIVE,                 )       **MISREPRESENTATION**
20                                        )  **(3)  CONCEALMENT**
                                          )  **(4)  VIOLATIONS OF CALIFORNIA**
21              DEFENDANTS.               )       **BUSINESS & PROFESSIONS CODE**
                                          )       **SECTION § 17200**
22                                        )  **(5)  VIOLATIONS OF THE CALIFORNIA**
                                          )       **FALSE CLAIMS ACT**
23                                        )  **(6)  NEGLIGENCE**
                                          )  **(7)  DECLARATORY RELIEF**
24                                        )
                                          )  **JURY TRIAL DEMANDED**
25                                        )
                                          )  **[Exemption From Filing Fee Pursuant To**
26                                        )  **Government Code § 6103]**
                                          )
27 _____)

28

COMPLAINT OF PLAINTIFF COUNTY OF KERN AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

Plaintiff County of Kern ("Plaintiff" or the "County") states the following causes of action against Tyler Technologies, Inc. ("Defendant" or "Tyler"), and Does 1-20, inclusive, for breach of contract, intentional misrepresentation, concealment, violations of California Business & Professions Code Section § 17200, violations of the California False Claims Act, negligence, declaratory relief, and allege as follows:

## THE PARTIES

1.      The County is, and at all times herein mentioned was, a political subdivision of the state of California.

2.      Tyler is, and at all times herein mentioned was, a Delaware corporation with its principal place of business in Plano, Texas that conducted, and continues to conduct, business in California, including business in this judicial district.

3.      The County is informed and believes, and thereon alleges, that each of the defendants named herein as DOES 1 through 20, inclusive, whether individual or corporate or otherwise, are unknown to Tyler, and therefore sues said defendants by such fictitious names. The County will seek leave to amend this Complaint to show such defendants' true names and capacities when the same are ascertained.

## VENUE

4.      Venue is proper in the County of Kern because the events that are the subject of this action occurred in this judicial district, the County sustained injuries in this judicial district as a result of Tyler's conduct in this judicial district, and Tyler is operating, doing business and engaged in activities in this judicial district.

## FACTUAL BACKGROUND

**A.      The Agreement.**

5.      On or about May 5, 2015, the County and Tyler entered into the Software License and Professional Services Agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

6.      Under the Agreement, Tyler agreed to install, implement, and service an integrated information system, known as Odyssey Case Manager ("Odyssey"), throughout the County's criminal

justice divisions, and to grant a license for the use of the same to the County.  Tyler agreed that the "purpose of the project is for the County to transition away from the County's legacy Criminal Justice Information System" and ensured that the project "will implement Odyssey for the County criminal justice departments using a proven approach that has been successful in other jurisdictions across the nation." [Ex. A at 23.]  According to Tyler, Odyssey is a "mature, robust application" resulting from "[s]ubstantial development and industry knowledge" that "mak[es] Odyssey the premier case management solution in the nation." [*Id.* at 30.]

7.    The County's criminal justice divisions are comprised of the Sheriff's Office, Probation Department, Jail, District Attorney's Office, and Public Defender's Office.  While fulfilling different duties and functions, the departments all work in coordination with one another to ensure that the County's criminal justice system works efficiently and serves its constituents.  A simple example illustrates this point: an individual can be arrested by the Sheriff's Office, charged and prosecuted by the District Attorney's Office, represented by the Public Defender's Office, serve time in and be released from jail, and have their integration back into the community overseen by the Probation Department. Because of this, the County desired—and Tyler promised to deliver—an integrated information system that mirrored the integrated duties and functions of the County's criminal justice divisions.

8.    Under the Agreement, Tyler promised, *inter alia*, that Odyssey would deliver "case tracking features for both prosecutorial and public defender offices including processing and maintaining hearing and trial information" and feature "electronic data sharing capabilities between the District Attorney and Public Defender." [Ex. A at 21.]  Odyssey would also be fully "integrated" across the County's criminal justice divisions and "is designed to automatically share information with fully integrated product centers available within the Odyssey suite." [*Id.* at 17, 21.]  Tyler also promised that Odyssey featured "real-time and batch data sharing with third-party systems is carried out through a standards-based integration platform for exchanging data between Odyssey and other criminal justice agencies." [*Id.*]

9.    For the Probation Department, Tyler promised, *inter alia*, to deliver "an integrated pretrial and probation management system" with "powerful document management and file-folder-tracking capabilities" to "ensure that supervision information is accurate, providing the full picture."

2

[*Id.*] Odyssey would also "link[] information with Tyler's case management system so that probation departments and courts have access to the most recent information for a defendant, and his or her case, such as financial obligations and demographic data." [*Id.*]

10.    Far from delivering on these promises, Tyler left the County with a dysfunctional, disconnected, and misfiring collection of parts that are unable to even masquerade as an integrated information system or come close to supporting the critical governmental functions of the Sheriff's Office, Probation Department, Jail, District Attorney's Office, and Public Defender's Office.   As described in detail below, it also left these departments without any means of operating in coordination with one another in even the most basic ways.  At no point in time has Odyssey been operational, and the County has had to revert back to using its legacy information system that Tyler was hired to replace with Odyssey.

**B.    Tyler's Fraudulent Representations And The Amendment To The Agreement.**

11.    After the execution of the Agreement, Tyler repeatedly represented to the County that, *inter alia*, (1) Tyler would ultimately deliver Odyssey in an integrated, operational and useable form, (2) Tyler possessed the expertise, staff and skills necessary to deliver Odyssey in an integrated, operational and useable form, (3) Tyler was on track to complete the installation and implementation of Odyssey, (4) Tyler was in the process of correcting, and had corrected, issues and problems experienced by the County with Odyssey's functionality and integration, and (5) Odyssey had the technical capacity and ability to accommodate the needs of the County's criminal justice divisions.  These representations were made repeatedly by numerous Tyler employees, including Ken Miles, Teresa Perry, Gina Sewell, Shayne Boyd and Brian Williams, who were each authorized to speak on behalf and act on behalf of Tyler.   When Tyler made these representations, Tyler knew that it would never be able to deliver Odyssey in an integrated, operational and useable form for the County's criminal justice divisions and did not intend to perform in full under the Agreement.

12.    The County relied on Tyler's representations in (1) allowing Tyler to continue to purportedly work on installing and implementing Odyssey, (2) paying Tyler's bills for work that did not support the implementation of Odyssey in an integrated, operational and useable form, (3) paying Tyler's bills for work that Tyler did not perform or complete, and (4) agreeing to increase the amount

1  payable to Tyler for the project through a subsequent amendment to the Agreement.

2      13.   On or about September 12, 2017, the County entered into Amendment No. 1 to the

3  Software License and Professional Services Agreement (the "Amendment").  A true and correct copy of

4  the Amendment is attached hereto as **Exhibit B** and incorporated herein by reference.

5      14.   Under the Amendment, Tyler agreed to complete "additional project components for the

6  successful implementation of an integrated criminal justice system." [Ex. B at ¶ (a).].  The Amendment

7  also increased the "maximum reimbursable amount" under the Agreement in exchange for Tyler's

8  promise to deliver an integrated, operational and useable information system to the County's criminal

9  justice divisions.  [*Id.* at ¶ 4.]

10     15.   After the execution of the Amendment, Tyler continued to make the same representations

11 summarized above to the County.  However, Tyler's representations were false, and Tyler made them

12 for the purpose of defrauding the County out of taxpayer dollars that should have been used to support

13 essential governmental functions.

14     16.   Further, between May 2015 and the present, Tyler invoiced and demanded payment from

15 the County for the purported "completion" of essential work supporting the installation, implementation

16 and servicing of Odyssey and the delivery of an integrated, operational and useable information system

17 for the County's criminal justice divisions.  In so doing, Tyler falsely represented to the County that the

18 invoices and demands were (1) accurate and correct, (2) reflected services and work that was completed,

19 and (3) reflected work that was intended to result in the implementation of Odyssey.  None of these

20 representations were true, and the County relied on them to its detriment by paying over $4.2 million to

21 Tyler and devoting over $9 million worth of County employee time to the project.  For instance, Tyler

22 invoiced, and was paid by, the County for the purported "completion" of data conversion milestones,

23 integration milestones, training provided by Tyler and maintenance provided by Tyler that were not, in

24 fact, completed or intended to result in the implementation of Odyssey.

25     **C.   Tyler's Failure To Deliver An Integrated And Operational Information System.**

26     17.   To date, Tyler has failed to deliver or implement an integrated, operational and useable

27 information system to the County for its criminal justice divisions and, in fact, the County has had to

28 continue to rely upon its legacy system.  Tyler's failure to deliver or implement an integrated,

operational and useable information system to the County for its criminal justice divisions has disrupted the County's operations and enriched Tyler at the expense of the County, the public and taxpayers.

18.   Odyssey failed to function in an operational or integrated manner in countless, foundational ways.  By way of a relatively small number of high-level examples:

- Tyler failed to operationalize Odyssey such that it would accomplish the basic task of containing and displaying accurate information.  Instead, Odyssey was replete with inaccurate and incorrect information, ranging from showing the wrong release date for individuals serving sentences in jail—which subjects the County to significant exposure due to the risk of incarcerating someone for longer than their sentence or releasing them too early—to wrong information regarding an individual's criminal charges, enhancements, bail amounts, warrants and criminal history.

- Tyler failed to operationalize Odyssey such that it would accomplish the basic task of containing updated and complete information.  For example, after a court ordered an individual released from Jail, the Sheriff's Office and Jail had no way of knowing which individual to release.  This created a significant risk of releasing the wrong individual or keeping someone in jail when they should have been released.

- Tyler failed to connect the County's criminal justice divisions and precluded them from exchanging accurate information with, and accessing accurate information from, one another through Odyssey in real-time, which the County's criminal justice divisions depend on to fulfill their duties and protect the rights of individuals within the criminal justice system.

- Tyler failed to operationalize Odyssey such that it could track and report the disposition of an individual's charges and enhancements as they moved through the Court system or the ultimate disposition of those charges and enhancements.

- Tyler failed to convert critical information and data in the County's legacy system to Odyssey, including information as basic as the criminal history of individuals that have been arrested for committing a crime or that were already in the criminal justice system. Tyler represented that data integration between the legacy information system and

Odyssey could be accomplished "with just one click," when in fact, it would require hundreds of thousands of hours of manual data entry by County employees. In many instances, Tyler could not operationalize Odyssey to even allow for the manual input of this basic information by County employees in the first instance.

- Tyler failed to operationalize Odyssey's booking function, which exposed the County to significant risk because it could result in the booking of the same individual twice on the same charge and result in the system displaying inaccurate information as basic as the amount of time served on a jail sentence.

- Tyler failed to operationalize Odyssey's warrant and good cause declaration functions, which prevented the County from timely obtaining warrants, catching criminals, and obtaining admissible evidence.

- Tyler failed to operationalize any process for allowing the County's criminal justice divisions to exchange information without revealing, and instead protecting, confidential, protected and privileged information.

- Tyler failed to operationalize Odyssey's promised functionality of supporting mandatory reporting obligations to various state agencies, including the Department of Justice, which would have cut off critical funding and exposed the County's criminal justice divisions to sanctions.

- Tyler failed to operationalize Odyssey's pleading functions for criminal charges and filings in connection with criminal cases. For instance, when the District Attorney's Office tried to file an initial accusatory pleading for criminal charges, they encountered error messages, and Odyssey's complete failure to transmit pleadings to the Court and the Public Defender's Office and case-related discovery to the Public Defender's Office.

- Tyler also failed to operationalize Odyssey such that a department other than the District Attorney's Office could create and transmit case-initiating documents. While the District Attorney's Office initiates cases for adults, the Probation Department is responsible for initiating cases for juveniles, which it did not have the ability to do in Odyssey.

- Tyler failed to operationalize Odyssey's docketing function, which resulted in its failure to update critical calendaring dates set by the Court.  For instance, if the Court set a significant hearing date, there would be no way for the County's criminal justice divisions to know about it through Odyssey.

- Tyler failed to operationalize Odyssey in a manner that would allow the Sheriff's Office and Probation Department to see the status of charges against individuals, which, among other concerning failures, interferes with the ability of dispatchers to provide accurate information to law enforcement officers in the field about the individuals with whom they are interacting and thereby placing officer safety at risk.

- Tyler failed to operationalize Odyssey such that the Public Defender's Office, which has an ethical and legal obligation to provide effective assistance of counsel, had the ability to determine who they represented in criminal proceedings and access to their information, including information as central as the charges that were filed against them.

- Tyler failed to operationalize Odyssey to accurately track and display information as basic as offense dates for violations of probation for the Probation Department.

- Tyler failed to integrate Odyssey with Noble, which is the risk assessment tool used by the Probation Department to create risk assessment reports on individuals within the criminal justice system that is used for essential functions such as sentencing.  Tyler failed to operationalize Odyssey such that it could populate the tool with accurate information, such as criminal history data, from County records or support the promised functionality of allowing the County to manually input information from other jurisdictions.

19.   In short, the relatively small handful of examples above demonstrate Tyler's complete failure to deliver anything resembling an integrated and functioning information system, and Tyler's ongoing failure to correct even the most basic and glaring issues with Odyssey.  Instead, Tyler left the County with a dysfunctional, disconnected, and misfiring collection of parts that are not capable of supporting the most basic needs of the County's individual criminal justice divisions—let alone an integrated criminal justice system.

7

20. The County reported the issues identified above to Tyler through Tyler's SharePoint system. Tyler acknowledged these issues by assigning them an "ODY" number. For instance, Tyler assigned ODY-235556 and ODY-258509 to the failed integration of NOBLE for the Probation Department. Tyler acknowledged its failure to operationalize Odyssey such that it could display accurate criminal charges and enhancements under ODY-257942. Tyler acknowledged its failure to operationalize Odyssey such that it would enable the County to comply with its mandatory state reporting obligations under ODY-235470. Tyler acknowledged its failure to operationalize Odyssey such that it could accurately track credit for time served on a jail sentence under ODY-258411. In spite of the County notifying Tyler of critical issues with Odyssey, Tyler never corrected them. Further, Tyler locked the County out of the SharePoint system so that the County would no longer have the ability to report issues with Odyssey to Tyler.

21. Tyler also sought to deceive, and did in fact deceive, the County by claiming that it was "fixing" or had "fixed" the problems identified by the County. In fact, Tyler never made any effort to fix the problems and did not actually correct them at any point in time. When the County reported a problem to Tyler, Tyler would ask the County to send it specific examples caused by the issue, which the County would do. Tyler would then "spot fix" the example sent by the County by manipulating Odyssey to simulate a correction without attempting to fix the actual issue and without actually correcting the underlying issue. As a result, the example issues identified by the County would reappear, the underlying issue would persist, and additional issues would arise attributable to Tyler's manipulation of the system to temporarily simulate a non-existent "fix." In other instances, Tyler would simply delete open issues that it had previously assigned an "ODY" number and claim that no reported problem existed.

22. Tyler also, and without authorization, used the login credentials of County employees to access the system without the County's knowledge, authorization or permission. Tyler then completed work flow processes and tasks while logged in as an employee of the County using a simulated, non-existent "fix." When the County would inform Tyler that the issues that it had previously reported had not been fixed, Tyler would deny that any issue remained and point to reports that it generated from the system showing the completion of work flow processes and tasks by County employees. However,

1  these work flow processes and tasks were completed by Tyler employees, including Steven Leduc, that
2  had used the login credentials of County employees without their knowledge, authorization or
3  permission for the purpose of manipulating the County's system to simulate the prior completion of
4  work flow processes and tasks that could not be recreated or repeated by County employees.

5        23.    The County also provided Tyler with resources to assist with correcting the issues with
6  Odyssey. For example, with respect to the County's state reporting obligations, the County obtained
7  approval from subject matter experts at the State of California to assist Tyler with operationalizing
8  Odyssey so that it could support the County's mandatory reporting obligations to various state agencies,
9  including the Department of Justice. Tyler told the County that it had contacted and worked with the
10  State of California to correct the reporting issues when, in fact, Tyler had not done so. Even when the
11  County provided Tyler with the appropriate contacts that it needed to work with to correct the issues
12  with Odyssey, Tyler made no effort to actually contact the appropriate subject matter experts or
13  otherwise pursue a solution to correct the issues.

14        24.    In addition to the more than $4.2 million that the County paid to Tyler without receiving
15  any useable work product from Tyler, the County deployed over 100 employees to work on the
16  implementation of Odyssey. Over the course of several years, these employees worked—and ultimately
17  wasted—tens of thousands of hours on the project due to Tyler's breach of the Agreement and
18  Amendment. The value of the time spent by the County's employees on the implementation of Odyssey
19  exceeds $9 million.

20  **D.**    **Tyler's Admission That It Could Not Deliver Odyssey As An Integrated And**
21          **Operational Information System.**

22        25.    On August 28, 2018, the County informed Tyler that should Tyler not resolve all
23  incomplete items necessary for the implementation of Odyssey in a functional and operational form by
24  November 28, 2018, the County would invoke the termination provisions of the Agreement as a result of
25  Tyler's breach of the Agreement and Amendment. Following that correspondence, Tyler informed the
26  County (through Ken Miles) that it was abandoning its plan to use Odyssey—at all—for the Probation
27  Department. Instead, Tyler insisted on replacing Odyssey with a new information system that it
28  acquired in September 2018, called CaseloadPRO. Tyler informed the County that CaseloadPRO would

only be used by the Probation Department and that it would take Tyler *two additional years* to implement CaseloadPRO for the Probation Department only.

26.   Further, CaseloadPRO was not integrated with Odyssey and could not be integrated with Odyssey at all.   This would mean that the Probation Department would have been completely disconnected from the District Attorney's Office, Public Defender's Office, Sheriff's Office and Jail and that Tyler would never be able to deliver an integrated information system using Odyssey.

27.   Tyler acquired CaseloadPRO for the specific purpose of replacing Odyssey because Tyler knew that it could not implement or operationalize Odyssey for use by probation departments across the country, including the County's Probation Department.   In spite of this, Tyler never disclosed—and instead actively concealed—that it could not implement and operationalize Odyssey for the County's Probation Department even though Tyler purchased CaseloadPRO for this very reason.   During the time that it was negotiating the acquisition of CaseloadPRO, Tyler continued to "work" on implementing Odyssey for the Probation Department and billed the County for the purported "work" even though Tyler knew that it was impossible to implement and would unilaterally decide to replace Odyssey with CaseloadPRO as soon as the acquisition was complete.

28.   Tyler's abandonment of Odyssey for the Probation Department and acknowledgment that it could not deliver an integrated information system across all of the County's criminal justice divisions using Odyssey was also a repudiation of Tyler's original and repeated representations of what it would deliver to the County and ultimately led the County to terminate the Agreement.

E.   **The County's Termination Of The Agreement, And Tyler's Continued Demands For Payment.**

29.   On March 1, 2019, the County issued a "Notice of Breach" pursuant to the termination provision of the Agreement.   On March 12, 2019, the County also issued a "stop work order" to Tyler consistent with the Agreement.

30.   In spite of this, Tyler continues to invoice the County for services that it has not and will not perform for the County.   For instance, as recently as March 1, 2020, Tyler invoiced the County for "Standard Annual Maintenance" in the amount of $342,186.60 when, in fact, no maintenance work has or will be performed by Tyler because Tyler never delivered or operationalized Odyssey.

10

COMPLAINT OF PLAINTIFF COUNTY OF KERN AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

## FIRST CAUSE OF ACTION

### (Breach Of Contract)

31.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 30 above.

32.     The County has performed all obligations required under the Agreement and the Amendment, except those that it was prevented or excused from performing.

33.     Under the Agreement and Amendment, Tyler agreed, *inter alia*, Tyler agreed to install, implement, and service an integrated information system throughout the County's criminal justice divisions and to grant a license for the use of the same to the County.  Specifically, Tyler agreed to deliver an integrated, functional, and operational information system to the County's Sheriff's Office, Probation Department, Jail, District Attorney's office, and Public Defender's Office.

34.     As set forth in detail above, Tyler has breached the Agreement and Amendment by, *inter alia*, not delivering an integrated, functional, and operational information system to the County's criminal justice divisions.  Further, Tyler has admitted that it cannot deliver an integrated and operational information system using Odyssey.

35.     As a result of Tyler's breach of the Agreement and Amendment, the County has paid Tyler over $4.2 million for a non-integrated, non-operational, non-functional and unusable information system and lost over $9 million dollars of County employee time on the project.  The County has been forced to use its legacy system as the Odyssey system is not operational.   Tyler has caused the County injury and damages in an amount to be proven at trial.  Further, Tyler is liable to pay for the County's attorney's fees, costs and interest related to the prosecution of its claims.

## SECOND CAUSE OF ACTION

### (Fraud And Deceit – Intentional Misrepresentation)

36.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 35 above.

37.     Between November 28, 2016 and the present, Tyler repeatedly represented to the County that, *inter alia*, (1) Tyler would ultimately deliver Odyssey in an integrated, operational and useable form, (2) Tyler possessed the expertise, staff and skills necessary to deliver Odyssey in an integrated,

operational and useable form, (3) Tyler was on track to complete the installation and implementation of Odyssey, (4) Tyler was in the process of correcting, and had corrected, issues and problems experienced by the County with Odyssey's functionality and integration, and (5) Odyssey had the technical capacity and ability to accommodate the needs of the County's criminal justice divisions.

38.     The County relied on Tyler's representations in (1) allowing Tyler to continue to purportedly work on installing and implementing Odyssey, (2) paying Tyler's bills for work that did not support the implementation of Odyssey in an integrated, operational and useable form, (3) paying Tyler's bills for work that Tyler did not perform or complete, and (4) agreeing to increase the amount payable to Tyler for the project through a subsequent amendment to the Agreement.

39.     However, Tyler's representations were not truthful. In fact, Tyler knew that it would never be able to deliver Odyssey in an integrated, operational and useable form for the County's criminal justice divisions. At the time that it made the above-referenced representations to the County, Tyler did not, *inter alia*, (1) intend to install and complete the implementation of Odyssey in an integrated, operational and useable form, (2) possess the expertise, staff and skills necessary to deliver Odyssey in an integrated, operational and useable form, (3) intend to fix any issues and problems experienced by the County with Odyssey's functionality and integration, and (4) intend to perform in full under the Agreement and Amendment, and (5) operationalize Odyssey such that it had the technical capacity and ability to meet the needs of the County's criminal justice divisions.

40.     Tyler's misrepresentations and knowledge of their falsity are confirmed by Tyler's acquisition of CaseloadPRO and unilateral decision to replace Odyssey with CaseloadPRO for the Probation Department. Even though Tyler was negotiating the acquisition of CaseloadPRO for the specific purpose of replacing Odyssey with it and knew that it would abandon Odyssey at the County as soon as the acquisition was complete, Tyler continued to make the above-referenced misrepresentations to the County.

41.     Tyler made the above-referenced misrepresentations with the intent of inducing the County to, *inter alia*, (1) enter into the Amendment, (2) allow Tyler to continue to work and bill the County for work allegedly performed under the Agreement and the Amendment, (3) pay for work that was not essential to and did not support the delivery of Odyssey in an integrated, operational and useable

1  form, and (4) increase the value of the Agreement in favor of Tyler.

2       42.    Further, Tyler submitted (and continues to submit) invoices and demands for payment to

3  the County.  In so doing, Tyler falsely represented to the County that the invoices and demands were (1)

4  accurate and correct, (2) reflected services and work that was completed, and (3) reflected work that was

5  intended to result in the implementation of Odyssey.  None of these representations were true, and the

6  County relied on them to its detriment by paying over $4.2 million to Tyler and devoting over $9 million

7  worth of County employee time to the project.  Had the County known the actual and true facts

8  regarding the fraudulent requests for payment, it would not have made the payments to Tyler.

9       43.    The County is informed and believes, and thereon alleges, that Tyler committed the acts

10  averred above maliciously, fraudulently and oppressively, with the wrongful intention of injuring the

11  County and its constituents and benefitting Tyler's sole purposes.

12       44.    Accordingly, as a result of Tyler's intentional and fraudulent misrepresentations of

13  material facts, the County has been damaged in an amount according to proof at trial.  Further, Tyler is

14  liable to pay for the County's attorney's fees, costs and interest related to the prosecution of its claims.

15  Moreover, because Tyler acted maliciously, fraudulently and oppressively as those terms are defined in

16  Civil Code § 3294, the County is entitled to recover punitive damages from Tyler.

17  **THIRD CAUSE OF ACTION**

18  **(Fraud And Deceit – Concealment)**

19       45.    The County realleges and incorporates by reference each and every allegation set forth in

20  paragraphs 1 through 44 above.

21       46.    Between November 28, 2016 and the present, Tyler repeatedly represented to the County

22  that, *inter alia*, (1) Tyler would ultimately deliver Odyssey in an integrated, operational and useable

23  form, (2) Tyler possessed the expertise, staff and skills necessary to deliver Odyssey in an integrated,

24  operational and useable form, (3) Tyler was on track to complete the installation and implementation of

25  Odyssey, (4) Tyler was in the process of correcting, and had corrected, issues and problems experienced

26  by the County with Odyssey's functionality and integration, and (5) Odyssey had the technical capacity

27  and ability to meet the needs of the County's criminal justice divisions.

28       47.    However, Tyler's representations were not truthful.  In fact, Tyler knew that it would

13

never be able to deliver Odyssey in an integrated, operational and useable form for the County's criminal justice divisions. At the time that it made the above-referenced representations to the County, Tyler did not, *inter alia*, (1) intend to install and complete the implementation of Odyssey in an integrated, operational and useable form, (2) possess the expertise, staff and skills necessary to deliver Odyssey in an integrated, operational and useable form, (3) intend to fix any issues and problems experienced by the County with Odyssey's functionality and integration, (4) intend to perform in full under the Agreement and Amendment, and (5) operationalize Odyssey such that it had the technical capacity and ability to meet the needs of the County's criminal justice divisions.

48. Further, Tyler submitted (and continues to submit) invoices and demands for payment to the County. In so doing, Tyler represented to the County that the invoices and demands were (1) accurate and correct, (2) reflected services and work that was completed, and (3) reflected work that was intended to result in the implementation of Odyssey. None of these representations were true, and the County relied on them to its detriment by paying over $4.2 million to Tyler and devoting over $9 million worth of County employee time to the project.

49. Tyler never disclosed the falsehood of each of the above-referenced representations to the County. Instead, Tyler actively concealed the above-referenced falsehoods from the County with the intent of inducing the County to, *inter alia*, (1) enter into the Amendment, (2) allow Tyler to continue to work and bill the County for work allegedly performed under the Agreement and the Amendment, (3) pay for work that was not essential to and did not support the delivery of Odyssey in an integrated, operational and useable form, and (4) increase the value of the Agreement in favor of Tyler.

50. Tyler concealed the truth regarding the above-referenced falsehoods in spite of the fact that Tyler was negotiating the acquisition of CaseloadPRO for the specific purpose of replacing Odyssey with it and knew that it would abandon Odyssey at the County as soon as the acquisition was complete.

51. Had the County known the truth, it would not have entered into the Amendment, paid for work that was not completed or was not integral to the delivery of Odyssey in an integrated, operational and useable form, and would not have incurred the cost, expense and disruption caused by Tyler's failure to implement an integrated, operational and useable information technology system for the County's criminal justice divisions.

COMPLAINT OF PLAINTIFF COUNTY OF KERN AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

52.     The County is informed and believes, and thereon alleges, that Tyler committed the acts averred above maliciously, fraudulently and oppressively, with the wrongful intention of injuring the County and benefitting Tyler's sole purposes.

53.     Accordingly, as a result of Tyler's concealment of material facts, the County has been damaged in an amount according to proof at trial. Further, Tyler is liable to pay for the County's attorney's fees, costs and interest related to the prosecution of its claims. Moreover, because Tyler acted maliciously, fraudulently and oppressively as those terms are defined in Civil Code § 3294, the County is entitled to recover punitive damages from Tyler.

### FOURTH CAUSE OF ACTION

### (Violations of Bus. & Prof. Code § 17200, *et seq.*)

54.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 53 above.

55.     California Business and Professions Code § 17200 *et seq.* prohibits any unlawful, unfair or fraudulent business practice or act.

56.     The business practices alleged above demonstrate Tyler's pattern and practice of unlawful, unfair and fraudulent conduct in its business operations. In sum, Tyler induced the County to enter into and remain in the Agreement and Amendment by repeatedly misrepresenting, *inter alia*, its ability and intent to implement Odyssey in an integrated, operational and useable form at the County's criminal justice divisions. Tyler's scheme was predicated on deceit. Tyler knew that it could not deliver and integrate Odyssey as promised, yet Tyler repeatedly assured the County that it could. Tyler knew that there were rampant, unresolvable issues with Odyssey, yet Tyler manipulated the system to simulate temporary "fixes" without actually correcting any of the underlying issues with Odyssey. Tyler knew that it intended to abandon Odyssey for the Probation Department as soon as it acquired CaseloadPRO, yet Tyler continued to assure the County that Odyssey would be delivered as promised and continued to bill and receive payment from the County for work that Tyler knew would not result in the successful implementation and integration of Odyssey for the Probation Department.

57.     Tyler devised and implemented the scheme set forth herein for the sole purpose of increasing the amount of work and time that it would spend on the project, thereby artificially inflating

its billings and the value of the project for Tyler's sole benefit. The County has paid Tyler in excess of $4.2 million and devoted over $9 million in County employee time to the project as a result of Tyler's scheme. To date, however, Tyler has failed to implement an integrated, operational and useable information system for the County's criminal justice divisions, which has disrupted the County's operations and enriched Tyler at the expense of the County and its taxpayers.

58.     Further, the County is informed and believes, and thereon alleges, that Tyler has engaged in the same conduct with respect to other counties, municipalities and/or local governments seeking an integrated operating system for their criminal justice divisions.

59.     Tyler's conduct constitutes unlawful, unfair and fraudulent acts in violation of California Business and Professions Code § 17200, *et seq.*

60.     As a result, the County is entitled to restitution from Tyler and an order instructing Tyler to disgorge the ill-gotten gains resulting from its unlawful, unfair and fraudulent business practices. Further, the general public will garner a significant benefit from the prosecution of this action in that public funds have been expended as a result of the wrongful acts of Defendant. Accordingly, under California Code of Civil Procedure Section 1021.5, Defendant must reimburse the County for the attorneys' fees and costs expended in this matter.

## FIFTH CAUSE OF ACTION

### (Violation Of The California False Claims Act)

61.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 60 above.

62.     As alleged above, Tyler submitted numerous invoices and demands for payment to the County. In so doing, Tyler represented to the County that it had "completed" essential work supporting the implementation of an integrated, operational and useable information system for the County's criminal justice divisions.

63.     In submitting the invoices and demands for payment to the County, Tyler represented to the County that the invoices and demands were (1) accurate and correct, (2) reflected services and work that was completed, and (3) reflected work that was intended to result in the implementation of Odyssey.

64.     The County is informed and believes, and on that basis alleges, that invoices and

COMPLAINT OF PLAINTIFF COUNTY OF KERN AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

1    demands submitted by Tyler were (1) not accurate or correct, (2) reflected services and work that was

2    not completed, and (3) reflected work that was not intended to result in the implementation of

3    Odyssey. Further, the County is informed and believes, and on that basis alleges, that Tyler did not

4    complete essential work supporting the implementation of an integrated, operational and useable

5    information system for its criminal justice divisions.

6        65.    The above-referenced invoices and demands for payment constitute false claims for

7    payment under Government Code § 12651.

8        66.    The above-referenced invoices were presented by Tyler to the County with either actual

9    knowledge of their falsity or deliberate ignorance or reckless disregard of their falsity.

10       67.    The County, at the time the false and fraudulent demands for payment in the invoices

11   were made, was ignorant of the falsity of the representations and believed them to be true. In reliance

12   on the above-referenced representations, the County paid the invoices submitted by Tyler in an amount

13   in excess of $4.2 million. Had the County known the actual and true facts regarding the fraudulent

14   requests for payment, it would not have made said payments.

15       68.    Tyler's acts constitute a violation of Government Code § 12651 and warrant an award to

16   the County for treble damages in an amount according to proof and civil penalties up to the maximum

17   permitted under the California False Claims Act for each false claim. Further, Tyler is liable to pay for

18   the County's attorney's fees, costs and interest related to the prosecution of its claims.

19                                   **SIXTH CAUSE OF ACTION**

20                                          **(Negligence)**

21       69.    The County realleges and incorporates by reference each and every allegation set forth in

22   paragraphs 1 through 68 above.

23       70.    Tyler owed the County a duty to exercise the same level of skill, prudence and diligence

24   in implementing and operationalizing an integrated information system for a criminal justice system as

25   other members of its profession would have exercised under the circumstances.

26       71.    Tyler negligently failed to exercise reasonable care and skill in implementing and

27   operationalizing Odyssey for the County's criminal justice divisions.

28       72.    Tyler negligently conducted itself such that its actions resulted in harm and/or damage

                                                  17

1 | including, without limitation, the loss of data, the loss of credentials, and the loss of County employee
2 | resources and employee time due to Tyler's negligent acts.

3 |     73.    Tyler negligently hired, supervised and retained employees that caused harm and/or
4 | damage to the County, including, without limitation, the loss of data, the loss of credentials, and the loss
5 | of County employee resources and time due to Tyler's negligent acts.

6 |     74.    Tyler negligently marketed and sold Odyssey while advertising its skill and expertise
7 | implementing information systems at public entities in California without actually possessing the
8 | requisite skill and expertise to implement Odyssey.

9 |     75.    In so doing, Tyler breached the duty of care that it owed the County and the standard of
10 | care in the community.

11 |     76.    Accordingly, as a result of Tyler's negligence, the County has been damaged in an
12 | amount according to proof at trial. Moreover, because Tyler acted maliciously, fraudulently and
13 | oppressively as those terms are defined in Civil Code § 3294, the County is entitled to recover punitive
14 | damages from Tyler. Further, Tyler is liable to pay for the County's attorney's fees, costs and interest
15 | related to the prosecution of its claims.

16 | <center>**SEVENTH CAUSE OF ACTION**</center>

17 | <center>**(Declaratory Relief)**</center>

18 |     77.    The County realleges and incorporates by reference each and every allegation set forth in
19 | paragraphs 1 through 76 above.

20 |     78.    As set forth above, Tyler has not completed, and indeed cannot complete, the installation,
21 | implementation and delivery of an integrated information system for its criminal justice divisions in an
22 | operational or useable form. In essence, the County has expended an amount in excess of $4.2 million
23 | for a non-integrated, non-operational, non-functional and unusable information system.

24 |     79.    In spite of the County's demands for repayment of its considerable expenditure for a non-
25 | integrated, non-operational, non-functional and unusable information system, Tyler has refused to return
26 | the payments.

27 |     80.    Further, Tyler has demanded, and continues to demand, that it is entitled to additional
28 | payment from the County under the Agreement and Amendment. The County denies this claim.

81.     Therefore, an actual controversy and dispute has arisen between the County and Tyler concerning their respective rights under the terms and conditions of the Agreement and Amendment. A judicial declaration is necessary and desirable at this time so that the parties may know their respective rights, duties and obligations with respect to the amounts paid by the County to Tyler for a non-integrated, non-operational, non-functional and unusable information system and the County's demands for additional payment from the County under the Agreement.

82.     For the reasons set forth in this Complaint, the County is entitled to declaratory relief.

## **PRAYER FOR RELIEF**

WHEREFORE, the County prays for judgment against Tyler as follows:

1.     For compensatory damages, according to proof at trial;

2.     For consequential damages, according to proof at trial;

3.     For restitution, according to proof at trial;

4.     For a declaration of the rights and duties of the County and Tyler;

5.     For punitive damages;

6.     For treble damages;

7.     For imposition of civil penalties at the maximum permitted under the California False Claims Act for each false claim;

8.     For attorneys' fees under the Agreement and Amendment, according to proof;

9.     For attorneys' fees to the extent provided under the law, according to proof;

10.    For costs, according to proof;

11.    Interest at the legal rate; and

12.    All other relief as the Court may deem just and proper.

COMPLAINT OF PLAINTIFF COUNTY OF KERN AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

1   DATE: MAY 18, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOLEY & LARDNER LLP**
EILEEN R. RIDLEY
ALAN R. OUELLETTE
JAIME DORENBAUM

By: _____
EILEEN R. RIDLEY
Attorneys for Plaintiff
COUNTY OF KERN

MARGO A. RAISON, COUNTY COUNSEL
ANDREW C. THOMSON, CHIEF DEPUTY
Attorneys for Plaintiff
COUNTY OF KERN

COMPLAINT OF PLAINTIFF COUNTY OF KERN AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

## DEMAND FOR JURY TRIAL

The County demands a jury trial on all claims so triable and an advisory jury for a factual determination on all equitable claims.

DATE: MAY 18, 2020

FOLEY & LARDNER LLP
EILEEN R. RIDLEY
ALAN R. OUELLETTE
JAIME DORENBAUM

By: _____
EILEEN R. RIDLEY
Attorneys for Plaintiff
COUNTY OF KERN

MARGO A. RAISON, COUNTY COUNSEL
ANDREW C. THOMSON, CHIEF DEPUTY

Attorneys for Plaintiff
COUNTY OF KERN

COMPLAINT OF PLAINTIFF COUNTY OF KERN AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

# EXHIBIT A

REDACTED



Kern County
Agt. # *255-2015*

## Agreement

This Software License and Professional Services Agreement (this "Agreement") is made and entered into by and between Tyler Technologies, Inc., a Delaware corporation ("Tyler"), and __Kern County__ (the "Purchaser").

### Background

Purchaser desires to engage Tyler to license certain software and to provide certain professional services related thereto, all on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein, along with other good and valuable consideration, the receipt and sufficiency of which all parties mutually acknowledge, Tyler and Purchaser agree as follows:

A. Tyler shall furnish the products and services described in this Agreement, and Purchaser shall pay the prices set forth in this Agreement.

B. This Agreement consists of this cover and signature page and the following attachments and exhibits attached hereto and to be attached throughout the Term of this Agreement, all of which are incorporated by reference herein:

- Schedule 1. – Investment Summary
- Exhibit A. – Software License and Professional Services Agreement
- Exhibit B. – Software Maintenance Agreement
- Exhibit C. – Statement of Work

IN WITNESS WHEREOF, this Agreement has been executed by a duly authorized officer of each Party hereto to be effective as of the date last set forth below (the "Effective Date"):

**TYLER TECHNOLOGIES, INC.**

Signature: _____

Date: __27 APR 2015__

Name: __BRET DIXON__

Title: __C.O.O., CEJ__

Address: __5101 Tennyson Parkway__

__Plano, Texas__

**COUNTY OF KERN**                    DAVID COUCH

By: _____

Chairman, Kern County Board of Supervisors

Date: __MAY 0 5 2015__

**APPROVED AS TO FORM**

By: _____

Gurujodha S. Khalsa, Chief Deputy County Counsel

Date: __4/29/15__

**APPROVED AS TO CONTENT**

By: _____

Jeff Frapwell, Director of Kern County Information Technology Services

Date: __4/28/15__

REDACTED

# Schedule 1 – Investment Summary

## Software License

Odyssey Software Enterprise License of **$1,582,000** is payable based on the following schedule.

| Schedule | Amount |
|---|---|
| Invoicing upon Contract Execution | $316,400 |
| Invoicing upon Contract Execution plus 5 months | $316,400 |
| Invoicing upon Contract Execution plus 10 months | $316,400 |
| Invoicing upon Contract Execution plus 15 months | $316,400 |
| Invoicing upon Contract Execution plus 20 months | $316,400 |
| TOTAL | $1,582,000 |

The Software Enterprise License includes the following software components.

- Odyssey Jail Manager
    - Mugshots
    - Jail Data Export Enterprise
    - Inmate Account Direct Deposit (TouchPay – transaction based)
    - Biometric Identification (requires hardware)
    - LiveScan
    - VINES Interface
- Odyssey Supervision
- Odyssey Attorney Manager
- Odyssey Financial Manager
- All Document Management Features
    - Interactive Scanning
    - Batch Scanning/Workflow
    - Auto-Attach
    - eSignatures and Merge to .Tiff
- Integration Toolkit – Jail Libraries
- Enterprise Custom Reporting
- Odyssey Portal
- SessionSync
- DataXchange

In addition to the enterprise licenses detailed above, Tyler has included 50 seats of the Lead Barcode and Lead Document Imaging software.

## Annual Maintenance and Support

Annual Maintenance and Support (M&S) fees of **$332,220** are due annually in advance and will begin 18 months after contract execution.

## Professional Services and Deliverable Cost

There is a total of 20,204 hours of professional services included in this engagement inclusive of the allowance for establishing local customizations.  The total costs for all services to perform the work for the project shall not exceed **$3,417,010** inclusive of project expenses.  These costs are payable based on completion and acceptance of the following project deliverables.

REDACTED

| | Est. Due Date | Amount |
|---|---|---|
| | 5/29/2015 | $61,200 |
| | 6/5/2015 | $71,400 |
| | 9/11/2015 | $125,800 |
| | 7/31/2015 | $83,300 |
| | 9/18/2015 | $81,600 |
| | 10/9/2015 | $76,500 |
| | 4/12/2016 | $153,000 |
| | 10/9/2015 | $51,000 |
| | 4/12/2016 | $68,000 |
| | 9/18/2015 | $34,000 |
| | 9/11/2015 | $39,100 |
| | 10/23/2015 | $83,300 |
| | 11/6/2015 | $39,100 |
| | 11/20/2015 | $45,900 |
| | 12/4/2015 | $57,800 |
| | 10/30/2015 | $74,800 |
| | 1/1/2016 | $71,400 |
| | 2/19/2016 | $52,700 |
| | 6/24/2016 | $79,900 |
| | 7/8/2016 | $39,100 |
| | 7/22/2016 | $56,100 |
| | 9/30/2016 | $57,800 |
| | 10/18/2016 | $73,100 |
| | 9/11/2015 | $39,100 |

REDACTED

| | | |
|---|---|---|
| | 10/23/2015 | $83,300 |
| | 11/6/2015 | $39,100 |
| | 11/20/2015 | $45,900 |
| | 12/4/2015 | $57,800 |
| | 10/30/2015 | $74,800 |
| | 1/1/2016 | $71,400 |
| | 2/19/2016 | $52,700 |
| | 6/24/2016 | $79,900 |
| | 7/8/2016 | $39,100 |
| | 7/22/2016 | $56,100 |
| | 9/30/2016 | $57,800 |
| | 10/18/2016 | $73,100 |
| | 10/23/2015 | $39,100 |
| | 12/4/2015 | $68,000 |
| | 12/18/2015 | $39,100 |
| | 1/1/2016 | $54,400 |
| | 1/15/2016 | $57,800 |
| | 6/17/2016 | $81,600 |
| | 7/1/2016 | $52,700 |
| | 7/8/2016 | $56,100 |
| | 10/4/2016 | $57,800 |
| | 11/28/2016 | $51,858 |
| | 11/28/2016 | $512,552 |
| | | $3,417,010 |

Operational Use shall be deemed to have successfully completed when Purchaser has operated the Licensed Software for a period of thirty (30) consecutive calendar days without a Service Level 1 Defect or a Service Level 2 Defect.

a) If a Service Level 1 Defect or Service Level 2 Defect occurs during the initial thirty (30) day period, then the Purchaser's Project Manager shall promptly notify Software Provider's Project Manager in writing, and Software

Provider shall use all reasonable efforts to promptly cure such Defect. Upon Software Provider's cure of any such Defect, the thirty (30) day timetable shall begin again with respect to such function.

b) At the end of the initial or additional thirty (30) day period(s), as the case may be, each of the functions for which the Purchaser has not reported a Service Level 1 Defect or Service Level 2 Defect shall be deemed to have successfully passed Operational Use.  When each of the functions for which the Purchaser did report a Service Level 1 Defect or Service Level 2 Defect during the initial thirty (30) day period has performed for a period of thirty (30) consecutive days without a further Service Level 1 Defect or Service Level 2 Defect, that function shall also be deemed to have successfully passed Operational Use.

(Exhibit A)
## Software License and Professional Services Agreement

This Software License and Professional Services Agreement is made and entered into as of the Effective Date by and between Tyler and Purchaser.

WHEREAS, Purchaser desires to engage Tyler to license certain software and to provide certain professional services related thereto, all on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises contained herein, along with other good and valuable consideration, the receipt and sufficiency of which all parties mutually acknowledge, Tyler and Purchaser agree as follows:

1.  CERTAIN DEFINITIONS
    1.1.   Agreement means this Software License and Professional Services Agreement, including all exhibits attached hereto and to be attached throughout the Term of this Agreement, all of which are incorporated by reference herein.

    1.2.   Business Day means any day, Monday through Friday, excepting any federal holiday.

    1.3.   Claims mean any and all claims, liens, demands, damages, liability, actions, causes of action, losses, judgments, costs, and expenses, including reasonable attorneys' fees and expenses.

    1.4.   Current Production Software Version means the current production version of Tyler's software listed on the Investment Summary.

    1.5.   Defect means any bug, error, contaminate, malfunction, or other defect in the Licensed Software caused by, arising from, or emanating from the reasonable control of Tyler that renders the Licensed Software in non-conformance with Tyler's then current published specifications.

    1.6.   Documentation means the user's operating manuals and any other materials in any form or media provided by Tyler to the users of the Licensed Software.

    1.7.   Embedded Third Party Software means licensed third party software (other than Third Person Software) that is required to provide the functionality of the Licensed Software, which as of the date of this Agreement, consists of the software set forth on Schedule 1 labeled as "Embedded Third Party Software".

    1.8.   Escrow Agent means Iron Mountain Intellectual Property Management, Inc.

    1.9.   Escrow Agreement means the Master Escrow Service Agreement between Tyler and Escrow Agent.

    1.10.  Indemnified Parties mean Purchaser and each of County's internal agencies, subdivisions and departments, board members, elected and appointed officials and officers, employees, volunteers, successors, and permitted assigns.

    1.11.  Investment Summary means the summary of fees and services set forth on Schedule 1.

    1.12.  License Fee means the "Total License Fees" as set forth on the Investment Summary, which is due and payable as set forth in Section 3.1.

    1.13.  Licensed Property means the Licensed Software and the Documentation.

    1.14.  Licensed Software means: (a) the Current Production Software Version; (b) Embedded Third Party Software; and (c) any Local Enhancements.

    1.15.  Local Enhancements means any refinement, enhancement, or other customization to the Current Production Software Version to be developed by Tyler per the Investment Summary.

    1.16.  Maintenance and Support Fees has the meaning set forth in Exhibit B – Software Maintenance Agreement.
    1.17.  Party means, individually, Tyler and Purchaser.

    1.18.  Project means the delivery and license of the Licensed Property and the performance of all services to be provided by Tyler in accordance with the provisions of this Agreement.

    1.19.  Project Manager means the person designated by each Party who is responsible for the management of the Project.

    1.20.  Software Maintenance Agreement means the maintenance and support services agreement attached hereto as Exhibit B.

    1.21.  T&M means time and materials.

    1.22.  Third Person Hardware means the CPUs, servers, and other hardware to be leased, purchased, or otherwise acquired by Purchaser from a third party that is minimally required to operate the Licensed Software and such other CPUs, servers, and other hardware that Purchaser has actually leased, purchased or otherwise acquired and/or may be minimally required in the future to operate the Licensed Software.

    1.23.  Third Person Software means the operating systems and other software to be licensed, purchased, or otherwise acquired by Purchaser from a third party that is minimally required to operate the Licensed Software and such operating systems and other software that Purchaser has actually licensed, purchased, or otherwise acquired and/or may be minimally required in the future to operate the Licensed Software.

    1.24.  Confidential and Proprietary Information means all information in any form relating to, used in, or arising out of a party's operations and held by, owned, licensed, or otherwise possessed by a party (whether held by, owned, licensed, possessed, or otherwise existing in, on or about that party's premises or Purchaser's offices, residence(s), or facilities and regardless of how such information came into being, as well as regardless of who created, generated or gathered the information), including, without limitation, all information contained in, embodied in (in any media whatsoever) or relating to inventions, ideas, creations, works of authorship, business documents, licenses, correspondence, operations, manuals, performance manuals, operating data, projections, bulletins, customer lists and data, sales data, cost data, profit data, financial statements, strategic planning data, financial planning data, designs, logos, proposed trademarks or service marks, test results, product or service literature, product or service concepts, process data, specification data, know how, software, databases, database layouts, design documents, release notes, algorithms, source code, screen shots, and other research and development information and data. Notwithstanding the foregoing, Confidential and Proprietary Information does not include information that: (a) becomes public other than as a result of a disclosure in breach hereof; (b) becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party, which is not prohibited from disclosing such information; (c) is known by the Receiving Party prior to its receipt from the Disclosing Party without any obligation of confidentiality with respect thereto; or (d) is developed by the Receiving Party independently of any disclosures made by the Disclosing Party.

2.  TITLE AND LICENSE
    2.1.   License Grant. In consideration for the License Fee, which shall be due and payable as set forth in Section 3, Tyler hereby grants to Purchaser a non-exclusive, royalty-free, revocable license (and sublicense with respect to the Embedded Third Party Software) to use the Licensed Property for Purchaser's internal administration, operation, and/or conduct of Purchaser's business operations by an unlimited number of users employed by Purchaser on an unlimited number of computers and/or computer stations utilized by Purchaser.  Upon Purchaser's payment of the License Fee in full, the foregoing licenses shall become irrevocable, subject to the restrictions on use set forth herein.

    2.2.   Restrictions. Unless otherwise expressly set forth in this Agreement, Purchaser shall not (a) reverse engineer, de-compile, or disassemble any portion of the Licensed Software or (b) sublicense, transfer, rent, or lease the Licensed Software or its usage.  To the extent Purchaser employs contractors, subcontractors, or other third parties to assist in the Project, Purchaser shall obtain from such third parties an

executed Tyler confidentiality agreement prior to such parties being permitted access to Tyler Confidential and Proprietary Information.

2.3.   Copies.   Purchaser may make and maintain such copies of the Licensed Property as are reasonably appropriate for its use and for archival and backup purposes; provided, however, that Purchaser shall retain all proprietary notices, logos, copyright notices, and similar markings on such copies.

2.4.   Embedded Third Party Software.   The license grant set forth in Section 2.1 includes the right to use any Embedded Third Party Software; provided, however, that such access to and use of such Embedded Third Party Software shall be according to such terms, conditions, and licenses as are imposed by the manufacturers and/or third party licensors of such Embedded Third Party Software.  All such Embedded Third Party Software shall be included in the License fee.  Tyler shall pass through to Purchaser any and all warranties granted to Tyler by the owners, licensors, and/or distributors of such Embedded Third Party Software.  Purchaser shall be responsible for procuring and paying for all Third Person Software.

2.5.   Title.

(a)   Tyler represents and warrants that it is the owner of all right, title, and interest in and to the Licensed Software (other than Embedded Third Party Software) and all components and copies thereof. Nothing in this Agreement shall be deemed to vest in Purchaser any ownership or intellectual property rights in and to Tyler's intellectual property (including, without limitation, Tyler Confidential and Proprietary Information), any components and copies thereof, or any derivative works based thereon prepared by Tyler.

(b)   All training materials developed solely by either Party shall be the sole property of such Party.  Any training materials developed jointly by the Parties shall be owned jointly by the Parties, and each Party shall be entitled to exercise all rights of ownership of such materials without any duty to account to the other, subject to Section 9.

(c)   All Purchaser data shall remain the property of Purchaser. Tyler shall not use Purchaser data other than in connection with providing the services pursuant to this Agreement.

2.6.   Purchaser Modifications.   Tyler shall have no liability pursuant to this Agreement or the Software Maintenance Agreement for any damages or defects to the Licensed Software caused, directly or indirectly, by Purchaser Modifications or other changes to the Licensed Software that are implemented without the prior written consent of Tyler.

3.   FEES AND INVOICING
3.1.   License Fee.   Purchaser shall pay to Tyler the License Fee in accordance with Schedule 1. Tyler shall invoice Purchaser upon each Payment Event, which shall be paid in accordance with Section 3.4.

3.2.   Professional Services Charges.   T&M charges for all professional services to be performed hereunder shall be invoiced and paid by Purchaser in accordance with Section 3.4.

3.3.   Expenses.   All expenses incurred by Tyler for this project are included in the project pricing outlined in Schedule 1.

3.4.   Invoicing.   Tyler shall invoice Purchaser Professional Services pursuant to the milestone schedule in Schedule 1. Each invoice shall state the total invoiced amount and shall be accompanied by a reasonably detailed description of the project milestone deliverables included in that invoice.

3.5 Payment Following receipt of a properly submitted invoice, Purchaser shall pay amounts owing therein not more than sixty (60) days thereafter. All payments shall be made in U.S. currency

3.6.Electronic Payment. Tyler prefers to receive payments electronically.

4.   PROJECT IMPLEMENTATION
4.1.   Professional Services.   Attached hereto as Schedule 1 is Tyler's fees associated with the services to be performed by Tyler for Purchaser in accordance with the Statement of Work attached hereto and incorporated herein by this reference, inclusive of travel time by Tyler's personnel from Tyler's place of business to and from Purchaser's place of business. Additional services requested by Purchaser beyond those detailed in Schedule

1 will be negotiated and incorporated as an amendment to this agreement.

4.2.   Office Space.   Purchaser shall, at its sole expense, provide reasonable access to office space, telephone access, network access (including providing Tyler reasonable access to a secure virtual private network connection or other comparable connection for use by Tyler from time to time on a non-dedicated basis), Internet connections, and such other facilities as may be reasonably requested by Tyler for use by Tyler personnel for the purpose of performing this Agreement while such personnel are working on-site and engaged in Project-related services.

4.3.   Third Person Hardware and Third Person Software.   Purchaser shall be responsible to purchase, install, and configure all Third Person Hardware and Third Person Software.  Tyler shall have no liability for defects in the Third Person Hardware or Third Person Software.

4.4.   Cooperation.   Purchaser acknowledges that the implementation of the Project is a cooperative process requiring the time and resources of Purchaser personnel. Purchaser shall, and shall cause its personnel to, use all reasonable efforts to cooperate with and assist Tyler as may be reasonably required to timely implement the Project, including, without limitation, providing reasonable information regarding its operations and reasonable access to its facilities.  Tyler shall not be liable for failure to timely implement the Project when such failure is due to Force Majeure (as identified in Section 16.15) or to the failure by Purchaser personnel to provide such cooperation and assistance (either through action or omission).

5.   DELIVERY AND INSTALLATION OF THE LICENSED SOFTWARE
5.1.   Delivery; Risk of Loss.   Tyler shall deliver the Licensed Software to Purchaser's place of business.  Risk of loss of the Licensed Software, and media on which such may be delivered, shall remain with Tyler at all times until completed delivery.

5.2.   Installation; Diagnostic Testing.   Tyler shall install the Licensed Software at Purchaser's place of business.  Upon installation, Tyler shall conduct its standard diagnostic evaluation to determine that the Licensed Software is properly installed and shall notify the Purchaser's Project Manager in writing after successful completion thereof.

6.   VERIFICATION OF THE LICENSED SOFTWARE; FINAL ACCEPTANCE
6.1.   Verification Procedure.   Upon installation of the Licensed Software, Tyler shall perform its standard test procedures and shall certify to Purchaser that the Licensed Software is in substantial conformance with Tyler's then current published specifications (the "Verification Procedure") and is ready to commence Operational Use.

6.2.   Optional Purchaser Validation.   Purchaser may, in its sole and absolute discretion, monitor the Verification Procedure by performing its own defined internal validation process to test the software to determine if it substantially complies with Tyler's then current published specifications. Such validation test shall constitute Purchaser's validation.

6.3.   Results Final; Correction.   Tyler's verification or Purchaser's validation that the Licensed Software substantially complies with the then current published specifications shall be final and conclusive except for latent defect, fraud, and such gross mistakes that amount to fraud. In the event said verification / validation becomes other than final, Purchaser's sole right and remedy against Tyler shall be to require Tyler to correct the cause thereof.  If Purchaser has made modifications to the software programs, Tyler will not make such corrections, unless such modifications were specifically authorized in writing by Tyler.

6.4.   Operational Use.   Notwithstanding anything to the contrary herein, Purchaser's use of the Licensed Software for its intended purpose ("Operational Use") shall constitute Tyler's verification or Purchaser's validation of the software products, without exception and for all purposes.

6.5.   Final Acceptance.   When the Licensed Software is ready to commence Operational Use, Purchaser shall be deemed to have "Final Acceptance" of the Licensed Software and the Licensed Software shall be subject to the terms and conditions of the Software Maintenance Agreement for purposes of Defect correction thereafter.

7.   TRAINING

Training shall be provided according to the tasks and activities included in Exhibit C – Statement of Work.

## 8.   MAINTENANCE SERVICES

8.1.   Maintenance and Support Agreement.  Upon the Effective Date, Tyler shall provide Purchaser with maintenance and support services for the Licensed Software. Tyler hereby waives Maintenance and Support Fees for the eighteen (18) month period commencing on the Effective Date, at which time Client shall make payment of a prorated amount through the end of the then-current annual maintenance and support term.

8.2.   Responsibilities of Purchaser.  In addition to the other responsibilities set forth herein, Purchaser shall: (a) provide all training of its personnel beyond the scope of training detailed in Exhibit C (b) collect, prepare, and enter all data necessary for the day-to- day operations of the Licensed Software; (c) retain separate copies of all conversion data delivered to Tyler; (d) provide the computer system on which the Licensed Software will be loaded and operated; (e) provide the requisite networks; (f) maintain an internal help desk function; (g) prior to Project completion, install all changes or updates into the Licensed Software and Third Person Software products that are furnished by Tyler for the purpose of correcting failures of the Licensed Software to conform to, and perform in accordance with, the requirements of this Agreement; and (h) maintain, as part of Purchaser's computer system, a secure Microsoft VPN connection for use by Tyler.

## 9.   TYLER CONFIDENTIAL AND PROPRIETARY INFORMATION

9.1.   Protection of Tyler Confidential and Proprietary Information. Purchaser shall not disclose, disseminate, transmit, publish, distribute, make available, or otherwise convey Tyler Confidential and Proprietary Information, and Purchaser shall not use, make, sell, or otherwise exploit any such Tyler Confidential and Proprietary Information for any purpose other than the performance of this Agreement, without Tyler's written consent, except: (a) as may be required by law, regulation, judicial, or administrative process; or (b) as required in litigation pertaining to the Agreement, provided that Tyler is given advance notice of such intended disclosure in order to permit it the opportunity to seek a protective order. Purchaser shall ensure that all individuals assigned to perform services herein shall abide by the terms of this Section 9.1 and shall be responsible for breaches by such persons.

9.2.   Judicial Proceedings.  If Purchaser is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand, or other similar process) to disclose any Tyler Confidential and Proprietary Information, Purchaser shall provide Tyler with prompt written notice of such request or requirement so that Tyler may seek protective orders or other appropriate remedies and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by Tyler, Purchaser nonetheless is legally compelled to disclose Tyler Confidential and Proprietary Information to any court or tribunal or else would stand liable for contempt or suffer other censure or penalty, Purchaser may, without liability herein, disclose to such court or tribunal only that portion of Tyler Confidential and Proprietary Information which the court requires to be disclosed, provided that Purchaser uses reasonable efforts to preserve the confidentiality of Tyler Confidential and Proprietary Information, including, without limitation, by cooperating with Tyler to obtain an appropriate protective order or other reliable assurance that confidential treatment shall be accorded Tyler Confidential and Proprietary Information by such court or tribunal.

## 10.   ESCROW

Tyler maintains an Escrow Agreement with an Escrow Agent under which Tyler places the source code of each major release. At Purchaser's request, Tyler will add Purchaser as a beneficiary on its Escrow Agreement upon payment in full of the License Fee. Purchaser will be invoiced the annual beneficiary fee by Tyler and is solely responsible for maintaining its status as a beneficiary. Release of the escrowed material shall be governed by the terms of the Escrow Agreement and the use thereof shall be restricted by Sections 2.2 and 10 of this Agreement.

## 11.   REPRESENTATIONS AND WARRANTIES

11.1.   Project Personnel.  All Tyler personnel utilized in connection with fulfilling its obligations pursuant to or arising from this Agreement shall be employees of Tyler or, if applicable, Tyler's subcontractor(s), shall be qualified to perform the tasks assigned them, and shall be in compliance with all applicable laws relating to employees generally, including, without limitation,

immigration laws.

11.2.   Media Defects.  The media on which the Licensed Software is provided shall, at the time of delivery and installation, be free of Defects in material and workmanship.

11.3.   Pass-Through of Warranties.  Tyler hereby passes through the benefits of all third party warranties that it receives in connection with any product provided to Purchaser.

11.4.   No Actions, Suits, or Proceedings.  There are no actions, suits, or proceedings, pending or, to the knowledge of Tyler, threatened, that shall have a material adverse effect on Tyler's ability to fulfill its obligations pursuant to or arising from this Agreement.

11.5.   Compliance with Laws.  In performing this Agreement, Tyler shall comply with all applicable material licenses, legal certifications, or inspections. Tyler shall also comply in all material respects with applicable federal, state, and local statutes, laws, ordinances, rules, and regulations.

11.6.   Ownership.  Tyler is a Delaware corporation that is listed for trading on the New York Stock Exchange.  No director, officer, or 5% or more stockholder shall, during the course of this Agreement, receive or confer improper personal benefits or gains associated with the performance of the services outlined in this Agreement.

11.7.   Certain Business Practices.  Neither Tyler nor any of its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in this Agreement by any federal department or agency.  Tyler further represents and warrants that it is not listed on any local, Purchaser, state or federal consolidated list of debarred, suspended, and ineligible contractors and grantees.  No person (other than permanent employees of Tyler) has been engaged or retained by Tyler to solicit, procure, receive, accept, arrange, or secure this Agreement for any compensation, consideration, or value.

11.8.   Illicit Code.  The Licensed Software, when delivered and installed by Tyler, does not contain, and Tyler has not knowingly introduced through any media, any virus, worm, trap door, back door, bomb, bug, or other contaminant or disabling device, including, without limitation, any timer, clock, counter or other limiting routines, codes, commands, or instructions that may have the effect or be used to access, alter, delete, limit, control, damage, or disable any Purchaser property.

EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION 11 OR ELSEWHERE IN THIS AGREEMENT, TYLER DISCLAIMS ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 12.   LIMITATION OF LIABILITY

TYLER'S LIABILITY TO PURCHASER FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER BASED ON A THEORY OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, SHALL BE LIMITED TO: (A) PRIOR TO OPERATIONAL USE, THE LICENSE FEES PAID BY PURCHASER; AND (B) AFTER OPERATIONAL USE, TYLER'S OBLIGATIONS AS SET FORTH IN THE TERMS AND CONDITIONS OF THE SOFTWARE MAINTENANCE AGREEMENT.  THE FOREGOING LIMITATIONS DO NOT APPLY TO THE FOLLOWING CIRCUMSTANCES: (1) FRAUD; OR (2) FOR BREACH OF SECTION 13.1 (CLAIMS FOR BODILY INJURY OR PROPERTY DAMAGE) OR SECTION 13.2 (INTELLECTUAL PROPERTY INFRINGEMENT).

IN NO EVENT SHALL TYLER BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOST REVENUES OR PROFITS, OR LOSS OF BUSINESS OR LOSS OF DATA ARISING OUT OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER THE PARTIES HAVE ADVANCE NOTICE OF THE POSSIBILITY OF SUCH DAMAGE.

## 13.   INTELLECTUAL PROPERTY

(a)   Notwithstanding any other provision of this Agreement, if any claim is asserted, or action or proceeding brought against Purchaser that alleges that all or any part of the Licensed Software, in the form supplied, or

modified by Tyler, or Purchaser's use thereof, infringes or misappropriates any United States intellectual property, intangible asset, or other proprietary right, title, or interest (including, without limitation, any copyright or patent or any trade secret right, title, or interest), or violates any other contract, license, grant, or other proprietary right of any third party, Purchaser, upon its awareness, shall give Tyler prompt written notice thereof. Tyler shall defend, and hold Purchaser harmless against, any such claim or action with counsel of Tyler's choice and at Tyler's expense and shall indemnify Purchaser against any liability, damages, and costs resulting from such claim. Without waiving any rights pursuant to sovereign immunity, Purchaser shall cooperate with and may monitor Tyler in the defense of any claim, action, or proceeding and shall, if appropriate, make employees available as Tyler may reasonably request with regard to such defense. This indemnity does not apply to the extent that such a claim is attributable to modifications to the Licensed Software made by Purchaser, or any third party pursuant to Purchaser's directions, or upon the unauthorized use of the Licensed Software by Purchaser.

(b)     If the Licensed Software becomes the subject of a claim of infringement or misappropriation of a copyright, patent, or trade secret or the violation of any other contractual or proprietary right of any third party, Tyler shall, at its sole cost and expense, select and provide one of the following remedies, which selection shall be in Tyler's sole discretion: (i) promptly replace the Licensed Software with a compatible, functionally equivalent, non-infringing system; or (ii) promptly modify the Licensed Software to make it non-infringing; or (iii) promptly procure the right of Purchaser to use the Licensed Software as intended.

## 14. TAXES

14.1. Tax Exempt Status. Purchaser is a governmental tax-exempt entity and shall not be responsible for any taxes for any Licensed Property or services provided for herein, whether federal or state. The fees paid to Tyler pursuant to this Agreement are inclusive of any applicable sales, use, personal property, or other taxes attributable to periods on or after the Effective Date of this Agreement.

14.2. Employee Tax Obligations. Each Party accepts full and exclusive liability for the payment of any and all contributions or taxes for Social Security, Workers' Compensation Insurance, Unemployment Insurance, or Retirement Benefits, Pensions, or annuities now or hereafter imposed pursuant to or arising from any state or federal laws which are measured by the wages, salaries, or other remuneration pay to persons employed by such Party for work performed under this Agreement.

## 15. TERM, SUSPENSION, AND TERMINATION

15.1. Term. The term of this Agreement (the "Term") shall commence on the Effective Date and shall continue until terminated as provided herein.

15.2. Termination for Cause. Either Party may terminate this Agreement for Cause, provided that such Party follows the procedures set forth in this Section 15.2.

(a) For purposes of this Section, "Cause" means either:

(i)     a material breach of this Agreement, which has not been cured within ninety (90) days of the date such Party receives written notice of such breach;

(ii)     the failure by Purchaser to timely pay when due any fees and expenses owed to Tyler pursuant to this Agreement and any delinquent amounts remain outstanding for a period of thirty (30) days after Tyler provides written notice of its intent to terminate for failure to pay;

(iii)     breach of Section 9; or

(iv)     if Tyler becomes insolvent or bankrupt, or is the subject of any proceedings relating to its liquidation or insolvency or for the appointment of a receiver or similar officer for it, has a receiver of its assets or property appointed or makes an
assignment for the benefit of all or substantially all of its creditors, or institutes or causes to be instituted any proceeding in bankruptcy or reorganization or rearrangement of its affairs.

(b)     No Party may terminate this Agreement under Section

15.2(a)(i) unless it cooperates in good faith with the alleged breaching Party during the cure period and complies in good faith with the dispute resolution procedures set forth in Section 17 following such period.

(c)     In the event either Party terminates this Agreement pursuant to this Section 16.2, each Party shall return all products, documentation, confidential information, and other information disclosed or otherwise delivered to the other Party prior to such termination and all revocable licenses granted herein shall terminate.

d. County and Tyler agree that this Agreement shall be immediately terminable if it is found that Tyler has engaged in any conduct related to securing or negotiating this Agreement that would be considered to create a conflict of interest with any agent, employee, officer, director or other representative of the County who was involved with decision making in any way relating to this Agreement.

15.3 Termination Without Cause. Either party may terminate this Agreement, without cause, upon sixty (60) days' prior written notice to the other party. Should the County terminate the contract without cause the County must pay for all outstanding license fees and all services that have been rendered. For all partially completed deliverable the County shall pay the percentage of that deliverable amount that has been completed.

a. Should notice be given by either party, both parties agree during said  sixty (60) day period each will continue to perform its obligations, including, but not limited to, providing Maintenance and Support Services, under this Agreement. Upon termination of this Agreement, neither party shall have any obligations or responsibilities to the other party beyond the effective date of its termination.

15.4     Termination for Lack of Appropriation. If Client should not appropriate or otherwise make available funds sufficient to purchase, lease, operate or maintain the products set forth in this Agreement, or other means of performing the same functions of such products, Client may unilaterally terminate this Agreement only upon thirty (30) days written notice to Tyler. Upon termination, Client shall remit payment for all products and services delivered to Client and all expenses incurred by Tyler prior to Tyler's receipt of the termination notice. Client will not be entitled to a refund or offset of previously paid license and other fees.

15.5     Survival. The following provisions shall survive after the Term of this Agreement: 1; 2; 9; 10; 12; 13; 14; 16; 17; and 19, 22, 24.

## 16. DISPUTE RESOLUTION

The parties agree to use good faith, reasonable efforts to meet, discuss, and try to resolve any disputes arising out of, or relating to, this Agreement for a period of sixty (60) days. The parties shall include in any such informal meetings persons with appropriate knowledge and authority, including, without limitation, Purchaser's Information Technology Manager and Tyler's Support Manager. Any negotiations pursuant to this Section 16 are confidential and shall be treated as compromise and settlement negotiations for purposes of the applicable rules of evidence. For any dispute that the Parties are unable to resolve through informal discussions or negotiations, the Parties shall have the right to pursue any remedies at law.

## 17. MISCELLANEOUS

17.1. Assignment. Neither Party may assign this Agreement or any of its respective rights or obligations herein to any third party without the express written consent of the other Party, which consent shall not be unreasonably withheld.

17.2. Subcontractors. Tyler shall not utilize any subcontractor(s) without the prior written consent of Purchaser's Project Manager, which consent shall not be unreasonably withheld. The approval by Purchaser of Tyler's right to use subcontractor(s) shall not waive or relieve Tyler from its obligations pursuant to this Agreement.

17.3. Cumulative Remedies. Except as specifically provided herein, no remedy made available herein is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy provided herein or available at law or in equity.

17.4. <u>Notices</u>. Except as otherwise expressly specified herein, all notices, requests or other communications shall be in writing and shall be deemed to have been given if delivered personally or mailed, by certified or registered mail, postage prepaid, return receipt requested, to the Parties at their respective addresses set forth on the signature page hereto, or at such other addresses as may be specified in writing by either of the Parties. All notices, requests, or communications shall be deemed effective upon personal delivery or seven (7) days following deposit in the mail.

17.6. <u>Waiver</u>. The performance of any obligation required of a Party herein may be waived only by a written waiver signed by the other Party, which waiver shall be effective only with respect to the specific obligation described therein.

17.10. <u>Relationship of Parties</u>. The Parties intend that the relationship between the Parties created pursuant to or arising from this Agreement is that of an independent contractor only. Neither Party shall be considered an agent, representative, or employee of the other Party for any purpose.

17.11. <u>Governing Law</u>. Any dispute arising out of or relating to this Agreement or the breach thereof shall be governed by the laws of the state of the domicile of Purchaser, without regard to or application of choice of law rules or principles.

17.14. <u>Contra Proferentem</u>. The doctrine of *contra proferentem* shall not apply to this Agreement. If an ambiguity exists in this Agreement, or in a specific provision, neither the Agreement nor the provision shall be construed against the Party who drafted the Agreement or provision.

17.15. <u>Force Majeure</u>. No Party to this Agreement shall be liable for delay or failure in the performance of its contractual obligations arising from any one or more events that are beyond its reasonable control, including, without limitation, acts of God, war, terrorism, and riot. Upon such delay or failure affecting one Party, that Party shall notify the other Party and use all reasonable efforts to cure or alleviate the cause of such delay or failure with a view to resuming performance of its contractual obligations as soon as practicable. Notwithstanding the foregoing, in every case the delay or failure to perform must be beyond the control and without the fault or negligence of the Party claiming excusable delay. Any performance times pursuant to or arising from this Agreement shall be considered extended for a period of time equivalent to the time lost because of any delay that is excusable herein, provided, however, that if a Force Majeure Event continues for a period of six (6) months, this Agreement may be terminated pursuant to Section 16.3.

17.16. <u>Equitable Relief</u>. Each Party covenants, represents, and warrants that any violation of this Agreement by such Party with respect to its respective obligations set forth in Sections 2.2 and 9 shall cause irreparable injury to the other Party and shall entitle the other Party to extraordinary and equitable relief by a court of competent jurisdiction, including, without limitation, temporary restraining orders and preliminary and permanent injunctions, without the necessity of posting bond or security.

17.17. <u>Attorneys ' Fees and Costs</u>. If attorneys' fees or other costs are incurred by either Party to secure the performance of any obligations under this Agreement, or to establish damages for the breach thereof or to obtain any other appropriate relief, whether by way of prosecution or defense, the prevailing Party shall be entitled to recover from the other Party its reasonable attorneys' fees and costs incurred in connection therewith.

## 18. INSURANCE

Tyler, in order to protect County and its board members, officials, agents, officers, and employees against claims and liability for bodily injury (including death)and loss and damage to property as a result of Tyler's negligent actions or willful misconduct in connection with the performance of Tyler's obligations, as required in this Agreement, shall secure and maintain insurance as described below. Tyler shall not perform any work under this Agreement until Tyler has obtained all insurance required under this section and the required certificates of insurance and all required endorsements have been filed with the County's authorized insurance representative, Insurance Tracking Services Inc. (ITS). Receipt of evidence of insurance that does not comply with all applicable insurance requirements shall not constitute a waiver of the insurance requirements set forth herein. The required documents must be signed by the authorized representative who is able to bind coverage. Upon

request, Tyler shall supply proof that such person is an authorized representative thereof, and is authorized to bind the named underwriter(s) and their company to the coverage, limits and termination provisions shown thereon. Tyler shall promptly deliver a certificate of insurance, and all required endorsements, with respect to each renewal policy, as necessary to demonstrate the maintenance of the required insurance coverage for the term specified herein. Such certificates and endorsements shall be delivered t within 10 days after any renewal of a policy required hereby. Tyler shall be responsible for any deductibles and self-insured retentions under all required insurance policies.

a.      Workers' Compensation and Employers Liability Insurance Requirement -- In the event Tyler has employees who may perform any services pursuant to this Agreement, Tyler shall submit written proof that Tyler is insured against liability for workers' compensation in accordance with the provisions of section 3700 of the California Labor Code.

Tyler shall require any sub-contractors to provide workers' compensation for all of the subcontractors' employees, unless the sub-contractors' employees are covered by the insurance afforded by Tyler. If any class of employees engaged in work or services performed under this Agreement is not covered by California Labor Code section 3700, Tyler shall provide and/or require each sub-contractor to provide adequate insurance for the coverage of employees not otherwise covered.

Tyler shall also maintain employer's liability insurance with limits of one million dollars ($1,000,000) for bodily injury or disease.

b.      Liability Insurance Requirements:

(1)      Tyler shall maintain in full force and effect, at all times during the term of this Agreement, the following insurance:

(a)      Commercial General Liability Insurance including, but not limited to, Personal Injury (including bodily injury and death), and Property Damage for liability arising out of Tyler's performance of work under this Agreement. The Commercial General Liability insurance shall contain no exclusions or limitation for independent contractors working on the behalf of the named insured. The amount of said insurance coverage required by this Agreement shall be the policy limits, which shall be at least one million dollars ($1,000,000) each occurrence and two million dollars ($2,000,000) aggregate.

(b)      Automobile Liability Insurance against claims of Personal Injury (including bodily injury and death) and Property Damage covering any vehicle and/or all owned, leased, hired and non-owned vehicles used in the performance of services pursuant to this Agreement with coverage equal to the policy limits, which shall be at least one million dollars ($1,000,000) each occurrence.

(2)      The Commercial General Liability and Automobile liability insurance required in this sub-paragraph b. shall include an endorsement naming the County and County's board members, officials, officers, and employees as additional insureds for liability arising out of this Agreement and any operations related thereto.

(3)      Any self-insured retentions in excess of $100,000 must be declared to County upon request and must be approved by the County Risk Manager prior to the Effective Date.

(4)      If any of the insurance coverages required under this Agreement is written on a claims-made basis, Tyler, at Tyler's option, shall either (i) maintain said coverage for at least three (3) years following the termination of this Agreement with coverage extending back to the effective date of this Agreement; (ii) purchase an extended reporting period of not less than three (3) years following the termination of this Agreement; or (iii) acquire a full prior acts provision on any renewal or replacement policy.

c.      Cancellation of Insurance -- The above stated insurance coverages required to be maintained by Tyler shall be maintained until the completion of

all of Tyler's obligations under this Agreement except as otherwise indicated herein. Each insurance policy supplied by Tyler shall not be suspended, voided, cancelled or reduced in coverage or in limits below the minimum required herein except after ten (10) days written notice by Tyler in the case of non-payment of premiums, or thirty (30) days written notice in all other cases. This notice requirement does not waive the insurance requirements stated herein. Tyler shall immediately obtain replacement coverage for any insurance policy that is terminated, canceled, non-renewed, or whose policy limits have been exhausted or upon insolvency of the insurer that issued the policy.

d.       All insurance shall be issued by a company or companies admitted to do business in California and listed in the current "Best's Key Rating Guide" publication with a minimum rating of A-; VII. Any exception to these requirements must be approved by the County Risk Manager.

e.       If Tyler is, or becomes during the term of this Agreement, self-insured or a member of a self-insurance pool, Tyler shall provide coverage equivalent to the insurance coverages and endorsements required above. The County will not accept such coverage unless the County determines, in its sole discretion and by written acceptance, that the coverage proposed to be provided by Tyler is equivalent to the above-required coverages.

f.       All insurance afforded by Tyler pursuant to this Agreement shall be primary as between Tyler and the County for claims which Tyler is liable and not contributing to all insurance or self-insurance maintained by the County. All policies, except professional liability/errors and omissions and workers compensation shall include a waiver of any right of recovery (waiver of subrogation) against the County.

g.       Insurance coverages in the minimum amounts set forth herein shall not be construed to relieve Tyler for any liability, whether within, outside, or in excess of such coverage, and regardless of solvency or insolvency of the insurer that issues the coverage; nor shall it preclude the County from taking such other actions as are available to it under any other provision of this Agreement or otherwise in law.

h.       Failure by Tyler to maintain all such insurance in effect at all times required by this Agreement shall be a material breach of this Agreement by Tyler.

## 19. INDEMNIFICATION

Tyler agrees to indemnify, defend and hold harmless County and County's agents, board members, elected and appointed officials and officers, employees, volunteers and authorized representatives from any and all losses, liabilities, charges, damages, claims, liens, causes of action, awards, judgments, costs, and expenses (including, but not limited to, reasonable attorneys' fees of County Counsel and counsel retained by County, expert fees, costs of staff time, and investigation costs) of whatever kind or nature, which arise out of or are in any way connected with any negligent act or omission or the willful of Tyler or Tyler's officers, agents, employees, independent contractors, sub-contractors of any tier, or authorized representatives. Without limiting the generality of the foregoing, the same shall include bodily and personal injury or death to any person or persons; damage to any property, regardless of where located, including the property of County; and any workers' compensation claim or suit arising from or connected with any services performed pursuant to this Agreement on behalf of Tyler by any person or entity.

## 20. AUDIT, INSPECTION, AND RETENTION OF RECORDS .

Tyler agrees to maintain and make available to County accurate books and financial records relative to all its activities under this Agreement. Tyler shall permit County to audit, examine and make excerpts and transcripts from such records, and to conduct audits of all invoices, materials, time or expenditure records of personnel or other data related to all other matters covered by this Agreement. Tyler shall maintain such data and records in an accessible location and condition for a period of not less than three (3) years from the date of final payment under this Agreement, or until after the conclusion of any audit, whichever occurs last. The State of California and/or any federal agency having an interest in the subject of this Agreement shall have the same rights conferred upon County herein.

## 21. AUTHORITY TO BIND COUNTY

It is understood that Tyler, in Tyler's performance of any and all duties under this Agreement, except as otherwise provided in this Agreement, has no authority to bind County to any agreements or undertakings.

## 22. CAPTIONS AND INTERPRETATIONS

Paragraph headings in this Agreement are used solely for convenience, and shall be wholly disregarded in the construction of this Agreement. No provision of this Agreement shall be interpreted for or against a party because that party or its legal representative drafted such provision. This Agreement is the product of negotiation and both parties are equally responsible for its authorship. Section 1654 of the California Civil Code shall not apply to the interpretation of this Agreement.

## 23. COMPLIANCE WITH LAW

Tyler shall observe and comply with all applicable County, state and federal laws, ordinances, rules and regulations now in effect or hereafter enacted with regard to the manner in which services are performed, each of which are hereby made a part hereof and incorporated herein by reference.

## 24. CONFIDENTIALITY

Neither party shall, without the written consent of the other, communicate Confidential Information, designated in writing or identified in this Agreement as such or which should reasonably be understood to be Confidential Information based upon the nature of the information and /or the circumstances surrounding its disclosure, to any third party and shall protect such information from inadvertent disclosure to any third party in the same manner that they protect their own Confidential Information, unless such disclosure is required in response to a validly issued subpoena or other process of law. Upon completion of this Agreement, the provisions of this paragraph shall continue to survive.

(b) Unauthorized Acts - Without limiting any party's rights in respect of a breach of this Section, the Receiving Party shall: (i) promptly notify the Disclosing Party of any unauthorized possession, use or knowledge, or attempt thereof, of the Confidential Information by any person or entity that may become known to the Receiving Party; (ii) promptly furnish to the Disclosing Party, at the Disclosing Party's expense, the details of the unauthorized possession, use or knowledge, or attempt thereof, known by the Receiving Party and assist the Disclosing Party in investigating or preventing the recurrence of any unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information; (iii) cooperate with the Disclosing Party in any litigation and investigation against third parties deemed necessary by the Disclosing Party to protect its proprietary rights; and (iv) promptly use its commercially reasonable efforts to prevent a recurrence of any such unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information.

(c) Breach of Confidentiality - The Parties acknowledge that, due to the unique nature of the Confidential Information, there can be no adequate remedy at law for any breach of the obligations hereunder, that any such breach will likely result in irreparable harm to the Disclosing Party, and therefore, that upon any breach or threatened breach of the confidentiality obligations in this section, the Disclosing Party shall be entitled to appropriate equitable relief, without the requirement of posting a bond, in addition to its other remedies at law.

(d) Return of Confidential Information - From time to time and upon the County's request, the Confidential Information of the County, including copies thereof, will be returned to the County, or if the County so elects, will be destroyed.

## 25. COUNTERPARTS

This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

## 26. ENFORCEMENT OF REMEDIES

No right or remedy herein conferred on or reserved to County is exclusive of any other right or remedy herein or by law or equity provided or permitted, but

each shall be cumulative of every other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise, and may be enforced concurrently or from time to time.

### 27. NONWAIVER
No covenant or condition of this Agreement can be waived except by the written consent of County. Forbearance or indulgence by County in any regard whatsoever shall not constitute a waiver of the covenant or condition to be performed by Tyler. County shall be entitled to invoke any remedy available to County under this Agreement or by law or in equity despite said forbearance or indulgence.

### 28. REPRESENTATIONS
Tyler makes the following warranties for this Agreement:
a.        Tyler has the expertise, support staff and facilities necessary to provide the services described in this Agreement; and
b.        nor does Tyler represent a person or firm with an interest adverse to County with reference to the subject of this Agreement; and
c.        Tyler shall diligently provide all required services in a timely and professional manner in accordance with the terms and conditions stated in this Agreement.

### 29. SEVERABILITY
Should any part, term, portion or provision of this Agreement be decided finally to be in conflict with any law of the United States or the State of California, or otherwise be unenforceable or ineffectual, the validity of the remaining parts, terms, portions, or provisions shall be deemed severable and shall not be affected thereby, provided such remaining portions or provisions can be construed in substance to constitute the agreement which the parties intended to enter into in the first instance.

### 30. SIGNATURE AUTHORITY
Each party has full power and authority to enter into and perform this Agreement, and the person signing this Agreement on behalf of each party has been properly authorized and empowered to enter into this Agreement.

### 31. SOLE AGREEMENT
This document, including the attachments hereto, contains the entire agreement of the parties relating to the services, rights, obligations and covenants contained herein and assumed by the parties respectively. No inducements, representations or promises have been made, other than those recited in this Agreement. No oral promise, modification, change or inducement shall be effective or given any force or effect.

### 32. COMPLIANCE WITH IRCA
Tyler acknowledges that Tyler, and all subcontractors hired by Tyler to perform services under this Agreement, are aware of and understand the Immigration Reform and Control Act ("IRCA"). Tyler is and shall remain in compliance with the IRCA and shall ensure that any subcontractors hired by Tyler to perform services under this Agreement are in compliance with the IRCA. In addition, Tyler agrees to indemnify, defend and hold harmless the County, its agents, officers and employees, from any liability, damages or causes of action arising out of or relating to any claims that Tyler's employees, or the employees of any subcontractor hired by Tyler, are not authorized to work in the United States for Tyler or its subcontractor and/or any other claims based upon alleged IRCA violations committed by Tyler or Tyler's subcontractor(s).

### 33. NO THIRD PARTY BENEFICIARIES
It is expressly understood and agreed that the enforcement of these terms and conditions and all rights of action relating to such enforcement, shall be strictly reserved to County and Tyler. Nothing contained in this Agreement shall give or allow any claim or right of action whatsoever by any other third person. It is the express intention of County and Tyler that any such person or entity, other than County or Tyler, receiving services or benefits under this Agreement shall be deemed an incidental beneficiary only.

### 34. AMENDMENTS
This Agreement represents the full and complete understanding between the parties, and may only be modified or amended by a written agreement signed by both parties.

### 35. STOP WORK ORDERS
(a) Effect - The County may, at anytime, by written stop work order to Contractor require Contractor to stop all, or any part, of the Services (except Maintenance and Support Services), or other work called for by this agreement for period not to exceed sixty (60) calendar days for any single instance after the stop work order is delivered to Contractor, and for any further period to which the County and Contractor may agree in writing, provided, however, that Stop Work Orders may not exceed one-hundred twenty (120) days in the aggregate under this Agreement,. A stop work order shall be specifically identified as such and shall indicate it is issued under this Section. Upon receipt of a stop work order, Contractor shall promptly comply with the terms of the stop work order and take all reasonable steps to end the incurrence of any costs, expenses or liabilities allocable to the Services or other work covered by the stop work order during the period of work stoppage. Within sixty (60) calendar days after a stop work order is delivered to Contractor, or within any extension of that period mutually agreed to by the County and Contractor, the County shall either: (i) cancel the stop work order; or (ii) terminate the work covered by the stop work order as provided for in Section 15.

### 36. CRIMINAL BACKGROUND CHECK REQUIREMENTS
At County's expense each Tyler employee who will be granted access to the Kern County Jail Facility shall undergo a security clearance background check prior to performing any work and/or being granted access to the facility and any Tyler employee assigned to the implementation of the licensed software, that is granted access to CJIS, shall undergo a Kern County background clearance equivalent to those imposed upon civilian employee applicants to the Sheriff's Department prior to performing any work under this Agreement.

REDACTED

(Exhibit B)
## Maintenance and Support Services Agreement

This Maintenance and Support Services Agreement (this "M&S Agreement") is made and entered into as of the Effective Date by and between Tyler Technologies, Inc., a Delaware corporation ("Tyler" or "Software Provider") and Purchaser.

WHEREAS, Tyler and Purchaser have entered into that certain Software License and Professional Services Agreement (the "License Agreement") pursuant to which, among other things, Purchaser has acquired a license to Tyler's Licensed Software.

WHEREAS, Purchaser desires Tyler to perform, and Tyler desires to perform, certain maintenance and support services related to the Licensed Software.

NOW, THEREFORE, in consideration of the promises contained herein, along with other good and valuable consideration, the receipt and sufficiency of which all parties acknowledge the parties agree as follows:

1. **CERTAIN DEFINITIONS**

   1.1.   Terms Not Defined. Terms not otherwise defined herein shall have the meanings assigned to such terms in the License Agreement.

   1.2.   Business Day means Monday through Friday, excluding Tyler Holidays.

   1.3.   Business Hour means 7:00 a.m. to 7:00 p.m., Central Time during Business Days.

   1.4.   Circumvention or Circumvention Procedures means, as applied to a Documented Defect, a change in operating procedures whereby Purchaser can reasonably avoid any deleterious effects of such Documented Defect. If a Circumvention Procedure is not acceptable to Purchaser, Purchaser may escalate this Defect as set forth in Section 3.11.

   1.5.   Defect means any bug, error, malfunction, or other defect in the Licensed Software caused by, arising from, or emanating from the reasonable control of Tyler that renders the Licensed Software in non-conformance with Tyler's then current published specifications.

   1.6.   Documented Defect means a Defect that Purchaser documents for Tyler pursuant to Section 2.1.

   1.7.   Essential Functionality means any operational aspect of the Licensed Software that is required for immediate and ongoing business continuity by one or more users and which adversely impacts business in a crucial or critical manner.

   1.8.   Non-essential Functionality means any operational aspect of the Licensed Software that will not interrupt business continuity or which will not adversely impact business in a crucial or critical manner.

   1.9.   Legislative Change means a refinement, enhancement, or other modification to the Licensed Software necessary to comply with final, federal, or statewide legislation or administrative regulation affecting all clients in Purchaser's state and pertaining to: (a) existing reports, exports, or data exchanges; (b) new reports; (c) new data entry fields for state reporting; (d) new fee calculations; (e) new disposition templates; (f) new sentence templates; or (g) new citation templates. Legislative Changes do not include the expansion of Purchaser's constitutional or operational responsibilities beyond those that exist as of the Effective Date

   1.10.   Effective Date has the meaning set forth in Section 8.1.

   1.11.   Service Level 1 Defect means a Documented Defect that causes (a) complete application failure or application unavailability; (b) application failure or unavailability in one or more of Purchasers remote location; or (c) systemic loss of multiple essential system functions.

   1.12.   Service Level 2 Defect means a Documented Defect that causes (a) repeated, consistent failure of Essential Functionality affecting more than one user or (b) loss or corruption of data.

   1.13.   Service Level 3 Defect means a Service Level 1 Defect with an existing Circumvention Procedure, or a Service Level 2 Defect that affects only one user or for which there is an existing Circumvention Procedure.

   1.14.   Service Level 4 Defect means a Documented Defect that causes failure of Non-Essential Software functionality or a cosmetic or other Documented Defect that does not qualify as any other Service Level Defect.

   1.15.   Third Person Software means all third party software required for the operation and use by Purchaser of the Licensed Software consistent with the license granted to Purchaser.

   1.16.   Version Release means new versions of the Licensed Software that contain technical improvements, functional enhancements, updates, extensions, and/or maintenance changes to the Licensed Software.

   1.17.   Tyler Holidays means one (1) day for a New Year's holiday, Good Friday, Memorial Day, a one (1) day holiday for Independence Day, Labor Day, Thanksgiving Day and the day after, and two (2) days during Christmas time. The exact date for any rolling holiday will be published on the Tyler website in advance of the date.

   1.18.   Enterprise Custom Reporting means ability to create custom reports using Microsoft SQL Reporting Services and publish the reports to Odyssey. These published reports can be added to a menu so that users may run them or schedule them like any other Odyssey report

   1.19.   Learning Management System means the ability to connect to a remote system and receive electronic recorded trainings regarding Odyssey software application.

2. **END USER RESPONSIBILITIES**

   2.1.   Documenting Defects. Purchaser must document all Defects in writing with sufficient information to recreate the Defect or otherwise clearly and convincingly document or evidence its occurrence, including, but not limited to, the operating environment, data set, user, or any other such information that Tyler may reasonably request. Purchaser shall deliver such information to Tyler concurrently with its notification to Tyler of a Defect. Purchaser shall use all reasonable efforts to eliminate any non-application related issues prior to its notification to Tyler of such Defect, including, but not limited to, issues related to the network, user training, Purchaser-produced extensions, and data problems not caused by the Licensed Software. Any technical or other issue for which Purchaser requests services, but which is not a Documented Defect, shall be treated as a request for other services and governed by Section 4.  It is understood and agreed the process of documenting a Defect hereunder may be a collaborative process between the County and Contractor in which both parties shall, in good faith, reasonably participate as necessary.

   2.2.   Other Purchaser Responsibilities.  Purchaser shall:

   (a) maintain all required Third Person Software to the release level compatible with the installed version(s) of the Licensed Software;

   (b) establish and maintain an internal help desk to be the central point of contact and communication between the end users and Tyler's support staff.  In the event that the Purchaser is unable to establish and maintain an internal help desk, Purchaser may select up to twenty (20) "super users" who may contact Tyler's help desk.

   (c) provide training on the Licensed Software to its employees;

   (d) allow Tyler to install patches and other maintenance releases provided by Tyler;

   (e) allow remote access by Tyler to  Purchaser's servers and data via a Microsoft VPN connection or CISCO VPN client or other mutually agreeable protocol, provided, however, that Purchaser acknowledges that failure to provide a timely and practical remote access method may negatively impact Tyler's ability to perform its responsibilities under this M&S Agreement;

   (f) implement and perform appropriate data backup and data recovery procedures related to the Licensed Software. In no event shall Tyler be held liable for any loss or other damage associated with the loss or destruction of any data related to the Licensed Software

REDACTED

that is attributable to Purchaser's failure to implement and perform such procedures on a timely and regular basis; and

(g) provide onsite installation, new integration, training, and other responsibilities with respect to Version Releases as set forth in Section 5.

3.  TYLER RESPONSIBILITIES – SUPPORT SERVICES

   3.1.  General Services for Reporting Production Documented Defects.

   (a)  Tyler shall provide Purchaser with procedures for contacting support staff during normal business hours (7:00 a.m. to 7:00 p.m., Central Time, Monday through Friday, excluding Tyler Holidays) for reporting Documented Defects. Tyler shall assist Purchaser in the diagnosis of any Documented Defect, including the assigned Service Level and Tyler's tracking number.

   (b)  For each reported Documented Defect, Tyler shall assign appropriate personnel to diagnose and correct the Documented Defect, and where appropriate, identify Circumvention Procedures. Tyler's initial response shall include an acknowledgement of notice of the Documented Defect, confirmation that Tyler has received sufficient information concerning the Documented Defect, and an action plan for resolving the Documented Defect and avoiding further deleterious consequences of the Documented Defect.

   3.2.  Service Level 1 Defects. Tyler shall provide an initial response to Service Level 1 Defects within one (1) Business Hour of receipt of the Documented Defect. Tyler shall use commercially reasonable efforts to resolve such Documented Defects or provide a Circumvention Procedure within one (1) Business Day. Tyler's responsibility for loss or corrupted data is limited to assisting Purchaser in restoring its database to a known, accurate state.

   3.3.  Service Level 2 Defects. Tyler shall provide an initial response to Service Level 2 Defects within four (4) Business Hours of receipt of the Documented Defect. Tyler shall use commercially reasonable efforts to resolve such Documented Defects or provide a Circumvention Procedures within five (5) Business Days. Tyler's responsibility for loss or corrupted data is limited to assisting Purchaser in restoring its database to a known, accurate state.

   3.4.  Service Level 3 Defects. Tyler shall provide an initial response to Service Level 3 Defects within one (1) Business Day of receipt of the Documented Defect. Tyler shall use commercially reasonable efforts to resolve such Documented Defect without the need for a Circumvention Procedure with the next published maintenance update or service pack, which shall occur at least quarterly. Tyler's responsibility for lost or corrupted data is limited to assisting Purchaser in restoring its database to a known, accurate state.

   3.5.  Service Level 4 Defects. Tyler shall provide an initial response to Service Level 4 Defects within two (2) Business Days. Tyler shall use commercially reasonable efforts to resolve such Non-Essential Documented Defect within two version release cycles and a cosmetic or other Documented Defect that does not qualify as any other Service Level Defect with a future Version Release.

   3.6.  Help Desk & Desktop Support. Software Provider shall provide the Purchaser with procedures for contacting support staff during normal business hours (7:00 a.m. to 7:00 p.m., Central Time, Monday through Friday, excluding Tyler Holidays) for reporting Documented Defects or obtaining helpdesk support on general application functionality. Software provider will provide ample help desk support; however, excessive support requirements may indicate a training need and require the purchase of additional training time.

   3.7.  Technical Server & Systems Support. Tyler shall use commercially reasonable efforts to provide Purchaser with technical support to assist Purchaser with troubleshooting the loss of functionality of Licensed Software for reasons other than a Documented Defect. Tyler technical support shall be limited to:

(a) assisting the Purchaser with isolating the source of Licensed Software failure due to systems-level hardware, Third Party Software, network, client-level hardware or peripherals;

(b) providing recommendations to Purchaser regarding resolution of said non-defect failure(s); and

(c) providing Purchaser with assistance on basic maintenance and administration of the Licensed Software environment, including basic data backup and restore procedures, deployment of Version Releases, and setup of supported peripheral devices for use with the Licensed Software

   3.8.  24 X 7 Emergency Support. Tyler shall provide the Purchaser with procedures for contacting support staff after normal business hours for the limited purpose of reporting emergency application unavailability issues (such as a Level 1 Defect) within the Licensed Software. Tyler shall use commercially reasonable efforts to provide the response set forth in Section 3.2.

   3.9.  Saturday Technical Support. Tyler shall use commercially reasonable efforts to be available for one pre-scheduled Saturday of each month to allow assistance to Purchaser IT staff. This option is available for the application of patches and full release upgrades as well as consulting with the Purchaser IT staff for server maintenance and configuration for the licensed software environment.

   3.10.  Base Version Level for Correction. Tyler shall correct or otherwise cure Documented Defects to the current Version Release of Licensed Software made available to Purchaser and either the immediately preceding Version Release or all Version Releases released to Purchaser within the prior one (1) year, whichever is greater.

   3.11.  Legislative Change Support. Tyler will use its commercially reasonable efforts to implement Legislative Changes within the time frames set forth in the applicable legislation regulation, but in any event in the next Version Release. Tyler's sole liability for implementing Legislative Changes in any calendar year shall be limited to the number of hours of analysis, development, post release data migration, and testing services, at Tyler's then current hourly rates, equal to not more than 20% of the total Annual Maintenance Fees for the Licensed Software paid by all clients with Legislative Change Support in Purchaser's state during such calendar year; to the extent additional programming services are required, such services shall be billed to Purchaser at Purchaser's contractual billing rates or at Tyler's then current hourly rates, if no contractual billing rates are in effect. Notwithstanding the foregoing, Purchaser shall be responsible for the cost of any other services required to implement a Legislative Change, including, without limitation, training, configuration, project management, or data conversion from external sources. Upon the mutual determination of the need for a Legislative Change that exceeds the limitations set forth above, Tyler shall provide Purchaser with a written statement identifying the total number of hours that Tyler is liable for Legislative Change Support as calculated above plus a good faith estimate of the additional cost to Purchaser. Such additional costs, if any, shall be prorated as a percentage of Annual Maintenance and Support Fees among all Odyssey clients in Purchaser's state with Legislative Change Support. If agreed upon by the parties, additional costs shall be memorialized in a written amendment to this agreement.

   3.12.  Escalation Procedure. If Tyler is unable to resolve any Service Level 1 or Service Level 2 Defect as provided in this Section 3, Purchaser may immediately escalate the issue to Purchaser's Project Manager or Designee and Tyler's Director of Client Services. Tyler and Purchaser will use good faith reasonable efforts to meet, discuss, and agree upon a resolution plan for the affected Defect. If Purchaser's Project Manager or Designee and Tyler's Director of Client Services cannot agree upon an acceptable resolution plan within 24 hours of such initial escalation, or such other reasonable time as the parties may agree, Purchaser may further escalate the issue to Purchaser's next Administrative Level and Tyler's Division Chief Operating Officer or Division President who shall have final authority to negotiate an acceptable resolution plan.

   3.13.  Enterprise Custom Reporting. License and Maintenance of Tyler's Odyssey Enterprise Custom Reporting will be included herein.

   3.14.  Learning Management System. Ability for end users to connect to

remotely hosted system for the purpose of continued training and new hire on ramps. Tyler will do commercially reasonable efforts to keep videos at current release level and within all areas of the application.

## 4.   ADDITIONAL SUPPORT SERVICES

Purchaser may request support services in addition to the standard maintenance offering (a "Service Request"). Such other support services may include, without limitation, services related to: (a) additional training; (b) technical assistance; (c) programming services; (d) installation of add-on components; and/or (e) business analysis. Tyler shall provide to Purchaser a written response to the request which describes in detail the anticipated impact of the request on the existing Licensed Software, the time required to perform such services, an implementation plan, and a schedule of the fees related thereto. Fees for additional support services shall be billed by Tyler directly to Purchaser and shall be invoiced monthly, which shall be due and payable in accordance with Section 7.2.

## 5.   VERSION RELEASES

Tyler shall notify Purchaser of the occurrence of a new Version Release and shall provide Purchaser with such Version Releases for the Licensed Software. The delivery of each Version Release shall include a complete, installable copy of the Licensed Software, together with release notes and other appropriate documentation. Tyler will provide installation software and instruction for use by Purchaser in installing new Version Releases provided, however, that if Tyler does not provide installation software and instructions, then Tyler shall provide installation assistance to Purchaser at no additional cost. Purchaser shall, at its own expense, be responsible for any configuration assistance, new integration, and training with respect to each Version Release.

## 6.   THIRD PERSON SOFTWARE

6.1.   Notice of New Third Person Software. Tyler shall provide Purchaser with advanced notice of any mandated new Third Person Software revision that shall be required to load a Version Release. Tyler shall use commercially reasonable efforts to minimize the need for Purchaser to rely upon updates of Third Person Software.

6.2.   Tyler Certification. At Tyler's expense, Tyler shall certify the compatibility of Third Person Software components used by the Licensed Software and maintain a list of supported Third Person Software release levels. Version Releases shall be certified to supported versions of all required Third Person Software. Tyler shall certify new releases of Third Person Software within a reasonable timeframe.

6.3.   Costs. Purchaser is responsible for all costs associated with installing and maintaining Third Person Software versions that are identified on Tyler's list of certified Third Person Software.

6.4.   Maintenance. Purchaser is responsible for maintaining software maintenance/update agreements with Third Person Software vendors at Purchaser's expense. At the request of Purchaser, Tyler shall participate with Purchaser in discussions with Third Person Software providers on all software maintenance issues.

## 7.   FEES

7.1.   Annual Maintenance Fee. Purchaser shall pay Tyler the annual maintenance and support fees as set forth on and in accordance with the timetables of Schedule 1 (the "Maintenance and Support Fees"). Upon the first and second anniversaries of the Effective Date, the Annual Maintenance and Support Fee shall be increased no greater than 3% or the Consumer Price Index as posted on the date of renewal, whichever is less.

7.2.   Each invoice shall include, at a minimum, the total invoiced amount and a reference to the specific items being invoiced under this M&S Agreement. Following receipt of a properly submitted invoice, Purchaser shall pay amounts owed within sixty (60) days. All payments shall be made in U.S. currency..

7.3.   Maintenance on Purchaser-Specific Customer Enhancements. The annual Maintenance and Support Fee may be further increased by agreement of the Parties with respect to (a) maintenance and support of Purchaser-Specific Customer Enhancements requested by Purchaser and (b) Limitation of Liability- Not Withstanding

material functional enhancements contained in new Version Releases that are not merely technical improvements, updates, extensions and/or maintenance changes to the Licensed Software. Purchaser will have the option to accept or decline any such material functional enhancement that would result in an increase in the Maintenance and Support Fee without affecting Purchaser's entitlement to receive the remainder of any Version Release in which such enhancement is offered.

7.4.   Suspension of Services for Non-payment. Tyler may suspend its performance of services hereunder during any period for which Purchaser does not pay any undisputed Maintenance and Support Fees for a period of time exceeding ninety (90) days. Tyler shall promptly reinstate maintenance and support services upon receipt of payment of all undisputed Maintenance and Support Fees, including all such fees for the period(s) during which services were suspended.

## 8.   TERM AND TERMINATION

8.1.   Term. This M&S Agreement shall commence in accordance with Schedule 1 of this M&S Agreement (the "Effective Date") and shall continue in effect for a period of one (1) year; provided, however, that at the end of such initial term, and on each subsequent anniversary of the Effective Date, the term shall automatically extend for an additional year unless a Party provides, at least ninety (90) days prior to the end of the then current term, written notice that it does not wish to extend the term or otherwise terminates the agreement as provided in this Section8.2.

8.2.   Termination by Purchaser at the End of a Term. Purchaser may terminate this M&S Agreement effective as of the end of the initial term or any subsequent term by giving not less than ninety (90) days' notice of its intent to terminate. Purchaser may, at its option, reinstate maintenance by providing notice to Tyler and making payment of fifty percent (50%) of each year's Maintenance and Support Fees that would have been owed by Purchaser during the lapsed period plus the Maintenance and Support Fees for the then upcoming maintenance year.

8.3.   Termination by Purchaser for Cause. Purchaser may terminate this M&S Agreement for "cause" in accordance with this Section 8.3. For purposes of this Section, "cause" means a continuous or repeated failure to cure Documented Defects timely as provided in Section 3. In such event, Purchaser shall deliver written notice of its intent to terminate along with a description in reasonable detail of the problems for which Purchaser is invoking its right to terminate. Following such notice, Tyler shall have ninety (90) days to cure such problems. Following such ninety (90) day period, Tyler and Purchaser shall meet to discuss any outstanding issues. In the event that "cause" still exists at the end of such period, then Purchaser may terminate this Agreement. In the event of a termination under this subsection, Tyler shall return all monies paid to Tyler by Purchaser under this M&S Agreement for the remainder of the then current maintenance period.

8.3.1 Termination Without Cause. Either party may terminate this Agreement, without cause, upon sixty (60) days' prior written notice to the other party. Should Purchaser choose to terminate without cause no refund of the fees paid under this agreement shall be made.

## 9.   LIMITATION OF LIABILITY

TYLER'S LIABILITY TO END USER FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS M&S AGREEMENT, WHETHER BASED ON A THEORY OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, SHALL BE LIMITED TO FIXING DEFECTS IN ACCORDANCE WITH SECTION 3 OR AS OTHERWISE SET FORTH IN SECTION 8.3.

IN NO EVENT SHALL TYLER BE LIABLE TO END USER FOR INCIDENTAL, CONSEQUENTIAL, OR SPECIAL DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, LOST REVENUES OR PROFITS, OR LOSS OF BUSINESS OR LOSS OF DATA ARISING OUT OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER THE PARTIES HAVE ADVANCE NOTICE OF THE POSSIBILITY OF SUCH DAMAGE.

Nothing herein shall be deemed to limit any claims arising under or out of Exhibit A and the limitations of this Section 9 shall only apply to claims arising under or out of this Exhibit B Maintenance and Support Services Agreement.

REDACTED

## 10. DISPUTE RESOLUTION

The parties agree to use good faith, reasonable efforts to meet, discuss, and try to resolve any disputes arising out of, or relating to, this M&S Agreement for a period of sixty (60) days. The parties shall include in any such informal meetings persons with appropriate knowledge and authority, including, without limitation, Purchaser's Information Technology Manager and Tyler's Support Manager. Any negotiations pursuant to this Section 10 are confidential and shall be treated as compromise and settlement negotiations for purposes of the applicable rules of evidence. For any dispute that the Parties are unable to resolve through informal discussions or negotiations, the Parties shall have the right to pursue any remedies at law.

## 11. MISCELLANEOUS

11.1. Assignment. Neither party may assign this M&S Agreement or any of its respective rights or obligations herein to any third party without the express written consent of the other party.

11.2. Notices. Except as otherwise expressly specified herein, all notices, requests or other communications shall be in writing and shall be deemed to have been given if delivered personally or mailed, by certified or registered mail, postage prepaid, return receipt requested, to the parties at their respective addresses set forth on the signature page, or at such other addresses as may be specified in writing by either of the parties. All notices, requests, or communications shall be deemed effective upon personal delivery or seven (7) days following deposit in the mail.

11.3. Counterparts. This M&S Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.4. Waiver. The performance of any obligation required of a party herein may be waived only by a written waiver signed by the other Parties, which waiver shall be effective only with respect to the specific obligation described therein.

11.5. Amendment. This M&S Agreement shall not be modified, amended or in any way altered except by an instrument in writing signed by the properly delegated authority of each Party. All amendments or modifications of this M&S Agreement shall be binding upon the parties despite any lack of consideration.

11.6. Governing Law. Any dispute arising out of or relating to this M&S Agreement or the breach thereof shall be governed by the laws of the state of the domicile of Purchaser, without regard to or application of choice of law rules or principles.

11.7. No Third Party Beneficiaries. Nothing in this M&S Agreement is intended to benefit, create any rights in, or otherwise vest any rights upon any third party.

11.8. Contra Proferentem The doctrine of contra proferentem shall not apply to this M&S Agreement. If an ambiguity exists in this Agreement, or in a specific provision, neither the Agreement nor the provision shall be construed against the party who drafted the M&S Agreement or provision.

REDACTED

(Exhibit C)
**Kern County ICJ Statement of Work (SOW)**

## Introduction

This Statement of Work (SOW) presents the phases, tasks, and activities that Tyler will execute to implement the Odyssey solution for Kern County's criminal justice departments: Sheriff's Office Jail, Probation Department (Adult and Juvenile), District Attorney, and Public Defender. The project will be coordinated and conducted in parallel with the Kern Superior Court's Odyssey implementation for criminal case processing and should include at a minimum the following functionality[1]:

Odyssey Jail Manager – Kern Sheriff's Office Jail and Probation Department
Tyler's Odyssey Jail Manager will be implemented within the Kern County Sheriff's Office Jail facilities and the Probation Department's juvenile detention facilities. Odyssey Jail Manager is a comprehensive jail management system that handles all aspects of the inmate through-care process, from initial intake to release processing. Based on the concept of a master names index, Jail Manager maintains complete histories of inmate detail that are accessible through an efficient, easy-to-use, graphical user interface. Built to operate on an enterprise-wide database, Jail Manager is designed to automatically share information with fully integrated product centers available within the Odyssey suite, including the court and prosecutor. Additionally, real-time and batch data sharing with third-party systems is carried out through a standards-based integration platform for exchanging data between Odyssey and other criminal justice agencies.

Jail Manager consists of a fully integrated series of highly configurable plug-and-play modules, features, and functions to meet an agency's current and evolving requirements. These options include:

> *Booking/Intake* – The booking/intake feature provides a mechanism for creating new inmate records using a combination of a unique offender identification number (such as a Jail ID# or Sheriff ID#) and a booking number. This module is used to capture intake details, including arrest and transport data, an intake status, demographic and descriptor information, initial bed/cell assignments, a preliminary classification, and a medical assessment. A system setup feature allows for the creation of an agency-defined booking checklist to track each inmate through a progression of intake steps and ensure the proper completion of this process.

> *Release Processing* – Jail Manager's release processing feature allows an agency to maintain dispositions against charges, associated bonds, and holds. In addition,

---

[1] It is worth emphasizing that the Out-of-the-Box functionality presented below is highly configurable within Odyssey. However, not every available functionality may offer the exact process the Kern participating agencies perform today. As such, the project includes an allowance of 1,800 development hours for establishing any customizations or integrations that the County leadership determines to be absolutely necessary. Given time constraints for deploying the solution, it will be crucial for the County and the participating justice agencies to work collaboratively with Tyler to determine what Odyssey enhancements and/or integrations are to be included for Go-Live and which are to be included post Go-Live.

REDACTED

sentences are tracked against system-generated expiration (or completion) dates. Releasing an inmate automatically triggers a number of pre-defined events, including but not limited to releasing of inmate property, generation of a check for outstanding trust account funds, printing of a release summary, and removal of the inmate from the inmate count roster.

➤ *Classification* – The classification feature includes a feature for creating custom assessments, including intake assessments and follow-up reassessment questionnaires. Assessment results are used to designate and assign inmate security levels and assist in the bed-load planning process. Results may be overridden when additional detail warrants it. This module tracks each inmate to ensure that all assessments are completed in a timely fashion.

➤ *Inmate Property* – The property feature is used to maintain a complete inventory of all of an inmate's property while incarcerated. Each item is tracked by date, type, description, and current location. Property locations are defined and adjusted using a system setup feature.

➤ *Legal Administration* – The legal administration feature is comprised of four distinct, yet tightly integrated modules: Warrants, Charges, Bonds, and Sentence Calculation.

➤ *Warrants* – The warrants module is found in each of Odyssey's product centers. This allows for automated flow of information from one system to the next and as such, the elimination of redundant data capture. All warrants are maintained within a centralized "party" record to guarantee consistency and provide universal access. The existence of active warrants on an inmate's electronic file is identified with a system-generated "W" icon displayed on all inmate-specific screens.

➤ *Charges* – The charges component allows for the capture and updating of key legal information related to each inmate. This consists of charge dates, charge numbers, descriptions, holds reasons, and associated bond detail. Court dates are also tracked, and sentence details are maintained for use in carrying out jail time calculations.

➤ *Bonds* – All bond details are entered and tracked within Jail Manager's bond processing feature. Each bond and bond amount is matched against an existing charge, with associated payments (including posting date, amount, payee, and receipt number) noted.

➤ *Jail Time Calculation Engine* – Jail Manager provides a customized, rules-based, jail time calculation engine for accurately computing all dates related to inmates' sentences. This can include the generation and display of all required dates, such as final charge expiration dates and an earliest/probable release date. Date adjustments for jail time credits, good time credits, work credits, and lost time are taken into account and can be set to trigger sentence re-calculations.

➤ *Rosters and Counts* – Jail Manager provides an administrative tool for defining all facility bed locations and internal locations. The Jail Roster screen utilizes this detail to provide a "cascading" (drill-down) visual representation of each facility's cells and a notation of the inmates who occupy them. Icons are used to designate the existence of inmates with specialized flags placed against them. Jail counts are easily viewed using an "at-a-glance" feature, allowing users to clearly identify open cells, inmates in transit, and inmates currently located outside of their assigned bed location.

REDACTED

➢ *Movement Tracking* – Movement tracking allows an agency to track all inmate-related movements, such as movements from a cell location to and from the gym, yard, infirmary, and court. Movement events are updated manually or through the use of scanners, and each event is date and time stamped in Jail Manager. A complete history of all movements is maintained. This module supports the use of bar code technology via scanners.

➢ *Jail Activities* – This feature provides a manual and automated "log" capability for use in chronicling a wide variety of inmate and facility activities as defined by an agency. These can include welfare/suicide checks, inmate refusals, the administration of prescriptions, officer breaks, and shift changes. All activities are date, time, and user stamped. This module supports the use of bar code technology via scanners.

➢ *Incidents & Disciplinary* – Jail Manager's incidents and disciplinary feature maintains a list of all incidents in which an inmate has been involved. Associated detail includes the incident location, type, parties involved, evidence, and the ability to capture a descriptive narrative. All entries are date and time stamped and are automatically assigned a unique incident number. Accessing the Hearing window allows a user to carry out disciplinary proceedings and assign any number or type of penalties.

➢ *Security Threat Groups (Gangs)* – This feature allows for the designation of an inmate into a security threat group and the maintenance of non- associations (keep-separates/keep-aways) among specific inmates and gang factions.

➢ *Visitation Management* – All inmate visits are tracked through use of the contacts feature within Jail Manager. The visits management feature records visitor details (including approved visitors), visit dates and times, and visit types (family, professional, etc.) and allows for registering of new inmate property and documenting of cash deposits into inmate accounts.

➢ *Inmate Notes* – This feature allows for the capture of an unlimited number of case notes in each inmate's electronic record. Notes are automatically date and user stamped and displayed in chronological order from earliest to latest. Specific note types can route information to other Jail Manager screens based on a pre-defined trigger. For example, if a note is entered stating that prior to release, another set of fingerprints must be taken, this information is routed to the Release screen and will notify the user at the time of release.

➢ *Inmate Accounting and Finances* – Jail Manager's inmate accounting and finances module is a GAAP-compliant banking system that allows an agency to administer inmate funds, handle cash bond collections, and transact other miscellaneous payments, such as charges for record searches or fingerprints for the public. This functionality could be used independently or in conjunction with another system such as the County's exiting Keefe Commissary.

➢ *Commissary* – Commissary functionality within Jail Manager equips an agency with all the tools required to run an end-to-end commissary operation if there is not a relationship with another Third-party vendor. This includes the printing and processing of order slips, processing of commissary orders, and deducting of funds from an inmate's trust account.

➢ *Imaging* – Inmate imaging is an integral part of the Odyssey Jail Manager

REDACTED

application. Image types can be defined based on agency requirements, and this can include facial images and images of scars, marks, and tattoos. All images are date/time stamped and assigned a unique, system-generated number. Images can be printed on documents and reports, as needed. An image icon will display on each inmate-specific screen to denote the presence of an image on file. Inmate images can be incorporated into lineups using a specialized, investigative function.

➤ **_Document Management_** – Document imaging is a standard part of Jail Manager. Images can be scanned (or imported) and linked directly to specific inmate records, including legal documents, incident investigations, and medical processing.

➤ **_System Security_** – Odyssey's Jail Manager utilizes a sophisticated security matrix that is "rights and roles" based. This allows a system administrator to define specific business roles and assign staff into one or more of these roles. Each role grants a set of rights to specific modules, features, functions, and fields within the system. In addition, access to specific inmate records and record types is identified within the security template.

➤ **_Reports_** – Jail Manager has myriad reporting capabilities, including the creation and production of standard (day-to-day) reports, custom reports, statistical reports, analytical reports, and state-mandated reports. Further, Microsoft Word® is embedded into the product to allow agencies to define custom documents that import data directly from the inmate database and provide full editing abilities. Examples of reports generated using this process are booking, bond and release forms, and incident reports.

**Odyssey Supervision – Kern Probation Department**
Tyler's Odyssey Supervision will be implemented within the Kern County Probation Department to address the adult and juvenile probation needs. Odyssey Supervision is an integrated pretrial and probation management system. The application's powerful document management and file-folder-tracking capabilities ensure that supervision information is accurate, providing the full picture. Rather than a probation system having a separate copy of the party and case data, Supervision links information with Tyler's case management system so that probation departments and courts have access to the most recent information for a defendant, and his or her case, such as financial obligations and demographic data.

Supervision provides the ability to track parties' compliance with conditions, drug testing history and treatment placements. The application provides the ability to configure risk and needs assessment questionnaires to meet the Probation Department's specific needs. Odyssey Supervision empowers users to cover every aspect of the supervision process. Supervision officers can utilize contact scheduling features via an integrated workspace so that they can view current caseloads and the day's hearings and contacts. Available party information extends to relationships, institutions, and places of employment.

Odyssey Supervision also presents relevant information displays in an intuitive interface with streamlined data sharing capabilities so that officers don't have to waste time searching for, or re-entering critical data. With Odyssey Supervision, users can perform List Manager queries and actions for mass updates. The application provides the ability to re-assign an officer's caseload to another and print letters for all defendants who missed their contacts on any given day.

**Odyssey Attorney Manager – Kern District Attorney and Public Defender Offices**
Tyler's Odyssey Attorney Manager will be implemented within both the Kern County District Attorney's Office and the Kern County Public Defender's Office. Odyssey Attorney Manager is designed to provide case tracking features for both prosecutorial and public defender offices including processing and maintaining hearing and trial information. In addition to being integrated within the Odyssey suite of courts and jail products, it provides for autonomy and complete confidentiality until information is ready to be released; including electronic data sharing capabilities between the District Attorney and Public Defender, thus reducing paper flow and increasing efficiency.

Odyssey Attorney Manager allow users to easily review, gather, and track case information such as data related to witnesses, victims, associates, evidence, history, and related cases. Attorney Manager provides the following features:

➢ Create cases manually using sources such as city, law enforcement agencies, and direct complaints from other citizens.

➢ Provide case tracking functionality for District Attorney, Public Defender and Non-Criminal cases including the option to track privileged party data that isn't stored on the integrated record.

➢ Attach documents, pictures, images, sound files, and movies to evidence

records.

➢ Ability to generate case statistics to determine caseloads assigned to each attorney.

➢ Track the history of all charges, their statuses, who modified them, when they were modified, and other details.

➢ Enter information relating to the Grand Jury process, and schedule cases and person to hearings.

➢ Generate notifications to victims and generate victim's reports to submit to the state.

➢ Ability to perform conflict checks for the Public Defender to help ensure that attorneys do not have existing conflicts of interest prior to representing a defendant.

➢ Easily create notifications and subpoenas.

➢ Ability to view a weekly Court calendar through generation of a report that enables attorneys to know what they have been scheduled in court.

➢ Reporting functionality to determine Time to Disposition information such as, how many cases were opened, how many closed, how long a case took to get to disposition, breakdown options by staff assignments, what cases are currently pending and others.

Independently, each office will be provided with the tools needed to effectively manage their caseload and track the data necessary to perform daily tasks.

Supporting Software Products
In addition to the core case management software, the Odyssey product suite includes complementary software that is integrated within the Odyssey platform. The software products listed below are included in the scope of this cost proposal.

➢ **Odyssey Content Manager –** The Odyssey Content Manager is the built-in content / document management component of the Odyssey platform. The scope of this software includes all of the document management capabilities including batch processing, auto-attach of documents, e-Signatures, and workflow/queue management.

➢ **Odyssey Enterprise Custom Reporting –** Odyssey comes with a large set of standard reports that have highly configurable selection and output criteria. Reports and jobs can be run on demand at any time or they can be scheduled to run automatically on regular intervals. Odyssey Enterprise Custom Reporting provides power users with the ability to create custom reports using Microsoft SQL Server Reporting Services (SSRS) for ad-hoc reporting or customized reports for repeated use.

➢ **Odyssey Portal (Public Access) –** Odyssey includes a portal that connects the county justice agencies with its constituency, providing access to inmate information, e-Filing tools, e-Payment solutions, and public case information, including documents.

➢ **Odyssey Integration Toolkit –** The Integration Toolkit provides the ability to

implement out-of-the-box integration with Odyssey. The integration toolkit serves as an abstraction layer to the core database that controls how data is entered and extracted. This will enable the County IT staff to build custom functionality by extending the Odyssey platform without breaking compatibility with future Odyssey software releases. The integration toolkit includes:

- o Application Programming Interfaces (APIs) – the APIs are web services that allow on demand adding, updating and querying data in Odyssey using a defined message based interface. The APIs are called as standard web services.

- o Configurable Integration Publishing (CIP) – the Configurable Integration Publisher allows automated publishing of messages based on events that have occurred in Odyssey.

➢ **DataXchange** – DataXchange enables justice and public safety agencies to share critical real-time information at key decision points with other Odyssey installations across county lines and state borders. The application is a secure cloud-based solution that returns queried data. The County maintains full control of the data and chooses what information to share. Data exchange can include party and case data, citations, vehicles, jailing's, incidents, warrants, electronic documents, and property information. DataXchange allows agencies to share this data with other participating agencies across city limits, county lines, and state borders, as well as with other agencies in Kern County, using Tyler products. For example, a judge in a courtroom can use DataXchange to make decisions about bail, custody, penalties/fines; or a deputy can use DataXchange to easily look up real-time warrant information.

➢ **California State Interfaces and Statistical Reports** – Similar to our business practices with customers in other states, Tyler has included the necessary interfaces and statistical reports required by the State of California in this proposal. This includes:

- o Probation Volunteer Services Report

- o Programs Reports

- o Investigation Statistics

- o Probation Statistical Reports, including the Juvenile Court and Probation Statistical System (JCPSS) report

- o Recidivism Report

- o Juvenile Hall Statistics Report

- o Programs Reports

- o Jail Population/Custody Status Report

- o Public Defender/Prosecutor Reporting

The purpose of the project is for the County to transition away from the County's legacy Criminal Justice Information System (CJIS). The project will implement Odyssey for the County criminal justice departments using a proven approach that has been successful in other jurisdictions across the nation.

The project will consist of six major phases, with each phase consisting of tasks and deliverables. The six major phases are:

- Phase 1: Project Initiation and Planning
- Phase 2: Solution Design and Development
- Phase 3: Jail Odyssey Deployment
- Phase 4: Probation Odyssey Deployment
- Phase 5: District Attorney and Public Defender Odyssey Deployment
- Phase 6: Project Conclusion

Summaries of each of the major phases are described below:

**Phase 1: Project Initiation and Planning** involves project initiation, infrastructure planning, and the business process review. This phase feeds many of the subsequent activities in the project: configuration, application refinements, infrastructure, integration, etc. It also facilitates verifying that the sequencing, timing, and scope for the project are correct.

**Phase 2: Solution Design and Development** is focused on validation that the infrastructure is properly prepared, and placeholder project tasks for addressing any mission critical application and integration developments for the overall solution (as needed). The phase will establish the detailed specifications and development of application refinements identified in Phase 1; development and testing of integrations identified in Phase 1; and establishing the technical infrastructure and application installation processes to meet the County's specific needs; and iterative refinement and testing of business processes and procedures. The phase also involves conducting training on the Odyssey Integration Toolkit via a workshop for those technical resources that the County designates.

**Phase 3: Jail Odyssey Deployment** will complete the deployment of the Odyssey Jail Manager solution for the Kern County Sheriff's Office Jail and Probation Department's juvenile detention facilities. This phase includes activities for configuration, data conversion, testing, and cutover efforts (Go-Live activities). The phase will include the County's sign-off of each corresponding project milestone/deliverable for User Acceptance Testing, training, final cutover, extended go-live support, and transition support to normal operations.

**Phase 4:   Probation Odyssey Deployment** will complete the deployment of the Odyssey Supervision solution for the Kern County Probation Department's adult and juvenile probation operations.   This phase includes activities for configuration, data conversion, testing, and cutover efforts (Go-Live activities). The phase will include the County's sign-off of each corresponding project milestone/deliverable for User Acceptance Testing, training, final cutover, extended go-live support, and transition support to normal operations.

**Phase 5:   District Attorney and Public Defender Odyssey Deployment** will complete the deployment of the Odyssey Attorney Manager solution for the Kern County District Attorney's Office and the Public Defender's Office. This phase includes activities for configuration, testing, and cutover efforts (Go-Live activities).  The phase will include the County's sign-off of each corresponding project milestone/deliverable for User Acceptance Testing, training, final cutover, extended go-live support, and transition support to normal operations.

**Phase 6:   Project Conclusion** will include the steps to formally complete and close out the

REDACTED

project, including efforts to finalize any remaining documentation and knowledge transfer to the County.

The project schedule (Gantt chart) is provided at the end of this SOW in Attachment A.   The total project duration is scheduled for approximately 20 months from project initiation through the second Go-Live event.   With respect to delivery and acceptance of the deliverables included in this SOW, the parties will follow the procedures and processes set forth in the following section.

## Governance

In every Odyssey ICJ implementation of a large county, governance is extremely important for ensuring that the project is on schedule.   For the Go-Live event, there will be a designated governance structure that assists with organizing decision-making for group as a whole.   The project will involve several groups of participants.   It should be noted that the final project governance structures and mechanisms will be finalized during Phase 1 of the project. These groups are defined in the following table:

| Groups | Compositions |
|---|---|
| County Executive Team | This group consists of the executive leadership of the County to include, but not be limited to the CAO or Designee, County ISD IT Director or CIO (Chief Information Officer), County Sheriff, Chief Probation Officer, District Attorney, and Public Defender. Additionally, given the coordination required with the Superior Court's Odyssey implementation project, this team should include the Superior Court's Executive Officer. |
| County Project Manager | This individual will serve as the primary and central point of contact that will work closely with the Tyler Project Manager and the Superior Court's Project Manager. This individual will represent the interests of the four County criminal justice departments. Further information on the responsibilities of this individual is provided below. |
| County Project Team | This group consists of the County's project leads, subject matter experts, and other core project staff. Additionally, given the coordination required with the Superior Court's Odyssey implementation project, this team should include the Superior Court's Project Manager. |
| County IT Team | This group consists of the County Information Technology Services (ITS) Division Chief, ITS Director, and other key technical personnel from each of the four County criminal justice departments. Additionally, given the coordination required with the Superior Court's Odyssey implementation project, this team should include the Superior Court's Deputy Court Executive Officer for IT. |
| External Stakeholders | This group includes all external parties to the project including the state- and federal- level justice partners and local law enforcement agencies' representatives. |
| Project Management Office (PMO) | The PMO is a joint group consisting of the project managers and project leads from Tyler, the Superior Court, and the four County departments. |

## Decision-Making and Deliverable Approvals

As with other Odyssey implementations, the Project will involve many decisions to be made throughout the project. The decisions will vary from strategic-level decisions to smaller, detailed project level decisions. It is critical to the success of the project that County ITS and each of the four County criminal justice departments designate specific individuals for making decisions on behalf of their department, or "project leads".

The County will select a single individual as an acting project manager. This individual will represent the interests of County ITS and the four County departments, and serve as the primary

contact to work directly with the Tyler Project Manager and Superior Court's Project Manager. The responsibilities of this individual include, but are not limited to, the following activities:

1. Coordinate the participation of County departments' representatives in all project activities, such as training, business process review, and workshops.
2. Coordinate the review of project deliverables and collecting feedback from the County.
3. Coordinate approval of project deliverables.
4. Together with Tyler's Project Manager, work towards keeping the project on schedule and on budget.
5. Communicate project status to the County Executive Team.

The coordination of gaining County feedback and approval on project deliverables will be critical to the success of this project. The County Project Manager will strive to gain deliverable and decision approvals from all authorized County representatives within 5 business days. Given that the designated decision-maker for each of the County departments may not always be available throughout the project's duration, there will need to be a designated backup proxy authorization for each decision point in the project. Assignment of each proxy will be the responsibility of the leadership from each County department. The proxies will be named individuals that have the authorization to make decisions on behalf of their department.

## Project Approach

Throughout the project, Tyler will leverage our extensive experience in similar projects, thereby allowing the County to focus on any strategic issues that need to be addressed as well as the strategic decisions that need to be made. The aforementioned six major phases involve a series of distinct tasks and deliverables for configuring and deploying the Odyssey solution. The phases and associated tasks will be performed in this project are detailed below.

### Phase 1: Project Initiation and Planning

This phase involves Pre-Implementation Planning and the Business Process Review and Facilitates verifying that the sequencing, timing, and scope for the project are correct. The specific tasks of this phase are described below.

### Task 1.1 – Project Planning

Tyler will work with the County to coordinate and plan a formal project kickoff meeting. This meeting signifies the start of the project and should be attended by representatives from each of the County departments as determined by the Project Manager. Together during the meeting, the team will review the project organization, project governance, project tracking and reporting tools, implementation lifecycle, and product development lifecycle.

Additionally, Tyler will introduce its implementation methodologies, terminology, and best practices to the County Project Team. This task will also present an opportunity for project managers and The County Executive Team to discuss the type of metrics and status reporting to be used to measure project progress and manage change. The attendees will leave the kickoff with an understanding of the project activities and their respective roles within each of the activities.

Tyler will work together with the County Project Team to prepare and deliver the most important project planning components required for delivery.   The activities will include creation and confirmation of the following project documents:

- User Acceptance Testing Plan
- Training Plan
- Change Management Plan

The purpose of creating these plans early in the project is to establish the basic structure of each of these plans based on previous experience and known best practices.  Each of these plans will continue to evolve and grow as the project progresses and additional details of the project emerge.

**Assumptions**
- The project kickoff will be conducted at single, central, location.
- The County Project Team will provide a meeting room sufficient to conduct a project kickoff meeting.

**County Involvement**
- County Executive Team and Project Team will attend the project kickoff.
- County Executive Team and Project Team will provide input and feedback into the Project Management Plan Deliverable.
- County Project Team will provide feedback and input on the Project Operational Plan deliverable.

**Deliverables**

| Deliverable | Description |
|---|---|
| **1.1.1 Project Management Plan** | This deliverable sets the foundation for the project by providing executive-level descriptions of the project vision, scope, methods of communication, and projected schedule. This document will be maintained throughout the duration of the project and kept up-to-date as changes to the project are decided upon.  The deliverable's intent is to be a working document used to help manage, track, and assign project tasks and progress. This deliverable includes four components listed below:<br><br>1. **Project Charter.**  This section of the deliverable authorizes the work of the project to begin and gives the Project Management Office the authority to manage the project.   This document will include a description of the intent of the project and expected results for the project.<br>2. **Communication Plan.**  This section of the deliverable details the flow of communication within the project. The deliverable includes communication between Tyler and County resources, as well as those who need to be informed and in what situations.<br>3. **Statement of Work (SOW).**  The statement of work will be incorporated into the Project Management Plan.<br>4. **Project Schedule.**  This section of the deliverable refines the proposed project plan, schedule, and organization; includes the identification of specific core and extended project team members from both Tyler and the County. |
| **1.1.2 Project Operational Plans** | The project operational plan is a combination of a number of smaller project operational plans combined together under a single document.  The three major components of the project operational plan are defined below:<br><br>1. **User Acceptance Testing (UAT) Plan.**  This document outlines the approach, plans, and resources necessary to conduct UAT.<br>2. **Training Plan.**  This document outlines the basic training approach, components, and curriculums. Assignment of end users to courses and curriculums will occur as the users are organized into roles and specific training needs are identified. |



|  | 3. **Change Management Plan.** This plan outlines the approach and activities that the combined project team will execute to proactively manage the level of organizational change. |
|---|---|

## Task 1.2 – Business Process Review

The Odyssey Case Manager product is a mature, robust application, and is the most widely implemented County case management system in the country.  Substantial development and industry knowledge has been invested in making Odyssey the premier case management solution in the nation.

In line with our experience, one of the initial tasks of any Odyssey implementations is a Business Process review.  The purpose of this task is to perform a high level walk through of the business unit needs of the County and how those needs can be met with Odyssey via configuration and business process improvements.

There are two activities that the County Project Team will be involved with prior to the business process review actually beginning:

- **Conduct Odyssey Basics Overview** – Prior to the business process review, Tyler will conduct an Odyssey Basics overview class for the business process review participants. The Odyssey Basics overview is a high-level training class that provides the participants with a basic understanding of the entire Odyssey solution.
- **Gather and Prepare Use Case Scenarios** – Tyler will ask the County Project Team to gather and prepare use case scenarios that are good representations of the County's major business process scenarios.  Tyler will work with the County Project Team to arrange these scenarios into a schedule for the business process review.

As part of the business process review, the project teams will examine any currently required external system integrations.  This activity will involve the representative(s) from each County department as appropriate.  Tyler will seek to understand key information about each existing integration to make a joint determination on the best method for meeting each of the County's integration requirements.    The result of this activity is basic determination for how each integration point will be satisfied (system interface developed, report generated, inquiry access provided, etc.)

In parallel to the activities listed above, the PMO will work to schedule the business process review sessions.  The business process review is a series of sessions with specific functional areas being covered at each session.

During the sessions, Tyler will conduct a walkthrough of the County's prepared use case scenarios.   The County Project Team will jointly review the solution within Odyssey in relation to the County's business needs.

As a product of this review, Tyler will prepare a business strategy document noting all recommended process changes, as well as any items that will need the Tyler Development team to address.

The outcome of each identified item could have one of three actions:

1. Implementing a change to the existing business practice to accomplish the same objective, without a modification to the software.
2. Identifying a solution that can be accomplished through Odyssey configuration.
3. Identifying a modification (customization) to Odyssey not included in the minimum functionality, to satisfy the requirement. Such a modification will have a separate scope and estimate defined and incorporated into the project's SOW after approval by the County Executive Team and County Project Manager.

The business process results will be reviewed with County Executive Team and County Project Team, with actions decided for each of the identified business needs. Results are also prioritized as to when each item needs to be delivered; prior to the initial go-live or after. As a proven approach for success, Tyler encourages all of our clients to only authorize those modifications absolutely necessary for day-one operations (for e.g., modifications to satisfy state law, local County rules, etc.).

**Assumptions**
- The business process review will involve County ITS and all four County criminal justice departments (Jail, Probation Department, District Attorney, and Public Defender).
- The Odyssey basics training will be conducted onsite at a single, centralized, location that can accommodate the County's designated participants.
- For each County department, the business process review will be conducted at a single, centralized, location that can accommodate participants from the relevant County department.
- The County IT Team will provide access to the current system environments for the purpose of conducting the business process review exercise.
- The County Project Team will prepare business scenario documentation for the purposes of conducting the business process review (with direction from Tyler).
- Appropriate SMEs from each of County departments and their justice partners involved with any identified integrations will be available as needed during the integration portion of the business process review exercise.

**County Involvement**
- The County Project Team and County IT Team will participate in the Business Process Review.
- The County Project Team and County IT Team will provide sufficient feedback and review of the Business Process Review Report.
- The County Executive Team will finalize decisions on all identified Odyssey modifications.

**Deliverables**



| Deliverable | Description |
|---|---|
| **1.2.1 Business Process Review Report** | Report capturing the results of the Business Process Review. This report will include:<br><br>• Summary of the business process review results<br>• Prioritized listing of critical items and estimated development (customization) needs<br>• Listing of process redesign and business practice change opportunities |

## Task 1.3 – Infrastructure Planning and IFL Overview

During this task Tyler will work with the County IT Team to plan for and design the County's Odyssey infrastructure. As part of this activity, Tyler will also provide the County IT Team with all Odyssey specifications and compatibility requirements for desktop hardware and peripheral devices. The County IT Team can leverage these specifications to ensure that its hardware environment is optimized to effectively operate the Odyssey environment.

In addition to the infrastructure planning during this task Tyler will also provide a one-day onsite overview of the Intermediate File Layout (IFL) toolset. The purpose of this training is to provide the County IT Team with a basic overview of the IFL toolset and framework for the purposes of determining the data conversion approach and resources.

**Assumptions**
- The County Odyssey ICJ solution will share the same infrastructure as the Odyssey solution currently being implemented with the Kern Superior Court.
- The County IT Team will communicate any preferences or predispositions that pertain to system architecture, peripheral devices, and/or technical capabilities.
- The County IT Team will provide input and feedback to the Solution Design document.

**County Involvement**
- The County IT Team and External Stakeholders will be designated by the County to contribute in architecture design discussions.
- The County IT Team will be involved in the review and feedback on the Solution Design deliverable.

**Deliverables**

| Deliverable | Description |
|---|---|
| **1.3.1 Solution Design** | Documents the planned Odyssey Environments (e.g. Production, Testing, Staging), and the necessary underlying infrastructure. This document will serve as the basis of any necessary hardware procurement and provisioning of server and network resources, as well as a guide to initial installation and repeatable processes for managing the environments on |

| | a continual basis. |
|---|---|

## Phase 2:  Solution Design and Development

This phase is focused on the design and development of the overall solution.  This phase will establish the detailed specification and development of application refinements identified in Phase 1; development and testing of integrations identified in Phase 1; establishing the technical infrastructure and application installation processes; configuration of the Odyssey solution to meet the County's specific needs; and iterative refinement and testing of business processes and procedures.

### Task 2.1 – Infrastructure Setup and Installation

Tyler and the County IT Team will work together to determine and define the optimal Odyssey environment, in accordance with the Solution Design document.  Tyler will work side-by-side with the County IT Team to install Odyssey and explain and train the team on the Odyssey installation manager.

Additionally, Tyler will send a list of compatible peripheral hardware devices (driver's license reader, fingerprint reader, handheld inmate tracking scanner) to the County IT Team and will work with the team to identify and purchase any necessary hardware.

**Assumptions**
- All necessary required hardware for operating Odyssey will be in place and ready for use.

**County Involvement**
- The County IT Team will be heavily involved in determining the optimal infrastructure configurations.

**Deliverables**

| Deliverable | Description |
|---|---|
| 2.1.1 Certification of Infrastructure Environment | Tyler shall certify that the Odyssey environment constructed is optimized to support the County's user base. |

### Task 2.2 – Application Development (Placeholder Only)

This task serves as a placeholder should any mission critical customizations be identified in Phase 1.  The Project is focused on providing a COTS-based Odyssey solution that is configured to the County's business needs with very limited to no customization.  However, should there be necessary customizations identified and approved by the County Executive Team, the necessary project activities will be completed in this task.

For this project, the County has an allowance of 1,800 development hours for establishing any customizations identified during the Business Process Review (Task 1.2).  The use of the hours are at the County's discretion.  During the Business Process Review, any identified functionality

gaps that cannot be met through configuration and/or business process improvements will be documented and prioritized. At that time, the County leadership can determine which functions are to be established during the project using the 1,800 hours of customization allowance.

The first step in the development process is the preparation of a conceptual process design (CPD). The CPD describes the business problem and how it will be addressed in Odyssey. It "tells the story," in addition to outlining the technical solution. The goal is to ensure that the requirements have been properly translated into a design that solves the business problem. The CPD is reviewed with the County Project Team either through a GoToMeeting (online) session or an on-site review. Modifications are made if necessary to the CPD prior to approval. During the CPD process, the original sizing estimate done during the business process review is evaluated. Finally, the revised CPD and estimate are approved by the County Executive Team.

For certain enhancement requests, Tyler will ask the County Project Team to take part in additional enhancement design/review meetings held throughout the development cycle. Because this process adds overhead to the development cycle, it is ideal for larger enhancements only or enhancements where the Tyler team feels there is a higher than normal risk of missing a requirement. The Tyler project manager will communicate anticipated release and review periods with the County Project Team. Additional activities, including configuration, testing, and enhancement approval, will be performed as part of Tyler's standard development release cycle.

In this task, Tyler will complete delivery of all the identified application and integration development work into the County test environment. Prior to delivery into the County environment all integrations and application enhancements will have been fully tested. These application enhancements will be packaged into a standard Odyssey release and as such will have completed Tyler's full QA and regression testing processes prior to delivery. In order for a software package to be released to a client's environment it will have been fully regression tested with a set of over 2,000 test scripts. No failures can exist within this regression test set; else the product is halted for release. Additionally, no Severity Level 1 or Severity Level 2 defects can exist for the product to be released.

**Assumptions**
- This task will be performed on an as-needed basis only.

**County Involvement**
- The County Executive Team will provide direction on the necessity of this task.

**Deliverables**

| Deliverable | Description |
|---|---|
| 2.2.1 Application CPD Documents | Conceptual Process Design Document for each approved application development project. This document tells the user story of the required development, as well as detail fields and functionality intended. |

| 2.2.2 Application Development Complete | Once application development is completed, Tyler will deliver the application enhancements to the County's Odyssey test environment for user acceptance testing. |
|---|---|

### Task 2.3 – Integration Development

Tyler's integration approach provides a standards-based integration platform for exchanging data between the County's Odyssey environment and external systems.  Tyler will enhance Odyssey to reflect identified California specific functionality as Tyler's investment into the California market.  These enhancements include state-level integration development work and statistical reporting work needed for functionality to comply with state statute and federal mandates.  Tyler will work closely with the County to validate the details of the mandated functionality to be included as part of the project, as some efforts may impact the Go-Live target dates.  Examples of these items include the Juvenile Court and Probation Statistical System (JCPSS) report, recidivism report, and monthly juvenile placement activities.

The County will lead the overall effort for establishing local integrations.  Tyler will provide the tools, training, and oversight for local integration development.  Tyler will assist the County with identifying and prioritizing those local integrations that need to be established prior to Go-Live or after (post Go-Live).Additionally, at the County's direction, Tyler may also use hours from the allowance of 1,800 development hours to work collaboratively with the County on establishing the first few local integrations that were collectively determined to be included for Go-Live. Examples of these local integrations include Odyssey interfaces with the following:

1. Noble View Risk Assessments
2. AFIS/COGENT for fast finger lookup
3. TouchPay kiosks
4. Inmate phone system
5. JusticeTrax forensic and evidence management software (District Attorney)
6. ARIETIS (Electronic Probable Cause declarations/Field Arrest Data Sheets and Search Warrants)
7. Keefe Commissary (Jail Commissary System)

Tyler strongly recommends that the County Executive Team only authorize those integrations absolutely necessary for day-one operations (for e.g., integrations to satisfy state law, local County rules, etc.).  The County IT Team will then establish the decided-upon integrations identified and prioritized and confirmed during the Business Process Review.  As unit testing is completed for each of the integrations, those integrations are packaged for deployment and released into the County's Odyssey testing environment.

In this task, Tyler will provide the County IT Team, and designated External Stakeholders, with training on the Odyssey Integration Toolkit. The purpose of providing training on the Integration Toolkit is to provide the County with the knowledge and expertise to maintain and enhance their local integration environment after the initial implementation of Odyssey is complete.

### Assumptions
- Tyler will lead the development of any identified state-mandated integrations and state reports with support from the County IT Team.
- The County IT Team will lead the local integration development effort; Tyler will provide

REDACTED

training to the appropriate County technical personnel on the use of the Odyssey Integration Toolkit.   Tyler will then serve in a consulting/advisory role as the County establishes the necessary system interfaces.

- Tyler will work with the County during the Business Process Review to finalize the state-level integrations and reports to be included for Go-Live, and determine the prioritization of projects and the order of completion.
- For all local interfaces, Tyler will work with the County to establish the integration components for facilitating data into, and out-of, Odyssey using the Integration Toolkit.
- In addition to the aforementioned assumption, for complete end-to-end integration, Tyler assumes that any involved external justice partners will be responsible for the translation, transportation, and receiving of published County information into their individual systems.
- The County will provide facilities sufficient for conducting the Integration Toolkit training.
- All Odyssey information will be published using the Odyssey's native XML.
- Appropriate SMEs from any external partner agencies involved with local integrations with the County will be available as needed.
- External Stakeholders are responsible for providing the necessary IT environment for testing interfaces.

**County Involvement**
- The County IT Team will lead the local integration development effort.
- The County IT Team will provide timely review of all CPD and/or other design documents.
- The County Project Team will provide test scripts and scenarios to the development team as necessary.
- The County IT Team, and its designees, will be involved in attending and participating in the Integration Toolkit training.

**Deliverables**

| Deliverable | Description |
|---|---|
| 2.3.1 Integration CPD Documents | Conceptual Process Design Document for each integration development project. This document tells the user story of the required development, as well as detail fields and functionality intended. |
| 2.3.2 Integration Development Complete | Once the integration development projects are completed, Tyler will deliver the completed interfaces to the County's test environment for user acceptance testing. |

**Task 2.4 – Conduct Integration Toolkit Workshop**

In this task, Tyler will conduct a training workshop on the Odyssey Integration Toolkit for the County's designated resources.  The Odyssey Integration Toolkit included in Tyler's solution is a robust set of APIs and XML notification components that allows reliable and maintainable access to the rich set of Odyssey data, while observing configured business rules and relationships.  The Toolkit comprises three areas:

- **API look-up services** – Web services that respond to standard information requests to retrieve information from the Odyssey database and return it to the requesting application.
- **API update services** – Web services that update information into the Odyssey database. All API services are schema-verified and transaction-based.
- **XML notification services** – Configurable XML m e s s a g e s that are triggered by application business events, such as case updated, party updated, or hearing scheduled.

The Odyssey Integration Toolkit is an extension of the Odyssey application itself. It builds on the same technologies as the main Odyssey application and evolves alongside the application continually—without destabilizing what has already been accomplished. Careful maintenance of the XML schema formats insulates integration components from ongoing enhancements to the main Odyssey core application.

**Assumptions**
- Tyler will conduct the integration toolkit training workshop at a central location designated by the County.

**County Involvement**
- The County IT Team will designate the appropriate staff to participate in the workshop.

**Deliverables**

| Deliverable | Description |
|---|---|
| **2.4.1 Integration Toolkit Workshop** | The Integration Toolkit training will be conducted onsite at one of the County's facilities. Tyler will work with the County Project Manager to schedule the workshop at an appropriate time to accommodate availability of resources. |

## Phase 3: Jail Odyssey Deployment
This phase will complete the deployment of the Odyssey Jail Manager solution for the Kern County Sheriff's Office Jail and Probation Department's juvenile detention facilities.

## Task 3.1 – Configuration
After the initial software is delivered and installed, Tyler will work with the County Project Team to establish the configuration of the Odyssey application that will prepare the system for the next phase of activities.

The configuration team will reuse scenarios prepared and information learned during the business process review as the starting point for the configuration/workflow task. During this task, the County Project Team and the Tyler configuration team will review and document the case processing workflow in Odyssey.

Tyler will prepare the teams for the configuration with a series of workshops. The workshops focus on the areas of configuration, forms, reports, and process review and design. Each workshop has been set up to instruct participants on best practices for performing each of the

REDACTED

functions. The purpose of the configuration workshop is to jointly configure the system with the County Project Team.

For the code configuration, forms, reports, and process review workshops, the project managers will be diligent in monitoring and reviewing the output of the session. At the end of the configuration/workflow design milestone, the teams will have successfully configured the Odyssey solution and defined selected critical processes. Additionally, the County Project Team will be confident in its ability to support, maintain, and modify the system configuration over time to meet new business needs.

**Assumptions**
- The Jail and Probation Department will have the appropriate representatives participate in configuration workshops.
- The County Project Team will provide sufficient meeting space to conduct all configuration workshops.
- The County IT Team will provide the desktop hardware necessary to conduct the configuration workshop.
- The County Project Team will complete their necessary configuration assignments in a mutually agreed upon timeframe.

**County Involvement**
- The County IT Team and Project Team will be heavily involved in all aspects of the configuration process.

**Workshops and Deliverables**

| Deliverable | Description |
| --- | --- |
| 3.1.1 Configuration Plan | This deliverable outlines the configuration plan. |
| 3.1.2 Jail Manager Configuration Workshop Completed | Workshops to be delivered on site by Tyler personnel to the County Project Team. Attendance by the County Project Team will be determined based on the subject matter of each configuration workshop. |
| 3.1.3 Security Workshop Completed | Workshop to be delivered on site by Tyler personnel to the County Project Team and County IT Team on security configuration. Attendance by County Project Team and County IT Team personnel will be jointly determined based on the division of responsibilities. |
| 3.1.4 Forms Workshop Completed | Workshop to be delivered on site by Tyler personnel to the County Project Team and County IT Team. Attendance by the County Project Team and County IT Team personnel will be jointly determined based on the division of responsibilities established by the County as well as the subject matter of each |

| | |
|---|---|
| | workshop. |
| **3.1.5 Configuration Tracking Spreadsheet** | Completed spreadsheet used to track the progress and completion of all application configuration tasks, activities, and assignments. |

**Task 3.2 – Data Conversion**

In this task, Tyler will work with the County's data experts to conduct multiple iterations of an automated data conversion. The purpose of this task is to transition the County's relevant jail and juvenile detention data from their legacy systems to Odyssey. This task will save the County time and effort during the go-live and transition process. This task will include a series of activities surrounding the conversion of data or the development of business processes to support the County's transition to the new Odyssey environment. Tyler and the County will assemble a high level data conversion team that will be in place throughout the project.

As part of the County's conversion activities, its business team should evaluate its legacy data to determine what data elements truly need to be brought forward to the new system. Our experience has shown us that in many cases data elements exist which no longer are utilized due to statutory or business process changes, or are otherwise of limited to no use to the County once they have transitioned to Odyssey. Data conversions are a significant undertaking to both Tyler and the County, and care should be taken to focus conversion efforts on data elements and business rules that will be of use to the County moving forward. Tyler has developed a world-class Conversion Toolkit Framework, which has been expanded and enhanced based on hundreds of our successful conversions. The Framework is kept current with Odyssey releases and service packs. It has tools that allow for validation of the data and also to verify that no data has been left behind.

To complete the conversion cycles, the conversion team will work with the business team performing a total data conversion and data validation. The teams will execute several cycles completing the following tasks for each cycle:

- Execute conversion scripts pushing data to configured site
- Review data with County Project Team
- Document data exceptions and business rules to be applied
- Document schema mapping, assumptions, and decisions applied to converted data
- Identify and document source data to be cleaned up prior to the next conversion run
- Update scripts as needed to influence different or additional data behavior

REDACTED

It is very common to find data issues with the conversion in its initial iterations. As the issues are identified, the teams will update scripts and conversion routines as necessary to create the desired output. The teams will repeat this process until the joint teams agree that the conversion routines and the physical data have been validated for production. This iterative process will recur until the data is production-ready. Historically, our conversion teams run three cycles before the teams approve the data conversion for the go-live transition. Once the data has been validated, the team will stage the conversion routines and any procedural instructions for User Acceptance Testing (Mock Go-Live).

**Assumptions**
- The scope of this task is limited to the County's primary legacy jail system (CJIS) and the systems currently used by the three juvenile detention institutions (FileMaker Pro 12.0, Visual FoxPro, and Microsoft Excel).
- Tyler will be provided with data from the source system(s) in a non-proprietary format (e.g. SQL Server tables, comma separated ASCII files, or some other mutually agreeable form, and on media that is readable by Tyler).
- Tyler will perform a standard conversion from the source system(s) to the Odyssey database using Tyler's existing IFL tool.
- This proposal assumes all data will be converted "as-is" with limited or zero data manipulation or cleanup.
- Tyler will work closely with the County representatives to identify business rules before writing the conversion. This step is typically defined as data mapping (mapping legacy data to Odyssey destinations).
- Tyler will perform three data pushes and lock the conversion code after the third iteration.
- The County Project Team leads and/or County Executives will make the necessary decisions on the data conversion strategic approach in a timely manner.

**County Involvement**
- The County's subject matter experts and resources most familiar with the current data will be involved in the data conversion effort.

**Deliverables**

| Deliverable | Description |
|---|---|
| 3.2.1 Load of Legacy Data into Staging Database | Legacy data conversion successfully extracted from the legacy environment by the County IT Team and loaded into the staging database by Tyler. |
| 3.2.2 Completion of Data Mapping | Mapping of legacy data is complete. The County will complete the mapping of data elements with assistance and guidance from Tyler. |
| 3.2.3 First Data Conversion Push | First data push from the staging database into the conversion environment is completed. |

REDACTED

**Task 3.3 – System Test (User Acceptance Testing)**

After any identified application customizations and/or integrations are delivered, configuration is finalized, and procedures are completed; the joint team will conduct a full system test of the completed business solution.    This is meant to simulate the actual transition and initial operation of the system in production, and is sometimes referred to as a "mock go-live".

Using predefined scenarios and business workflow documentation, the business teams will work to test end-to-end processes through the system.   Each area of the application is carefully tested; results are collected and reviewed. If issues are found, they are documented and addressed.   Mitigation procedures promptly begin to address any items prior to the start of end user training.

The goal for end user acceptance testing is a full end-to-end test cycle.  This testing will verify that all aspects of the project (configuration, forms configuration, security configuration, development, data conversion, integration, and procedures) are working seamlessly.   Testing cycles should be completed on both existing and new case scenarios, and verify the system is operating at the expected level needed to support an end user go-live.   This activity serves several purposes.  Collectively the teams have performed a mock go-live.  This will give the project management team a solid view of activities and issues that will arise over the actual go-live weekend.  Running the predefined scenarios through the new site, the County Project Team are able to validate end-to-end functional processes including any integration packages.

**Assumptions**
- This task will be coordinated, and conducted together with, the User Acceptance Testing (UAT) activities for the other County criminal justice departments in scope of this project.
- This task will coordinated, and conducted together with, the UAT activities of the Kern Superior Court's Odyssey implementation for criminal case processing.
- The County Project Team will have developed the necessary test scenarios as part of the Business Process Review and Configuration activities.
- All test scripts will have been completed jointly between the County Project Team and Tyler as part of the development of the application development tasks; specifically the development and approval of the CPD documents.
- External Stakeholders will participate as necessary in executing the test scenarios.
- External Stakeholders will provide the environment(s) necessary to conduct acceptance testing (interfaces), as needed.

**County Involvement**
- The County Project Team and County IT Team will be heavily involved in conducting the user acceptance testing task.

**Deliverables**

| Deliverable | Description |
|---|---|
| 3.3.1 User Acceptance Testing | Report documenting the completion and approval of user acceptance testing.  This includes verification of configuration, |

| Report | development, integrations, and updated business process procedures. |
|---|---|

### Task 3.4 – Jail Odyssey Go-Live

This task will complete the Go-Live project activities for the deployment of the Odyssey Jail Manager solution for the Kern County Sheriff's Office Jail and Probation Department's juvenile detention institutions.    A successful go-live starts with detailed planning of the activities, timeframes, and decision points necessary to ensure predictable results.    This reduces the operational risks involved with the County's transition to Odyssey.  While each County will have unique characteristics, generally the methodology used to conduct go-live activities remains unchanged.

To arrive at this point, the County Project Team and Tyler will have successfully completed each of the following project milestones:

- Configuration Complete
- Any determined Application Development Complete
- Integration Development Complete
- End-to-end Functionality Validation Complete

Once Sign-off on User Acceptance Testing has been accomplished, training can proceed, and in parallel, the final detailed planning for cutover to the new system and processes will be performed.  This typically includes detailed hour-by-hour task lists, completion checklists, and contact information for all key affected personnel, key decision points and contingency plans. During this process, Tyler will plan accordingly to minimize any impact to the County, the County's external partners, and the public during the actual cut-over.

**Assumptions**
- Go-live activities will be coordinated, and conducted together with, the go-live activities for the other County criminal justice departments in scope of this project.
- This task will coordinated, and conducted together with, the go-live activities of the Kern Superior Court's Odyssey implementation for criminal case processing.
- The County Project Team has signed off that user acceptance testing has completed.
- The County Project Team will provide review and feedback on the Go-Live Transition Plan.

**County Involvement**
- The County Project Team will be involved in development, review, and approval of the Go-Live Transition plan.
- Designated and trained County personnel will support Tyler personnel on go-live activities at remote/satellite facility locations in the County.

**Deliverables**

| Deliverable | Description |
|---|---|
| 3.4.1 Go-Live | The Go-Live Transition Plan details out the exact plan for the |

| | |
|---|---|
| **Transition Plan** | go-live event.  This includes a detailed task list of activities, estimated duration, and task owner.   In addition, the go-live transition plan will document all contingency plans should issues or problems be encountered. |

## Training

Using a training plan previously reviewed and approved, the PMO will initiate the training activities.  Training materials and the course plan are organized through a series of modules that focus training on the subject matter experts' specific job functions.

Training is administered so as to minimally impact the day-to-day operations of each criminal justice department.  The schedule and plan are created with the County's supervisors so that the operation of the departments can continue during training.

### Assumptions

- The County Project Team will work with Tyler to jointly develop a training plan that identifies the size, makeup, and subject-area of each of the training classes.
- The County Project Team will provide training facilities and all equipment necessary to execute the agreed upon training plan.
- Tyler will work with the County as much as possible to provide end-user training in a manner that minimizes the impact to daily County departments' operations.

### County Involvement

- Designated and trained County personnel will provide assistance to Tyler trainers in conducting the end-user training.

### Deliverables

| Deliverable | Description |
|---|---|
| **3.4.2 Training Plans and Materials** | The training plan will detail out which end-user courses will be conducted and which County staff will attend each course. Additional training materials will be developed and delivered as necessary based on the training needs identified.   For the training materials, the County can decide to include the following:<br><br>• screen shots<br>• text instructions<br>• quick reference guides<br>• e-learning or just-in-time (on demand) job aids,<br>• Web-based manuals, job aids, etc.<br>• minimal number of screens required to do a task (such as initiate a case)<br>• specific operational processing by functional area<br>• system administration and Help Desk guides |

| | including, but not limited to installation, troubleshooting procedures, system update, ad hoc reporting, tuning, and integrating local components<br>• other materials as required by the County to ensure they can maintain functionality and daily operations<br><br>The exact materials to be produced and used during the training process will be determined by agreement of the joint project teams. |
|---|---|
| 3.4.3 Go-Live Push to Production | The County's legacy data is pushed into the production environments as part of the go-live activities. |

Go-Live

To assist with the actual go-live transition, the PMO will add additional personnel to the project team. In coordination with the County Project Manager, Tyler will engage additional project implementation personnel, integration specialists and/or support personnel to assist during the go-live process. The exact composition of the go-live team will be jointly determined by the PMO based on perceived need and any special conditions that may exist.

The weeks prior to and after the go-live will be planned in detail. This includes activities regarding pending case transition, configuration, environments, operations, financials, calendars, and personnel. The PMO will establish the go-live plan and the method by which its status will be communicated to all involved.

For every system go-live, Tyler strives to maintain business continuity and minimize downtime during regular business hours. Tyler will work with the Jail, in conjunction with other participating agencies to determine the go-live date. The ideal timing for go-live is during the slowest business day(s) of the week. As an example, Sunday morning through Tuesday afternoon, to limit impact of daily operations.

Upon completion of Tuesday's business, the defined strategy for population of pending jailing's should be implemented. System validation and checkout should be conducted at this time. It is recommended that a reduced workforce be available for data entry in all areas of operations on Tuesday, around mid-morning. This allows for maximum focus on procedural, workstation, security, training and system issues, with limited impact to daily operations. Effectively, the system is live on Tuesday and available to the County's staff.

Assumptions
• External Stakeholders will be available to assist in supporting the interfaces associated with the go-live process.
• Tyler will work with the County as much as possible to provide post Go-Live end-user training in a manner that minimizes the impact to daily County operations.

County Involvement
• The County Project Team will be involved in supporting the go-live process.

REDACTED

**Deliverables**

| Deliverable | Description |
|---|---|
| 3.4.4 Go-Live Status Reports | Weekly status reports that identify the running log of issues and associated resolution plans during the cutover process to the new system.  It is anticipated that there will be four weeks of go-live status reports delivered, however the exact number will be jointly determined by the PMO based on need and relevance. |

## Phase 4:  Probation Odyssey Deployment

This phase will complete the deployment of the Odyssey Supervision solution for the Kern County Probation Department's adult and juvenile probation operations.

### Task 4.1 – Configuration

After the initial software is delivered and installed, Tyler will work with the County Project Team to establish the configuration of the Odyssey application that will prepare the system for the next phase of activities.

The configuration team will reuse scenarios prepared and information learned during the business process review as the starting point for the configuration/workflow task.  During this task, the County Project Team and the Tyler configuration team will review and document the case processing workflow in Odyssey.

Tyler will prepare the teams for the configuration with a series of workshops.  The workshops focus on the areas of configuration, forms, reports, and process review and design.    Each workshop has been set up to instruct participants on best practices for performing each of the functions.  The purpose of the configuration workshop is to jointly configure the system with the County Project Team.

For the code configuration, forms, reports, and process review workshops, the project managers will be diligent in monitoring and reviewing the output of the session.   At the end of the configuration/workflow design milestone, the teams will have successfully configured the Odyssey solution and defined selected critical processes.  Additionally, the County Project Team will be confident in its ability to support, maintain, and modify the system configuration over time to meet new business needs.

**Assumptions**
- The Probation Department will have the appropriate representatives participate in configuration workshops.
- The County Project Team will provide sufficient meeting space to conduct all configuration workshops.
- The County IT Team will provide the desktop hardware necessary to conduct the configuration workshop.
- The County Project Team will complete their necessary configuration assignments in a mutually agreed upon timeframe.

**County Involvement**
- The County IT Team and Project Team will be heavily involved in all aspects of the configuration process.

**Workshops and Deliverables**

| Deliverable | Description |
|---|---|
| 4.1.1 Configuration Plan | This deliverable outlines the configuration plan. |
| 4.1.2 Supervision Configuration Workshop Completed | Workshops to be delivered on site by Tyler personnel to the County Project Team. Attendance by the County Project Team will be determined based on the subject matter of each configuration workshop. |
| 4.1.3 Security Workshop Completed | Workshop to be delivered on site by Tyler personnel to the County Project Team and County IT Team on security configuration. Attendance by County Project Team and County IT Team personnel will be jointly determined based on the division of responsibilities. |
| 4.1.4 Forms Workshop Completed | Workshop to be delivered on site by Tyler personnel to the County Project Team and County IT Team. Attendance by the County Project Team and County IT Team personnel will be jointly determined based on the division of responsibilities established by the County as well as the subject matter of each workshop. |
| 4.1.5 Configuration Tracking Spreadsheet | Completed spreadsheet used to track the progress and completion of all application configuration tasks, activities, and assignments. |

**Task 4.2 – Data Conversion**

In this task, Tyler will work with the County's data experts to conduct multiple iterations of an automated data conversion. The purpose of this task is to transition the County Probation Department's relevant adult and juvenile probation data from their legacy systems to Odyssey. This task will save the County time and effort during the go-live and transition process. This task will include a series of activities surrounding the conversion of data or the development of business processes to support the County's transition to the new Odyssey environment. Tyler and the County will assemble a high level data conversion team that will be in place throughout the project.

As part of the County's conversion activities, its business team should evaluate its legacy data to determine what data elements truly need to be brought forward to the new system. Our experience has shown us that in many cases data elements exist which no longer are utilized due to statutory or business process changes, or are otherwise of limited to no use to the

County once they have transitioned to Odyssey.   Data conversions are a significant undertaking to both Tyler and the County, and care should be taken to focus conversion efforts on data elements and business rules that will be of use to the County moving forward.     Tyler has developed a world-class Conversion Toolkit Framework, which has been expanded and enhanced based on hundreds of our successful conversions.  The Framework is kept current with Odyssey releases and service packs.  It has tools that allow for validation of the data and also to verify that no data has been left behind.

To complete the conversion cycles, the conversion team will work with the business team performing a total data conversion and data validation.  The teams will execute several cycles completing the following tasks for each cycle:

- Execute conversion scripts pushing data to configured site
- Review data with County Project Team
- Document data exceptions and business rules to be applied
- Document schema mapping, assumptions, and decisions applied to converted data
- Identify and document source data to be cleaned up prior to the next conversion run
- Update scripts as needed to influence different or additional data behavior

It is very common to find data issues with the conversion in its initial iterations.  As the issues are identified, the teams will update scripts and conversion routines as necessary to create the desired output.  The teams will repeat this process until the joint teams agree that the conversion routines and the physical data have been validated for production.  This iterative process will recur until the data is production-ready.  Historically, our conversion teams run three cycles before the teams approve the data conversion for the go-live transition.  Once the data has been validated, the team will stage the conversion routines and any procedural instructions for User Acceptance Testing (Mock Go-Live).

Assumptions
- The scope of this task is limited to the County's primary legacy probation systems: CJIS, ISIS (adult), Act 6.0 (juvenile), Visual FoxPro (work program), and AS400 (financial data).
- Tyler will be provided with data from the source system(s) in a non-proprietary format (e.g. SQL Server tables, comma separated ASCII files, or some other mutually agreeable form, and on media that is readable by Tyler).
- Tyler will perform a standard conversion from the source system(s) to the Odyssey database using Tyler's existing IFL tool.
- This proposal assumes all data will be converted "as-is" with limited or zero data manipulation or cleanup.
- Tyler will work closely with the County representatives to identify business rules before writing the conversion.  This step is typically defined as data mapping (mapping legacy data to Odyssey destinations).
- Tyler will perform three data pushes and lock the conversion code after the third iteration.
- The County Project Team leads and/or County Executives will make the necessary decisions on the data conversion strategic approach in a timely manner.

**County Involvement**
- The County's subject matter experts and resources most familiar with the current data will be involved in the data conversion effort.

**Deliverables**

| Deliverable | Description |
|---|---|
| 4.2.1 Load of Legacy Data into Staging Database | Legacy data conversion successfully extracted from the legacy environment by the County IT Team and loaded into the staging database by Tyler. |
| 4.2.2 Completion of Data Mapping | Mapping of legacy data is complete.  The County will complete the mapping of data elements with assistance and guidance from Tyler. |
| 4.2.3 First Data Conversion Push | First data push from the staging database into the conversion environment is completed. |

**Task 4.3 – System Test (User Acceptance Testing)**

After any identified application customizations and/or integrations are delivered, configuration is finalized, and procedures are completed; the joint team will conduct a full system test of the completed business solution.   This is meant to simulate the actual transition and initial operation of the system in production, and is sometimes referred to as a "mock go-live".

Using predefined scenarios and business workflow documentation, the business teams will work to test end-to-end processes through the system.   Each area of the application is carefully tested; results are collected and reviewed. If issues are found, they are documented and addressed.  Mitigation procedures promptly begin to address any items prior to the start of end user training.

The goal for end user acceptance testing is a full end-to-end test cycle.  This testing will verify that all aspects of the project (configuration, forms configuration, security configuration, development, data conversion, integration, and procedures) are working seamlessly.  Testing cycles should be completed on both existing and new case scenarios, and verify the system is operating at the expected level needed to support an end user go-live.  This activity serves several purposes.  Collectively the teams have performed a mock go-live.  This will give the project management team a solid view of activities and issues that will arise over the actual go-live weekend.  Running the predefined scenarios through the new site, the County Project Team are able to validate end-to-end functional processes including any integration packages.

**Assumptions**
- This task will be coordinated, and conducted together with, the User Acceptance Testing (UAT) activities for the other County criminal justice departments in scope of this project.
- This task will coordinated, and conducted together with, the UAT activities of the Kern Superior Court's Odyssey implementation for criminal case processing.

REDACTED

- The County Project Team will have developed the necessary test scenarios as part of the Business Process Review and Configuration activities.
- All test scripts will have been completed jointly between the County Project Team and Tyler as part of the development of the application development tasks; specifically the development and approval of the CPD documents.
- External Stakeholders will participate as necessary in executing the test scenarios.
- External Stakeholders will provide the environment(s) necessary to conduct acceptance testing (interfaces), as needed.

**County Involvement**
- The County Project Team and County IT Team will be heavily involved in conducting the user acceptance testing task.

**Deliverables**

| Deliverable | Description |
|---|---|
| 4.3.1 User Acceptance Testing Report | Report documenting the completion and approval of user acceptance testing. This includes verification of configuration, development, integrations, and updated business process procedures. |

**Task 4.4 – Probation Odyssey Go-Live**

This task will complete the deployment of the Odyssey Supervision solution for the Kern County Probation Department's adult and juvenile probation operations. A successful go-live starts with detailed planning of the activities, timeframes, and decision points necessary to ensure predictable results. This reduces the operational risks involved with the County's transition to Odyssey. While each County will have unique characteristics, generally the methodology used to conduct go-live activities remains unchanged.

To arrive at this point, the County Project Team and Tyler will have successfully completed each of the following project milestones:

- Configuration Complete
- Any determined Application Development Complete
- Integration Development Complete
- End-to-end Functionality Validation Complete

Once Sign-off on User Acceptance Testing has been accomplished, training can proceed, and in parallel, the final detailed planning for cutover to the new system and processes will be performed. This typically includes detailed hour-by-hour task lists, completion checklists, and contact information for all key affected personnel, key decision points and contingency plans. During this process, Tyler will plan accordingly to minimize any impact to the County, the County's external partners, and the public during the actual cut-over.

REDACTED

**Assumptions**
- Go-live activities will be coordinated, and conducted together with, the go-live activities for the other County criminal justice departments in scope of this project.
- This task will coordinated, and conducted together with, the go-live activities of the Kern Superior Court's Odyssey implementation for criminal case processing.
- The County Project Team has signed off that user acceptance testing has completed.
- The County Project Team will provide review and feedback on the Go-Live Transition Plan.

**County Involvement**
- The County Project Team will be involved in development, review, and approval of the Go-Live Transition plan.
- Designated and trained County personnel will support Tyler personnel on go-live activities at remote/satellite facility locations in the County.

**Deliverables**

| Deliverable | Description |
|---|---|
| 4.4.1 Go-Live Transition Plan | The Go-Live Transition Plan details out the exact plan for the go-live event. This includes a detailed task list of activities, estimated duration, and task owner. In addition, the go-live transition plan will document all contingency plans should issues or problems be encountered. |

Training

Using a training plan previously reviewed and approved, the PMO will initiate the training activities. Training materials and the course plan are organized through a series of modules that focus training on the subject matter experts' specific job functions.

Training is administered so as to minimally impact the day-to-day operations of each criminal justice department. The schedule and plan are created with the County's supervisors so that the operation of the departments can continue during training..

**Assumptions**
- The County Project Team will work with Tyler to jointly develop a training plan that identifies the size, makeup, and subject-area of each of the training classes.
- The County Project Team will provide training facilities and all equipment necessary to execute the agreed upon training plan.
- Tyler will work with the County as much as possible to provide end-user training in a manner that minimizes the impact to daily County departments' operations.

**County Involvement**
- Designated and trained County personnel will provide assistance to Tyler trainers in conducting the end-user training.

REDACTED

**Deliverables**

| Deliverable | Description |
|---|---|
| **4.4.2 Training Plans and Materials** | The training plan will detail out which end-user courses will be conducted and which County staff will attend each course. Additional training materials will be developed and delivered as necessary based on the training needs identified.   For the training materials, the County can decide to include the following:<br><br>• screen shots<br>• text instructions<br>• quick reference guides<br>• e-learning or just-in-time (on demand) job aids,<br>• Web-based manuals, job aids, etc.<br>• minimal number of screens required to do a task (such as initiate a case)<br>• specific operational processing by functional area<br>• system administration and Help Desk guides including, but not limited to installation, troubleshooting procedures, system update, ad hoc reporting, tuning, and integrating local components<br>• other materials as required by the County to ensure they can maintain functionality and daily operations<br><br>The exact materials to be produced and used during the training process will be determined by agreement of the joint project teams. |
| **4.4.3 Go-Live Push to Production** | The County's legacy data is pushed into the production environments as part of the go-live activities. |

## Go-Live

To assist with the actual go-live transition, the PMO will add additional personnel to the project team.  In coordination with the County Project Manager, Tyler will engage additional project implementation personnel, integration specialists and/or support personnel to assist during the go-live process.  The exact composition of the go-live team will be jointly determined by the PMO based on perceived need and any special conditions that may exist.

The weeks prior to and after the go-live will be planned in detail.  This includes activities regarding pending case transition, configuration, environments, operations, financials, calendars, and personnel.  The PMO will establish the go-live plan and the method by which its status will be communicated to all involved.

For every system go-live, Tyler strives to maintain business continuity and minimize downtime during regular business hours.  Tyler will work with the Probation Department, in conjunction with the other participating agencies, to plan for and determine the actual go-live date.  The ideal timing for the go-live is during the slowest business day(s) of the week.  One preferred strategy is to start the process on Friday and finish by Monday morning, allowing for maximum use of non-business hours for go-live activities.

Upon completion of Friday's business, the defined strategy for population of pending cases should be implemented.  System validation and checkout should be conducted at this time, generally on a Saturday.  It is recommended that a reduced workforce be available for data entry in all areas of operations on Sunday, around mid-morning.  This allows for maximum focus on procedural, workstation, security, training and system issues, with limited impact to daily operations.  Effectively, the system is live on Sunday and available to the County's staff.

Assumptions
- External Stakeholders will be available to assist in supporting the interfaces associated with the go-live process.
- Tyler will work with the County as much as possible to provide post Go-Live end-user training in a manner that minimizes the impact to daily County operations.

County Involvement
- The County Project Team will be involved in supporting the go-live process.

Deliverables

| Deliverable | Description |
|---|---|
| 4.4.4 Go-Live Status Reports | Weekly status reports that identify the running log of issues and associated resolution plans during the cutover process to the new system.  It is anticipated that there will be four weeks of go-live status reports delivered, however the exact number will be jointly determined by the PMO based on need and relevance. |

## Phase 5:  District Attorney and Public Defender Odyssey Deployment

This phase will complete the deployment of the Odyssey Attorney Manager solution for the Kern County District Attorney's Office and the Public Defender's Office.  Given that the Odyssey product center, called Attorney Manager, is designed for both prosecutors and public defenders, this phase will implement the Odyssey solution for the County District Attorney and Public Defender together.  Through configuration of security rights and roles, only the appropriate resources will have access to information in each of the separate departments' Odyssey virtual environment.

### Task 5.1 – Configuration

After the initial software is delivered and installed, Tyler will work with the County Project Team to establish the configuration of the Odyssey application that will prepare the system for the next phase of activities.

The configuration team will reuse scenarios prepared and information learned during the business process review as the starting point for the configuration/workflow task.  During this

REDACTED

task, the County Project Team and the Tyler configuration team will review and document the case processing workflow in Odyssey.

Tyler will prepare the teams for the configuration with a series of workshops. The workshops focus on the areas of configuration, forms, reports, and process review and design. Each workshop has been set up to instruct participants on best practices for performing each of the functions. The purpose of the configuration workshop is to jointly configure the system with the County Project Team.

For the code configuration, forms, reports, and process review workshops, the project managers will be diligent in monitoring and reviewing the output of the session. At the end of the configuration/workflow design milestone, the teams will have successfully configured the Odyssey solution and defined selected critical processes. Additionally, the County Project Team will be confident in its ability to support, maintain, and modify the system configuration over time to meet new business needs.

### Assumptions
- The District Attorney and the Public Defender will have the appropriate representatives participate in configuration workshops.
- The County Project Team will provide sufficient meeting space to conduct all configuration workshops.
- The County IT Team will provide the desktop hardware necessary to conduct the configuration workshop.
- The County Project Team will complete their necessary configuration assignments in a mutually agreed upon timeframe.

### County Involvement
- The County IT Team and Project Team will be heavily involved in all aspects of the configuration process.

### Workshops and Deliverables

| Deliverable | Description |
| --- | --- |
| 5.1.1 Configuration Plan | This deliverable outlines the configuration plan. |
| 5.1.2 Attorney Manager Configuration Workshop Completed | Workshops to be delivered on site by Tyler personnel to the County Project Team. Attendance by the County Project Team will be determined based on the subject matter of each configuration workshop. |
| 5.1.3 Security Workshop Completed | Workshop to be delivered on site by Tyler personnel to the County Project Team and County IT Team on security configuration. Attendance by County Project Team and County IT Team personnel will be jointly determined based on the |

| | division of responsibilities. |
|---|---|
| **5.1.4 Forms Workshop Completed** | Workshop to be delivered on site by Tyler personnel to the County Project Team and County IT Team. Attendance by the County Project Team and County IT Team personnel will be jointly determined based on the division of responsibilities established by the County as well as the subject matter of each workshop. |
| **5.1.5 Configuration Tracking Spreadsheet** | Completed spreadsheet used to track the progress and completion of all application configuration tasks, activities, and assignments. |

**Task 5.2 – System Test (User Acceptance Testing)**

After any identified application customizations and/or integrations are delivered, configuration is finalized, and procedures are completed; the joint team will conduct a full system test of the completed business solution. This is meant to simulate the actual transition and initial operation of the system in production, and is sometimes referred to as a "mock go-live".

Using predefined scenarios and business workflow documentation, the business teams will work to test end-to-end processes through the system. Each area of the application is carefully tested; results are collected and reviewed. If issues are found, they are documented and addressed. Mitigation procedures promptly begin to address any items prior to the start of end user training.

The goal for end user acceptance testing is a full end-to-end test cycle. This testing will verify that all aspects of the project (configuration, forms configuration, security configuration, development, integration, and procedures) are working seamlessly. Testing cycles should be completed on both existing and new case scenarios, and verify the system is operating at the expected level needed to support an end user go-live. This activity serves several purposes. Collectively the teams have performed a mock go-live. This will give the project management team a solid view of activities and issues that will arise over the actual go-live weekend. Running the predefined scenarios through the new site, the County Project Team are able to validate end-to-end functional processes including any integration packages.

**Assumptions**
- This task will be coordinated, and conducted together with, the User Acceptance Testing (UAT) activities for the other County criminal justice departments in scope of this project.
- This task will coordinated, and conducted together with, the UAT activities of the Kern Superior Court's Odyssey implementation for criminal case processing.
- The County Project Team will have developed the necessary test scenarios as part of the Business Process Review and Configuration activities.
- All test scripts will have been completed jointly between the County Project Team and Tyler as part of the development of the application development tasks; specifically the development and approval of the CPD documents.

- External Stakeholders will participate as necessary in executing the test scenarios.
- External Stakeholders will provide the environment(s) necessary to conduct acceptance testing (interfaces), as needed.

**County Involvement**
- The County Project Team and County IT Team will be heavily involved in conducting the user acceptance testing task.

**Deliverables**

| Deliverable | Description |
|---|---|
| **5.2.1 User Acceptance Testing Report** | Report documenting the completion and approval of user acceptance testing. This includes verification of configuration, development, integrations, and updated business process procedures. |

## Task 5.3 – District Attorney and Public Defender Odyssey Go-Live

This task will complete the deployment of the Odyssey Attorney Manager solution for the Kern County District Attorney's Office and the Public Defender's Office. A successful go-live starts with detailed planning of the activities, timeframes, and decision points necessary to ensure predictable results. This reduces the operational risks involved with the County's transition to Odyssey. While each County will have unique characteristics, generally the methodology used to conduct go-live activities remains unchanged.

To arrive at this point, the County Project Team and Tyler will have successfully completed each of the following project milestones:

- Configuration Complete
- Any determined Application Development Complete
- Integration Development Complete
- End-to-end Functionality Validation Complete

Once Sign-off on User Acceptance Testing has been accomplished, training can proceed, and in parallel, the final detailed planning for cutover to the new system and processes will be performed. This typically includes detailed hour-by-hour task lists, completion checklists, and contact information for all key affected personnel, key decision points and contingency plans. During this process, Tyler will plan accordingly to minimize any impact to the County, the County's external partners, and the public during the actual cut-over.

**Assumptions**
- Go-live activities will be coordinated, and conducted together with, the go-live activities for the other County criminal justice departments in scope of this project.
- This task will coordinated, and conducted together with, the go-live activities of the Kern Superior Court's Odyssey implementation for criminal case processing.
- The County Project Team has signed off that user acceptance testing has completed.

REDACTED

- The County Project Team will provide review and feedback on the Go-Live Transition Plan.

**County Involvement**
- The County Project Team will be involved in development, review, and approval of the Go-Live Transition plan.
- Designated and trained County personnel will support Tyler personnel on go-live activities at remote/satellite facility locations in the County.

**Deliverables**

| Deliverable | Description |
|---|---|
| 5.3.1 Go-Live Transition Plan | The Go-Live Transition Plan details out the exact plan for the go-live event. This includes a detailed task list of activities, estimated duration, and task owner.  In addition, the go-live transition plan will document all contingency plans should issues or problems be encountered. |

## Training

Using a training plan previously reviewed and approved, the PMO will initiate the training activities. Training materials and the course plan are organized through a series of modules that focus training on the subject matter experts' specific job functions.

Training is administered so as to minimally impact the day-to-day operations of each criminal justice department.  The schedule and plan are created with the County's supervisors so that the operation of the departments can continue during training.

**Assumptions**
- The County Project Team will work with Tyler to jointly develop a training plan that identifies the size, makeup, and subject-area of each of the training classes.
- The County Project Team will provide training facilities and all equipment necessary to execute the agreed upon training plan.
- Tyler will work with the County as much as possible to provide end-user training in a manner that minimizes the impact to daily County departments' operations.

**County Involvement**
- Designated and trained County personnel will provide assistance to Tyler trainers in conducting the end-user training.

**Deliverables**

| Deliverable | Description |
|---|---|
| 5.3.2 Training Plans and Materials | The training plan will detail out which end-user courses will be conducted and which County staff will attend each course. Additional training materials will be developed and delivered as necessary based on the training needs identified.  For the |

|  | training materials, the County can decide to include the following:<br><br>• screen shots<br>• text instructions<br>• quick reference guides<br>• e-learning or just-in-time (on demand) job aids,<br>• Web-based manuals, job aids, etc.<br>• minimal number of screens required to do a task (such as initiate a case)<br>• specific operational processing by functional area<br>• system administration and Help Desk guides including, but not limited to installation, troubleshooting procedures, system update, ad hoc reporting, tuning, and integrating local components<br>• other materials as required by the County to ensure they can maintain functionality and daily operations<br><br>The exact materials to be produced and used during the training process will be determined by agreement of the joint project teams. |

**Go-Live**

To assist with the actual go-live transition, the PMO will add additional personnel to the project team. In coordination with the County Project Manager, Tyler will engage additional project implementation personnel, integration specialists and/or support personnel to assist during the go-live process. The exact composition of the go-live team will be jointly determined by the PMO based on perceived need and any special conditions that may exist.

The weeks prior to and after the go-live will be planned in detail. This includes activities regarding pending case transition, configuration, environments, operations, financials, calendars, and personnel. The PMO will establish the go-live plan and the method by which its status will be communicated to all involved.

For every system go-live, Tyler strives to maintain business continuity and minimize downtime during regular business hours. Tyler will work with the District Attorney's Office and the Public Defender's Office, in conjunction with the other participating agencies, to plan for and determine the actual go-live date. The ideal timing for the go-live is during the slowest business day(s) of the week. One preferred strategy is to start the process on Friday and finish by Monday morning, allowing for maximum use of non-business hours for go-live activities.

Upon completion of Friday's business, the defined strategy for population of pending cases should be implemented. System validation and checkout should be conducted at this time, generally on a Saturday. It is recommended that a reduced workforce be available for data entry in all areas of operations on Sunday, around mid-morning. This allows for maximum focus on procedural, workstation, security, training and system issues, with limited impact to daily operations. Effectively, the system is live on Sunday and available to the County's staff.

**Assumptions**
- External Stakeholders will be available to assist in supporting the interfaces associated with the go-live process.
- Tyler will work with the County as much as possible to provide post Go-Live end-user training in a manner that minimizes the impact to daily County operations.

**County Involvement**
- The County Project Team will be involved in supporting the go-live process.

**Deliverables**

| Deliverable | Description |
|---|---|
| 5.3.3 Go-Live Status Reports | Weekly status reports that identify the running log of issues and associated resolution plans during the cutover process to the new system.  It is anticipated that there will be four weeks of go-live status reports delivered, however the exact number will be jointly determined by the PMO based on need and relevance. |

## Phase 6:  Project Conclusion

This phase represents project completion, and will signal the conclusion of implementation activities. In this final phase, the implementation project will be officially completed and the PMO will work with the County to transition from implementation to operations and maintenance.

**Assumptions**
- All project implementation activities have been completed and approved.
- No material project issues remain.

**County Involvement**
- None.

**Deliverables**

| Deliverable | Description |
|---|---|
| 6.1 Project Closeout Report | The project closeout report will be approved by the County Executive Team signaling final approval and completion of the implementation project. |

## Attachment A – Project Schedule

This appendix presents the proposed project schedule as shown in the Gantt chart on the following pages. This draft project schedule will serve as a working schedule that is updated by the PMO throughout the project. During the project kickoff, this project schedule will be reviewed with the County and will be adjusted as necessary.

REDACTED



Kern County, California
Odyssey Integrated Criminal Justice (ICJ) Implementation
Draft Project Schedule

| ID | ID | Task Name | Predec | Duration | Start | Finish |
|---|---|---|---|---|---|---|
| 1 | | Kern County Odyssey ICJ Implementation Project | | 431 days | Mon 4/6/15 | Mon 11/28/16 |
| 2 | Phase 1 | Project Initiation and Planning | | 120 days | Mon 4/6/15 | Fri 9/18/15 |
| 3 | Task 1.1 | Project Planning | | 50 days | Mon 4/6/15 | Fri 6/12/15 |
| 4 | | Mobilize ICJ Project Team | | 10 days | Mon 4/6/15 | Fri 4/17/15 |
| 5 | | Coordinate with Court Project Team | 4SS | 10 days | Mon 4/6/15 | Fri 4/17/15 |
| 6 | | Develop Collaboration Plan of Action | 5 | 15 days | Mon 4/20/15 | Fri 5/8/15 |
| 7 | | Prepare for Project Kickoff | 6SS | 15 days | Mon 4/20/15 | Fri 5/8/15 |
| 8 | | Conduct Project Kickoff | 7 | 5 days | Mon 5/11/15 | Fri 5/15/15 |
| 9 | | Develop Communication Plan | 6,8,5,7 | 5 days | Mon 5/18/15 | Fri 5/22/15 |
| 10 | | Confirm Statement of Work | 9 | 5 days | Mon 5/25/15 | Fri 5/29/15 |
| 11 | | Confirm Project Schedule | 10 | 5 days | Mon 6/1/15 | Fri 6/5/15 |
| 12 | Del 1.1.1 | Deliverable: Project Management Plan | 10 | 0 days | Fri 5/29/15 | Fri 5/29/15 |
| 13 | | Gain Approval on Project Management Plan | 12 | 5 days | Mon 6/1/15 | Fri 6/5/15 |
| 14 | | Develop User Acceptance Testing Plan | 12 | 10 days | Mon 6/1/15 | Fri 6/12/15 |
| 15 | | Develop Training Plan | 12 | 5 days | Mon 6/1/15 | Fri 6/5/15 |
| 16 | | Develop Change Management Plan | 12 | 5 days | Mon 6/1/15 | Fri 6/5/15 |
| 17 | Del 1.1.2 | Deliverable: Project Operational Plans | 13 | 0 days | Fri 6/5/15 | Fri 6/5/15 |
| 18 | Task 1.2 | Business Process Review | | 120 days | Mon 4/6/15 | Fri 9/18/15 |
| 19 | | Business Process Review Preparation | 5SS | 10 days | Mon 4/6/15 | Fri 4/17/15 |
| 20 | | Conduct Odyssey Basics System Overview | 12 | 20 days | Mon 6/1/15 | Fri 6/26/15 |
| 21 | | Conduct Odyssey Fit Assessment | 20 | 20 days | Mon 6/29/15 | Fri 7/24/15 |
| 22 | | Conduct Integration Fit Assessment | 21 | 25 days | Mon 7/27/15 | Fri 8/28/15 |
| 23 | | Develop Business Process Review Report | 22 | 10 days | Mon 8/31/15 | Fri 9/11/15 |
| 24 | Del 1.2.1 | Deliverable: Business Process Review Report | 23 | 0 days | Fri 9/11/15 | Fri 9/11/15 |
| 25 | | Gain Approval on Business Process Review Report | 24 | 5 days | Mon 9/14/15 | Fri 9/18/15 |
| 26 | Task 1.3 | Infrastructure Planning and IFL Overview | | 60 days | Mon 4/20/15 | Fri 9/7/15 |
| 27 | | Document Base Architecture | 4 | 10 days | Mon 4/20/15 | Fri 5/1/15 |
| 28 | | Create and Review Acquisition Inventory List | 27 | 10 days | Mon 5/4/15 | Fri 5/15/15 |
| 29 | | Procure Infrastructure Components | 28 | 30 days | Mon 5/18/15 | Fri 6/26/15 |
| 30 | | Conduct Infrastructure Planning Workshops | 28,29 | 10 days | Mon 6/29/15 | Fri 7/10/15 |
| 31 | | Conduct Application Installation Workshop | 29,30 | 10 days | Mon 7/13/15 | Fri 7/24/15 |
| 32 | | Finalize Solution Design Document | 31 | 5 days | Mon 7/27/15 | Fri 7/31/15 |
| 33 | Del 1.3.1 | Deliverable: Solution Design | 32 | 0 days | Fri 7/31/15 | Fri 7/31/15 |
| 34 | | Conduct IFL Overview | 33 | 5 days | Mon 8/3/15 | Fri 8/7/15 |
| 35 | Phase 2 | Solution Design and Development | | 182 days | Mon 8/3/15 | Tue 4/12/16 |
| 36 | Task 2.1 | Infrastructure Setup and Installation | | 35 days | Mon 8/3/15 | Fri 9/18/15 |
| 37 | | Test | | 15 days | Mon 8/3/15 | Fri 8/21/15 |
| 38 | | Conduct Server Installation | 33 | 5 days | Mon 8/3/15 | Fri 8/7/15 |
| 39 | | Conduct Desktop Application Installation | 38 | 5 days | Mon 8/10/15 | Fri 8/14/15 |
| 40 | | Conduct Desktop Application Testing | 39 | 5 days | Mon 8/17/15 | Fri 8/21/15 |
| 41 | | Milestone: Initial Software Delivery, Installation | 40 | 0 days | Fri 8/21/15 | Fri 8/21/15 |
| 42 | | Stage | | 10 days | Mon 8/10/15 | Fri 8/21/15 |
| 43 | | Conduct Server Installation | 38 | 5 days | Mon 8/10/15 | Fri 8/14/15 |
| 44 | | Conduct Desktop Application Installation | 43 | 5 days | Mon 8/17/15 | Fri 8/21/15 |
| 45 | | Production | | 20 days | Mon 8/24/15 | Fri 9/18/15 |
| 46 | | Conduct Production Server Installation | 41 | 5 days | Mon 8/24/15 | Fri 8/28/15 |
| 47 | | Conduct Production Fail-Safe Server Installation | 46 | 5 days | Mon 8/31/15 | Fri 9/4/15 |
| 48 | | Conduct Production Reporting Server Installation | 47 | 5 days | Mon 8/31/15 | Fri 9/11/15 |
| 49 | | Conduct Desktop Application Installation | 48 | 5 days | Mon 9/14/15 | Fri 9/18/15 |
| 50 | Del 2.1.1 | Deliverable: Certification of Infrastructure Environment | 49 | 0 days | Fri 9/18/15 | Fri 9/18/15 |
| 51 | Task 2.2 | Application Development (Placeholder Only) | | 147 days | Mon 9/21/15 | Tue 4/12/16 |
| 52 | | Develop Application CPD Documents | 25 | 15 days | Mon 9/21/15 | Fri 10/9/15 |
| 53 | Del 2.2.1 | Deliverable: Application CPD Documents | 52 | 0 days | Fri 10/9/15 | Fri 10/9/15 |

March 25, 2015

| | | | |
|---|---|---|---|
| Task | | Project Summary | Inactive Milestone | Manual Summary Rollup | Progress |
| Split | | External Tasks | Inactive Summary | Manual Summary | Deadline |
| Milestone | | External Milestone | Manual Task | Start-only | |
| Summary | | Inactive Task | Duration-only | Finish-only | |

REDACTED

Kern County, California
Odyssey Integrated Criminal Justice (ICJ) Implementation
Draft Project Schedule



| ID | ID | Task Name | Predec | Duration | Start | Finish |
|---|---|---|---|---|---|---|
| 54 | | Conduct Application Development Projects | 53 | 120 days | Mon 10/12/15 | Fri 3/25/16 |
| 55 | | Deliver Application Development Projects to Test Environments | 54 | 2 days | Mon 3/28/16 | Tue 3/29/16 |
| 56 | | Conduct Application Development Testing | 55 | 10 days | Wed 3/30/16 | Tue 4/12/16 |
| 57 | Del 2.2.2 | Deliverable: Application Development Complete | 56 | 0 days | Tue 4/12/16 | Tue 4/12/16 |
| 58 | Task 2.3 | Integration Development | | 147 days | Mon 9/21/15 | Tue 4/12/16 |
| 59 | | Develop Integration CPD Documents | 25 | 15 days | Mon 9/21/15 | Fri 10/9/15 |
| 60 | Del 2.3.1 | Deliverable: Integration CPD Documents | 59 | 0 days | Fri 10/9/15 | Fri 10/9/15 |
| 61 | | Conduct Integration Development Projects | 67,60 | 120 days | Mon 10/12/15 | Fri 3/25/16 |
| 62 | | Deliver Integration Development Projects to Test Environments | 61 | 2 days | Mon 3/28/16 | Tue 3/29/16 |
| 63 | | Conduct Integration Development Testing | 62 | 10 days | Wed 3/30/16 | Tue 4/12/16 |
| 64 | Del 2.3.2 | Deliverable: Integration Development Complete | 63 | 0 days | Tue 4/12/16 | Tue 4/12/16 |
| 65 | Task 2.4 | Conduct Integration Toolkit Workshop | | 20 days | Mon 8/24/15 | Fri 9/18/15 |
| 66 | | Conduct Integration Toolkit Workshop | 41 | 20 days | Mon 8/24/15 | Fri 9/18/15 |
| 67 | Del 2.4.1 | Deliverable: Integration Toolkit Workshop Completed | 66 | 0 days | Fri 9/18/15 | Fri 9/18/15 |
| 68 | Phase 3 | Jail Odyssey Deployment | | 135 days | Mon 8/24/15 | Mon 11/28/16 |
| 69 | Task 3.1 | Configuration | | 135 days | Mon 8/24/15 | Fri 2/26/16 |
| 70 | | Conduct Configuration Plan | 41 | 15 days | Mon 8/24/15 | Fri 9/11/15 |
| 71 | Del 3.1.1 | Deliverable: Configuration Plan | 70 | 0 days | Fri 9/11/15 | Fri 9/11/15 |
| 72 | | Odyssey Configuration SME training | 71 | 10 days | Mon 9/14/15 | Fri 9/25/15 |
| 73 | | Conduct Odyssey Configuration Workshop | 72 | 20 days | Mon 9/28/15 | Fri 10/23/15 |
| 74 | Del 3.1.2 | Deliverable: Jail Manager Configuration Workshop Completed | 73 | 0 days | Fri 10/23/15 | Fri 10/23/15 |
| 75 | | Conduct Configuration | 73,74,74 | 14 wks | Mon 11/23/15 | Fri 2/26/16 |
| 76 | | Conduct Security Workshop | 74 | 10 days | Mon 10/26/15 | Fri 11/6/15 |
| 77 | Del 3.1.3 | Deliverable: Security Workshop Completed | 76 | 0 days | Fri 11/6/15 | Fri 11/6/15 |
| 78 | | Conduct Forms Workshop | 74 | 10 days | Mon 11/9/15 | Fri 11/20/15 |
| 79 | Del 3.1.4 | Deliverable: Forms Workshop Completed | 78 | 0 days | Fri 11/20/15 | Fri 11/20/15 |
| 80 | | Conduct Forms Consultation | 77 | 10 days | Mon 11/9/15 | Fri 11/20/15 |
| 81 | | Develop Configuration Tracking Spreadsheet | 80 | 10 days | Mon 11/23/15 | Fri 12/4/15 |
| 82 | Del 3.1.5 | Deliverable: Configuration Tracking Spreadsheet | 81 | 0 days | Fri 12/4/15 | Fri 12/4/15 |
| 83 | Task 3.2 | Data Conversion | | 200 days | Mon 8/24/15 | Fri 6/24/16 |
| 84 | | Conduct Data Conversion Preparation | 52SS | 10 days | Mon 9/21/15 | Fri 10/2/15 |
| 85 | | IFL Training | 84 | 10 days | Mon 10/5/15 | Fri 10/16/15 |
| 86 | | Create Legacy Data Extract | 85 | 10 days | Mon 10/19/15 | Fri 10/30/15 |
| 87 | Del 3.2.1 | Deliverable: Load of Legacy Data into Staging Database | 86 | 0 days | Fri 10/30/15 | Fri 10/30/15 |
| 88 | | Conduct Data Mapping | 87 | 20 days | Mon 11/2/15 | Fri 11/27/15 |
| 89 | | Modify Data Conversion Scripts as Necessary | 88 | 25 days | Mon 11/30/15 | Fri 1/1/16 |
| 90 | Del 3.2.2 | Deliverable: Completion of Data Mapping | 89 | 0 days | Fri 1/1/16 | Fri 1/1/16 |
| 91 | | Conduct Conversion Push #1 | 90 | 5 days | Mon 1/4/16 | Fri 1/8/16 |
| 92 | | Perform Conversion Data Review #1 | 91 | 15 days | Mon 1/11/16 | Fri 1/29/16 |
| 93 | | Perform Rework | 92 | 15 days | Mon 2/1/16 | Fri 2/19/16 |
| 94 | Del 3.2.3 | Deliverable: First Data Conversion Push | 93 | 0 days | Fri 2/19/16 | Fri 2/19/16 |
| 95 | | Conduct Conversion Push #2 | 93 | 5 days | Mon 2/22/16 | Fri 2/26/16 |
| 96 | | Perform Conversion Data Review #2 | 95 | 15 days | Mon 2/29/16 | Fri 3/18/16 |
| 97 | | Perform Rework | 96 | 10 days | Mon 3/21/16 | Fri 4/1/16 |
| 98 | | Conduct Conversion Push #3 | 97 | 5 days | Mon 4/4/16 | Fri 4/8/16 |
| 99 | | Perform Conversion Data Review | 98 | 15 days | Mon 4/11/16 | Fri 4/29/16 |
| 100 | | Perform Rework | 99 | 10 days | Mon 5/2/16 | Fri 5/13/16 |
| 101 | | Conduct Legacy Data Cleanup - As Needed | 100 | 30 days | Mon 5/16/16 | Fri 6/24/16 |
| 102 | | Perform Final Test Data Conversion | 97 | 5 days | Mon 4/4/16 | Fri 4/8/16 |
| 103 | | Perform Data Review | 102 | 15 days | Mon 4/11/16 | Fri 4/29/16 |
| 104 | | Prepare Post Conversion Scripts | 103 | 10 days | Mon 5/2/16 | Fri 5/13/16 |
| 105 | Task 3.3 | System Test (User Acceptance Testing) | | 30 days | Mon 5/16/16 | Fri 6/24/16 |
| 106 | | Conduct User Acceptance Testing | 104 | 30 days | Mon 5/16/16 | Fri 6/24/16 |

| | | | | | |
|---|---|---|---|---|---|
| Task | | Project Summary | | Inactive Milestone | ◇ | Manual Summary Rollup | | Progress | |
| Split | | External Tasks | | Inactive Summary | | Manual Summary | | Deadline | ⇩ |
| Milestone | ◆ | External Milestone | ◆ | Manual Task | | Start-only | ⊏ | | |
| Summary | | Inactive Task | | Duration-only | | Finish-only | ⊐ | | |

March 25, 2015

REDACTED



Kern County, California
Odyssey Integrated Criminal Justice (ICJ) Implementation
Draft Project Schedule

| ID | ID | Task Name | Predec | Duration | Start | Finish |
|---|---|---|---|---|---|---|
| 107 | Del 3.3.1 | Deliverable: User Acceptance Testing Report | 106 | 0 days | Fri 6/24/16 | Fri 6/24/16 |
| 108 | Task 3.4 | Jail Odyssey Go-Live | | 111 days | Mon 6/27/16 | Mon 11/28/16 |
| 109 | | Conduct Go-Live Transition Planning | 107 | 10 days | Mon 6/27/16 | Fri 7/8/16 |
| 110 | Del 3.4.1 | Deliverable: Go-Live Transition Plan | 109 | 0 days | Fri 7/8/16 | Fri 7/8/16 |
| 111 | | Prepare Training Material and End User Training Matrix | 110 | 10 days | Mon 7/11/16 | Fri 7/22/16 |
| 112 | Del 3.4.2 | Deliverable: Training Plans and Materials | 111 | 0 days | Fri 7/22/16 | Fri 7/22/16 |
| 113 | | Training | | 50 days | Mon 7/25/16 | Fri 9/30/16 |
| 114 | | Conduct Super User Training | 111 | 15 days | Mon 7/25/16 | Fri 8/12/16 |
| 115 | | Conduct Admin / Management Training | 114 | 15 days | Mon 8/15/16 | Fri 9/2/16 |
| 116 | | Conduct End User Training | 115 | 20 days | Mon 9/5/16 | Fri 9/30/16 |
| 117 | | Go-Live | | 41 days | Fri 9/30/16 | Mon 11/28/16 |
| 118 | Del 3.4.3 | Deliverable: Go-Live Push to Production | 116 | 0 days | Fri 9/30/16 | Fri 9/30/16 |
| 119 | | Execute Go-Live | 118 | 2 days | Mon 10/3/16 | Tue 10/4/16 |
| 120 | | Monitor Odyssey Implementation | 119 | 10 days | Wed 10/5/16 | Tue 10/18/16 |
| 121 | Del 3.4.4 | Deliverable: Go-Live Status Reports | 119,120 | 0 days | Tue 10/18/16 | Tue 10/18/16 |
| 122 | | Go-Live Support | 119,121 | 10 days | Wed 10/19/16 | Tue 11/1/16 |
| 123 | | Post-Implementation Support | 122 | 9 days | Wed 11/2/16 | Mon 11/14/16 |
| 124 | | Milestone: Jail Odyssey Implementation Acceptance | 123 | 0 days | Mon 11/14/16 | Mon 11/14/16 |
| 125 | | Transition to Support | | 10 days | Tue 11/15/16 | Mon 11/28/16 |
| 126 | Phase 4 | Probation Odyssey Deployment | | 331 days | Mon 8/24/15 | Mon 11/28/16 |
| 127 | Task 4.1 | Configuration | | 135 days | Mon 8/24/15 | Fri 2/26/16 |
| 128 | | Conduct Configuration Plan | 70SS | 15 days | Mon 8/24/15 | Fri 9/11/15 |
| 129 | Del 4.1.1 | Deliverable: Configuration Plan | 128 | 0 days | Fri 9/11/15 | Fri 9/11/15 |
| 130 | | Odyssey Configuration SME Training | 129 | 10 days | Mon 9/14/15 | Fri 9/25/15 |
| 131 | | Conduct Odyssey Configuration Workshop | 130 | 20 days | Mon 9/28/15 | Fri 10/23/15 |
| 132 | Del 4.1.2 | Deliverable: Supervision Configuration Workshop Completed | 131 | 0 days | Fri 10/23/15 | Fri 10/23/15 |
| 133 | | Conduct Configuration | 131,132 | 14 wks | Mon 11/23/15 | Fri 2/26/16 |
| 134 | | Conduct Security Workshop | 132 | 10 days | Mon 10/26/15 | Fri 11/6/15 |
| 135 | Del 4.1.3 | Deliverable: Security Workshop Completed | 134 | 0 days | Fri 11/6/15 | Fri 11/6/15 |
| 136 | | Conduct Forms Workshop | 135 | 10 days | Mon 11/9/15 | Fri 11/20/15 |
| 137 | Del 4.1.4 | Deliverable: Forms Workshop Completed | 136 | 0 days | Fri 11/20/15 | Fri 11/20/15 |
| 138 | | Conduct Forms Consultation | 135 | 10 days | Mon 11/9/15 | Fri 11/20/15 |
| 139 | | Develop Configuration Tracking Spreadsheet | | 10 days | Mon 11/23/15 | Fri 12/4/15 |
| 140 | Del 4.1.5 | Deliverable: Configuration Tracking Spreadsheet | 139 | 0 days | Fri 12/4/15 | Fri 12/4/15 |
| 141 | Task 4.2 | Data Conversion | | 200 days | Mon 9/21/15 | Fri 6/24/16 |
| 142 | | Conduct Data Conversion Preparation | 52SS | 10 days | Mon 9/21/15 | Fri 10/2/15 |
| 143 | | IFL Training | 142 | 10 days | Mon 10/5/15 | Fri 10/16/15 |
| 144 | | Create Legacy Data Extract | 143 | 10 days | Mon 10/19/15 | Fri 10/30/15 |
| 145 | Del 4.2.1 | Deliverable: Load of Legacy Data Into Staging Database | 144 | 0 days | Fri 10/30/15 | Fri 10/30/15 |
| 146 | | Conduct Data Mapping | 145 | 20 days | Mon 11/2/15 | Fri 11/27/15 |
| 147 | | Modify Data Conversion Scripts as Necessary | 146 | 25 days | Mon 11/30/15 | Fri 1/1/16 |
| 148 | Del 4.2.2 | Deliverable: Completion of Data Mapping | 147 | 0 days | Fri 1/1/16 | Fri 1/1/16 |
| 149 | | Conduct Conversion Push #1 | 148 | 5 days | Mon 1/4/16 | Fri 1/8/16 |
| 150 | | Perform Conversion Data Review #1 | 149 | 15 days | Mon 1/11/16 | Fri 1/29/16 |
| 151 | | Perform Rework | 150 | 15 days | Mon 2/1/16 | Fri 2/19/16 |
| 152 | Del 4.2.3 | Deliverable: First Data Conversion Push | 151 | 0 days | Fri 2/19/16 | Fri 2/19/16 |
| 153 | | Conduct Conversion Push #2 | 152 | 5 days | Mon 2/22/16 | Fri 2/26/16 |
| 154 | | Perform Conversion Data Review #2 | 153 | 15 days | Mon 2/29/16 | Fri 3/18/16 |
| 155 | | Perform Rework | 154 | 15 days | Mon 3/21/16 | Fri 4/8/16 |
| 156 | | Conduct Conversion Push #3 | 155 | 5 days | Mon 4/11/16 | Fri 4/15/16 |
| 157 | | Perform Conversion Data Review | 156 | 15 days | Mon 4/18/16 | Fri 4/29/16 |
| 158 | | Perform Rework | 157 | 10 days | Mon 5/2/16 | Fri 5/13/16 |
| 159 | | Conduct Legacy Data Cleanup - As Needed | 158 | 30 days | Mon 5/16/16 | Fri 6/24/16 |

| Task | | Project Summary | | Inactive Milestone | ◇ | Manual Summary Rollup | | Progress | |
|---|---|---|---|---|---|---|---|---|---|
| Split | | External Tasks | | Inactive Summary | | Manual Summary | | Deadline | ⇩ |
| Milestone | ◆ | External Milestone | ◇ | Manual Task | | Start-only | ⊏ | | |
| Summary | | Inactive Task | | Duration-only | | Finish-only | ⊐ | | |

March 25, 2015

Kern County, California
Odyssey Integrated Criminal Justice (ICJ) implementation
Draft Project Schedule



| ID | ID | Task Name | Predec | Duration | Start | Finish |
|----|----|-----------|--------|----------|-------|--------|
| 160 | | Perform Final Test Data Conversion | 155 | 5 days | Mon 4/4/16 | Fri 4/8/16 |
| 161 | | Perform Data Review | 160 | 15 days | Mon 4/11/16 | Fri 4/29/16 |
| 162 | | Prepare Post Conversion Scripts | 161 | 10 days | Mon 5/2/16 | Fri 5/13/16 |
| 163 | Task 4.3 | System Test (User Acceptance Testing) | | 30 days | Mon 5/16/16 | Fri 6/24/16 |
| 164 | | Conduct User Acceptance Testing | 162 | 30 days | Mon 5/16/16 | Fri 6/24/16 |
| 165 | Del 4.3.1 | Deliverable: User Acceptance Testing Report | 164 | 0 days | Fri 6/24/16 | Fri 6/24/16 |
| 166 | Task 4.4 | Probation Odyssey Go-Live | | 111 days | Mon 6/27/16 | Mon 11/28/16 |
| 167 | | Conduct Go-Live Transition Planning | 165 | 10 days | Mon 6/27/16 | Fri 7/8/16 |
| 168 | Del 4.4.1 | Deliverable: Go-Live Transition Plan | 167 | 0 days | Fri 7/8/16 | Fri 7/8/16 |
| 169 | | Prepare Training Material and End User Training Matrix | 168 | 10 days | Fri 7/11/16 | Fri 7/22/16 |
| 170 | Del 4.4.2 | Deliverable: Training Plans and Materials | 169 | 0 days | Fri 7/22/16 | Fri 7/22/16 |
| 171 | | Training | | 50 days | Mon 7/25/16 | Fri 9/30/16 |
| 172 | | Conduct Super User Training | 169 | 15 days | Mon 7/25/16 | Fri 8/12/16 |
| 173 | | Conduct Admin / Management Training | 172 | 15 days | Mon 8/15/16 | Fri 9/2/16 |
| 174 | | Conduct End User Training | 173 | 20 days | Mon 9/5/16 | Fri 9/30/16 |
| 175 | | Go-Live | | 41 days | Fri 9/30/16 | Mon 11/28/16 |
| 176 | Del 4.4.3 | Deliverable: Go-Live Push to Production | 174 | 0 days | Fri 9/30/16 | Fri 9/30/16 |
| 177 | | Execute Go-Live | 176 | 2 days | Mon 10/3/16 | Tue 10/4/16 |
| 178 | | Monitor Odyssey Implementation | 177 | 10 days | Wed 10/5/16 | Tue 10/18/16 |
| 179 | Del 4.4.4 | Deliverable: Go-Live Status Reports | 177,178 | 0 days | Tue 10/18/16 | Tue 10/18/16 |
| 180 | | Go-Live Support | 177,178 | 10 days | Wed 10/19/16 | Tue 11/1/16 |
| 181 | | Post-Implementation Support | 180 | 9 days | Wed 11/2/16 | Mon 11/14/16 |
| 182 | | Milestone: Probation Odyssey Implementation Acceptance | 181 | 0 days | Mon 11/14/16 | Mon 11/14/16 |
| 183 | | Transition to Support | 181,182 | 10 days | Tue 11/15/16 | Mon 11/28/16 |
| 184 | Phase 5 | District Attorney and Public Defender Odyssey Deployment | | 291 days | Mon 10/5/15 | Mon 11/14/16 |
| 185 | Task 5.1 | Configuration | | 135 days | Mon 10/5/15 | Fri 4/8/16 |
| 186 | | Conduct Configuration Plan | 70SS+6 | 15 days | Mon 10/5/15 | Fri 10/23/15 |
| 187 | Del 5.1.1 | Deliverable: Configuration Plan | 186 | 0 days | Fri 10/23/15 | Fri 10/23/15 |
| 188 | | Odyssey Configuration SME training | 187 | 10 days | Mon 10/26/15 | Fri 11/6/15 |
| 189 | | Conduct Odyssey Configuration Workshop | 188 | 20 days | Mon 11/9/15 | Fri 12/4/15 |
| 190 | Del 5.1.2 | Deliverable: Attorney Manager Configuration Workshop Completed | 189 | 0 days | Fri 12/4/15 | Fri 12/4/15 |
| 191 | | Conduct Configuration | 189,190 | 14 wks | Mon 1/4/16 | Fri 4/8/16 |
| 192 | | Conduct Security Workshop | 190 | 10 days | Mon 12/7/15 | Fri 12/18/15 |
| 193 | Del 5.1.3 | Deliverable: Security Workshop Completed | 192 | 0 days | Fri 12/18/15 | Fri 12/18/15 |
| 194 | | Conduct Forms Workshop | 193 | 10 days | Mon 12/21/15 | Fri 1/1/16 |
| 195 | Del 5.1.4 | Deliverable: Forms Workshop Completed | 194 | 0 days | Fri 1/1/16 | Fri 1/1/16 |
| 196 | | Conduct Forms Consultation | 193 | 10 days | Mon 12/21/15 | Fri 1/1/16 |
| 197 | | Develop Configuration Tracking Spreadsheet | 196 | 10 days | Mon 1/4/16 | Fri 1/15/16 |
| 198 | Del 5.1.5 | Deliverable: Configuration Tracking Spreadsheet | 197 | 0 days | Fri 1/15/16 | Fri 1/15/16 |
| 199 | Task 5.2 | System Test (User Acceptance Testing) | | 25 days | Mon 5/16/16 | Fri 6/17/16 |
| 200 | | Conduct User Acceptance Testing | 104 | 25 days | Mon 5/16/16 | Fri 6/17/16 |
| 201 | Del 5.2.1 | Deliverable: User Acceptance Testing Report | 200 | 0 days | Fri 6/17/16 | Fri 6/17/16 |
| 202 | Task 5.3 | District Attorney and Public Defender Odyssey Go-Live | | 105 days | Mon 6/20/16 | Mon 11/14/16 |
| 203 | | Conduct Go-Live Transition Planning | 201 | 10 days | Mon 6/20/16 | Fri 7/1/16 |
| 204 | Del 5.3.1 | Deliverable: Go-Live Transition Plan | 203 | 0 days | Fri 7/1/16 | Fri 7/1/16 |
| 205 | | Prepare Training Material and End User Training Matrix | 204 | 5 days | Mon 7/4/16 | Fri 7/8/16 |
| 206 | Del 5.3.2 | Deliverable: Training Plans and Materials | 205 | 0 days | Fri 7/8/16 | Fri 7/8/16 |
| 207 | | Training | | 50 days | Mon 7/11/16 | Fri 9/16/16 |
| 208 | | Conduct Super User Training | 205 | 15 days | Mon 7/11/16 | Fri 7/29/16 |
| 209 | | Conduct Admin / Management Training | 208 | 15 days | Mon 8/1/16 | Fri 8/19/16 |
| 210 | | Conduct End User Training | 209 | 20 days | Mon 8/22/16 | Fri 9/16/16 |
| 211 | | Go-Live | | 41 days | Mon 9/19/16 | Mon 11/14/16 |
| 212 | | Execute Go-Live | 210 | 2 days | Mon 9/19/16 | Tue 9/20/16 |

| | | | | | |
|---|---|---|---|---|---|
| Task | | Project Summary | | Inactive Milestone | Manual Summary Rollup | Progress |
| Split | | External Tasks | | Inactive Summary | Manual Summary | Deadline |
| Milestone | | External Milestone | | Manual Task | Start-only | |
| Summary | | Inactive Task | | Duration-only | Finish-only | |

March 25, 2015

REDACTED



Kern County, California
Odyssey Integrated Criminal Justice (ICJ) Implementation
Draft Project Schedule

| ID | ID | Task Name | Predec | Duration | Start | Finish |
|----|----|-----------|--------|----------|-------|--------|
| 213 | | Monitor Odyssey Implementation | 212 | 10 days | Wed 9/21/16 | Tue 10/4/16 |
| 214 | Del 5.3.3 | Deliverable: Go-Live Status Reports | 212,213 | 0 days | Tue 10/4/16 | Tue 10/4/16 |
| 215 | | Go-Live Support | 212,214 | 10 days | Wed 10/5/16 | Tue 10/18/16 |
| 216 | | Post-Implementation Support | 215 | 9 days | Wed 10/19/16 | Mon 10/31/16 |
| 217 | | Milestone: DA and PD Odyssey Implementation Acceptance | 216 | 0 days | Mon 10/31/16 | Mon 10/31/16 |
| 218 | | Transition to Support | 216,217 | 10 days | Tue 11/1/16 | Mon 11/14/16 |
| 219 | Phase 6 | Project Conclusion | | 10 days | Tue 11/15/16 | Mon 11/28/16 |
| 220 | | Finalize Knowledge Transfer | 218 | 5 days | Tue 11/15/16 | Mon 11/21/16 |
| 221 | | Finalize Documentation | 220 | 5 days | Tue 11/22/16 | Mon 11/28/16 |
| 222 | | Close Project | 221 | 0 days | Mon 11/28/16 | Mon 11/28/16 |
| 223 | Del 6.1 | Deliverable: Project Closeout Report | 222 | 0 days | Mon 11/28/16 | Mon 11/28/16 |
| 224 | | Milestone: Project Completion | 223 | 0 days | Mon 11/28/16 | Mon 11/28/16 |

# EXHIBIT B

Kern County
Agt. # 562 -2017

# AMENDMENT NO. 1
## TO
## SOFTWARE LICENSE AND PROFESSIONAL SERVICES AGREEMENT
### (County of Kern – Tyler Technologies, Inc.)

This amendment no. 1 ("Amendment No. 1") to the Software License and Professional Services Agreement is made and entered into this _12th_ day of _September_, 2017, by and between the County of Kern, a political subdivision of the state of California (hereinafter "Purchaser"), and Tyler Technologies, Inc., a Delaware corporation (hereinafter "Tyler"), with its principal place of business located at 5101 Tennyson Parkway, Plano, Texas 75024.

## RECITALS

WHEREAS:

(a)     Purchaser and Tyler have heretofore entered into a Software License and Professional Services Agreement (Kern County Agt. #255-2015, dated May 5, 2015), whereby Tyler grants to Purchaser a non-exclusive, royalty-free, revocable license (and sublicenses with respect to the Embedded Third Party Software) to use the Licensed Software for Purchaser's internal administration, operation, and or conduct of Purchaser business operations by an unlimited number of users employed by  purchases and professional services in accordance with the Statement of Work deemed necessary for Purchaser to implement an integrated criminal justice system; and

(b)     The Agreement stipulates that, additional services beyond those detailed in the Statement of Work will be negotiated and incorporated as an amendment; and

(c)     Tyler and Purchaser have mutually agreed on additional project components for the successful implementation of an integrated criminal justice system; and

(d)     Tyler acknowledges that the cost associated with the mutually agreed upon additional projects will be partially covered by Superior Court of California County of Kern as detailed in the "Court Sponsorship" column of Exhibit C-1 and should be not be billed to the Purchaser; and

(e)     Purchaser and Tyler have agreed to amend certain terms and conditions of the Agreement in order to expand the Statement of Work and increase the not to exceed amount; and

(f)     The Agreement is therefore amended effective September 12, 2017;

NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter set forth and incorporating by this reference the foregoing recitals, the parties hereto agree to amend the Agreement as follows:

1

1. Exhibit "C," Kern County ICJ Statement of Work (SOW), shall be amended by incorporating Exhibit "C-1" Kern County Authorization Order dated September 12, 2017.

2. Schedule 1 – Investment Summary, shall be amended to include the addition of 1,257.75 professional service hours at a rate of $165.00 per hour for custom development work.  These hours are hereby added to the Investment summary and incorporated herein by reference. The hours added herein shall be used for the express purpose of projects identified in Exhibit "C-1" which is attached and incorporated herein by reference.

3. Purchaser shall pay 50% of new development requests, identified in Exhibit "C-1", upon execution of this Amendment No. 1 by both parties; 20% upon Tyler's delivery and Purchaser's acceptance, as those concepts are defined in the Agreement, of a Conceptual Design Document related to the work described in Exhibit C-1 and any supporting documentation utilized for development such as User and Configuration guides, and/or workflow documents, as applicable; and the remaining 30% shall be due upon completion of Operational Use as defined in "Schedule 1 – Investment Summary."

4. The maximum reimbursable amount under this Agreement for license fees and professional services is hereby increased from Four Million Nine Hundred Ninety Nine Thousand Ten Dollars and Zero Cents ($4,999,010), by Two Hundred Seven Thousand Five Hundred Twenty Eight Dollars and Seventy Five Cents ($207,528.75), for a new contractual amount not to exceed Five Million Two Hundred Six Thousand Five Hundred Thirty Eight Dollars and Seventy Five Cents ($5,206,538.75).

5. Purchaser and Tyler hereby agree that approval of all development projects must be approved by Purchaser in the following order: County department subject matter expert, County department information technology manager, County department manager, and County Project Manager. Projects that involve multiple County Departments shall require the above outlined approvals from each involved department.

6. All capitalized terms used in this Amendment No. 1 and not otherwise defined, shall have the meaning ascribed thereto in the Agreement.

7. This Amendment No. 1 may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

8. Except as provided herein, all other terms, conditions, and covenants of the Agreement and any and all amendments thereto shall remain in full force and effect.

2

[Signatures follow on next page]

IN WITNESS WHEREOF, the parties have entered into this Amendment No. 1 to the Agreement as of the day and year first written above.

COUNTY OF KERN                                    TYLER TECHNOLOGIES, INC

By _____                       By _____
Chairman                                         Name: Craig Seekamp
Board of Supervisors                             Title: Sr. Corporate Attorney

APPROVED AS TO CONTENT:
COUNTY ADMINISTRATIVE OFFICE

By _____
Name: Ryan Alsop
Title: County Administrative Officer

APPROVED AS TO CONTENT:
INFORMATION TECHNOLOGY SERVICES

By _____
Ron Nakagawa
Project Manager

APPROVED AS TO FORM:
OFFICE OF COUNTY COUNSEL

By _____
Chief Deputy County Counsel

Tyler Amendment 1

4