EILEEN R. RIDLEY, CA Bar No. 151735
    eridley@foley.com
ALAN R. OUELLETTE, CA Bar No. 272745
    aouellette@foley.com
JAIME DORENBAUM, CA Bar No. 289555
    jdorenbaum@foley.com
**FOLEY & LARDNER LLP**
555 California Street, Suite 1700
San Francisco, CA 94104-1520
Telephone:  415.434.4484
Facsimile:   415.434.4507

MARGO A. RAISON, COUNTY COUNSEL
**COUNTY OF KERN, STATE OF CALIFORNIA**
By:  Marshall S. Fontes, Chief Deputy (SBN 139567)
Kern County Administrative Center
1115 Truxtun Avenue, Fourth Floor
Bakersfield, CA 93301
Telephone:  661.868.3800
Facsimile:  661-868-3805

Attorneys for Plaintiff and Counter-Defendant
County of Kern

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COUNTY OF KERN,<br><br>   Plaintiff,<br><br>  v.<br><br>TYLER TECHNOLOGIES, INC., and DOES 1 THROUGH 20, inclusive,<br><br>   Defendants. | Case No:  1:20-cv-00853-AWI-HBK<br><br>**FIRST AMENDED COMPLAINT OF PLAINTIFF COUNTY OF KERN FOR:**<br><br>**(1) BREACH OF CONTRACT**<br>**(2) INTENTIONAL MISREPRESENTATION**<br>**(3) CONCEALMENT**<br>**(4) VIOLATIONS OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION § 17200**<br>**(5) VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT**<br>**(6) DECLARATORY RELIEF** |
| TYLER TECHNOLOGIES, INC.,<br><br>   Counter-Claimant,<br><br>  v.<br><br>COUNTY OF KERN,<br><br>   Counter-Defendant. | **JURY TRIAL DEMANDED**<br><br>Judge:  Honorable Anthony W. Ishii<br><br>**COMPLAINT FILED:  MAY 18, 2020** |

Plaintiff County of Kern ("Plaintiff" or the "County") states the following causes of action against Tyler Technologies, Inc. ("Defendant" or "Tyler") for breach of contract, intentional misrepresentation, concealment, violations of California Business & Professions Code Section § 17200, violations of the California False Claims Act, declaratory relief, and allege as follows:

## THE PARTIES

1.      The County is, and at all times herein mentioned was, a political subdivision of the state of California.

2.      Tyler is, and at all times herein mentioned was, a Delaware corporation with its principal place of business in Plano, Texas that conducted, and continues to conduct, business in California, including business in this judicial district.

## VENUE

3.      The Court has personal jurisdiction pursuant to 28 U.S. Code § 1332(a).  *See* ECF No. 1.

4.      Venue is proper in this judicial district because the events that are the subject of this action occurred in this judicial district, the County sustained injuries in this judicial district as a result of Tyler's conduct in this judicial district, and Tyler is operating, doing business and engaged in activities in this judicial district.

## FACTUAL BACKGROUND

**A.      The Agreement.**

5.      On or about May 5, 2015, the County and Tyler entered into the Software License and Professional Services Agreement (the "Agreement").  A true and correct copy of the Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

6.      Under the Agreement, Tyler agreed to install, implement, and service an integrated information system, known as Odyssey Case Manager ("Odyssey"), throughout the County's criminal justice divisions, and to grant a license for the use of the same to the County.  Tyler agreed that the "purpose of the project is for the County to transition away from the County's legacy Criminal Justice Information System" and ensured that the project "will implement Odyssey for the County criminal justice departments using a proven approach that has been successful in other jurisdictions across the nation."  [Ex. A at 23.]  According to Tyler, Odyssey is a "mature, robust application" resulting from

1

"[s]ubstantial development and industry knowledge" that "mak[es] Odyssey the premier case management solution in the nation." [*Id*. at 30.]

7.     The County's criminal justice divisions are comprised of the Sheriff's Office, Probation Department, Jail, District Attorney's Office, and Public Defender's Office (the "Justice Partners"). While fulfilling different duties and functions, the departments all work in coordination with one another to ensure that the County's criminal justice system works efficiently and serves its constituents.  A simple example illustrates this point: an individual can be arrested by the Sheriff's Office, charged and prosecuted by the District Attorney's Office, represented by the Public Defender's Office, serve time in and be released from jail, and have their integration back into the community overseen by the Probation Department.  Because of this, the County desired—and Tyler promised to deliver—an integrated information system that mirrored the integrated duties and functions of the County's criminal justice divisions and that could provide support for cases from their inception through conclusion.

8.     Under the Agreement, Tyler promised, *inter alia*, that Odyssey would deliver "case tracking features for both prosecutorial and public defender offices including processing and maintaining hearing and trial information" and feature "electronic data sharing capabilities between the District Attorney and Public Defender." [Ex. A at 21.]  Odyssey would also be fully "integrated" across the County's criminal justice divisions and "is designed to automatically share information with fully integrated product centers available within the Odyssey suite." [*Id*. at 17, 21.]  Tyler also promised that Odyssey featured "real-time and batch data sharing with third-party systems is carried out through a standards-based integration platform for exchanging data between Odyssey and other criminal justice agencies." [*Id*.]

9.     For the Probation Department, Tyler promised, *inter alia*, to deliver "an integrated pretrial and probation management system" with "powerful document management and file-folder-tracking capabilities" to "ensure that supervision information is accurate, providing the full picture." [*Id*.]  Odyssey would also "link[] information with Tyler's case management system so that probation departments and courts have access to the most recent information for a defendant, and his or her case, such as financial obligations and demographic data." [*Id*.]

10.     Far from delivering on these promises, Tyler left the County with a dysfunctional,

disconnected, and misfiring collection of parts that are unable to even masquerade as an integrated information system or come close to supporting the critical governmental functions of the Sheriff's Office, Probation Department, Jail, District Attorney's Office, and Public Defender's Office.   As described in detail below, it also left these departments without any means of operating in coordination with one another in even the most basic ways.  While the contract contemplated a November 28, 2016 "Go Live" date, at no point in time has Odyssey been operational, and the County has had to revert back to using its legacy information system that Tyler was hired to replace with Odyssey.

**B.     Tyler's Fraudulent Representations and the Amendment to the Agreement.**

11.     After the execution of the Agreement, Tyler repeatedly represented to the County that, *inter alia*, (1) Tyler would ultimately deliver Odyssey in an integrated, operational and useable form, (2) Tyler possessed the expertise, staff and skills necessary to deliver Odyssey in an integrated, operational and useable form, (3) Tyler was on track to complete the installation and implementation of Odyssey, (4) Tyler was in the process of correcting, and had corrected, issues and problems experienced by the County with Odyssey's functionality and integration, and (5) Odyssey had the technical capacity and ability to accommodate the needs of the County's criminal justice divisions.  These representations were made repeatedly by numerous Tyler employees, including Ken Miles (Tyler's VP of Operations), Teresa Perry (Tyler's Project Manager), Gina Sewell (Director of Project Management, Courts & Justice Division), Shayne Boyd (Project Executive), and Brian Williams (Tyler's Professional Services Director), who were each authorized to speak on behalf and act on behalf of Tyler.  When Tyler made these representations, Tyler knew that it would never be able to deliver Odyssey in an integrated, operational and useable form for the County's criminal justice divisions and did not intend to perform in full under the Agreement.

12.     Representative examples of the above-described misrepresentations follow:

- On or about June 18, 2015, Ken Miles represented orally and through a PowerPoint presentation to the County (including, without limitation, Lee Ann Herron (Information Security Officer), Geoffrey Hill (Construction Services Division Director), Nancy Lawson (Assistant County Admin. Officer for Budget/Finance/Compliance), and Brent Currie (Administrative Analyst)) that Tyler's "California Presence" and success with

similar projects throughout the State of California gave Tyler the expertise, skills and experience necessary to efficiently operationalize Odyssey and integrate the Justice Partners on the Odyssey platform.  At the time this representation was made, Mr. Miles knew that it was false because Tyler had never operationalized or integrated any other California county's criminal justice divisions on the Odyssey platform in spite of its representations to the contrary.

- On or about June 18, 2015, Ken Miles orally and through a PowerPoint presentation represented to the County (including, without limitation, Lee Ann Herron, Geoffrey Hill, Nancy Lawson, and Brent Currie) that Tyler understood the Justice Partners' state mandated reporting requirements and that Odyssey had the ability to create the "necessary reports" required by the State of California.  Indeed, Mr. Miles represented to the County that Odyssey was compliant with California's state-mandated reporting requirements.  At the time these representation were made, Mr. Miles knew that they were false because Tyler had never operationalized or integrated any other California county's criminal justice divisions on the Odyssey platform.  Further, various Tyler employees, including Gina Sewell on August 15, 2017, subsequently confirmed orally to the County (including, without limitation, Nancy Lawson, Brent Currie, Ron Nakagawa (Technology Services Manager/Applications) and Lee Ann Herron) that Odyssey did not contain processes for satisfying the County's state-mandated reporting requirements and that Tyler did not have knowledge or understanding of what the County's state-mandated reporting requirements entailed at the time that it entered into the Agreement and Amendment.  However, at the August 15, 2017 meeting, Ms. Sewell assured the County (through the individuals identified above) that they "*now*" have an employee that understands California compliance and that Tyler would get the reporting component of Odyssey operationalized for the County.  This too was a lie, as Tyler did not take any additional steps at any point in time toward operationalizing the reporting component of Odyssey and never had a "California compliance expert" work on the Project.  Consistent with the false nature of Tyler's claims, Tyler never operationalized the reporting function

4

of Odyssey for the County.

- On or about June 18, 2015, Ken Miles represented orally to the County (including, without limitation, Nancy Lawson, Geoffrey Hill, Brent Currie, and Lee Ann Herron) that the Go Live date of November 28, 2016 will "not move" and that Tyler would have Odyssey operationalized and integrated before that date.  Mr. Miles further promised a "single 'Big Bang' Go Live" event on that date.  At the time that this representation was made, Mr. Miles knew it was false.  Indeed, Tyler (through Gina Sewell) subsequently confirmed orally and in writing to the County (including, without limitation, Nancy Lawson, Brent Currie, Geoffrey Hill, and Lee Ann Herron) on August 15, 2017 that Tyler never "intended" for Odyssey to Go Live on or before November 28, 2016.  In fact, Tyler claimed that the original "intent" of the project was to Go Live within 20 months from execution of the Agreement (which, as discussed below, also did not occur).

- On or about June 18, 2015, Ken Miles represented orally to the County (including, without limitation, Nancy Lawson, Brent Currie, Geoffrey Hill, and Lee Ann Herron) that Tyler would convert and operationalize the data in the County's legacy system into Odyssey and convert it such that it would be useable within Odyssey.  At the time that Mr. Miles made this representation, he knew that it was false.  In fact, Tyler (through Gina Sewell) subsequently disclosed orally and in writing to the County on August 15, 2017 (including Nancy Lawson, Geoffrey Hill, Lee Ann Herron, and Brent Currie) that Tyler only intended to move data from the County's legacy system to Odyssey "as is" without any conversion or "clean-up," which rendered it unusable and inaccessible in Odyssey.

- On or about June 18, 2015, Ken Miles represented orally to the County (including, without limitation, Nancy Lawson, Geoffrey Hill, Brent Currie, and Lee Ann Herron) that it currently possessed the ability to operationalize a jail management system for the Sheriff's Office that could accurately and completely track an offender's booking date, duration of sentence and date of release information.  At the time this representation was made, Mr. Miles knew that it was false because Tyler's jail management software had—a

FIRST AMENDED COMPLAINT AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

few months earlier—given rise to a federal class action lawsuit arising out of an out-of-state county's unlawful incarceration of individuals past their release date due to inherent defects and deficiencies in Odyssey jail management software.  This issue was never corrected, as Odyssey gave rise to a subsequent class action lawsuit against a different out-of-state county in 2016 because Odyssey created the wrongful incarceration of individuals convicted of criminal offenses past their date of release.  As discussed below, Tyler never operationalized Odyssey such that it displayed accurate and complete offender booking dates, duration of sentences, and dates of release information for the County, which would have resulted in the unlawful incarceration of individuals past their release date.

- On or about November 2016, Ken Shelton (Implementation Specialist at Tyler) orally represented to Shannon Hixson that Tyler had the ability to operationalize Odyssey's booking process for the Sheriff's Office and Jail such that the County would be able to create a supplemental booking for individuals who commit a new crime while in the custody of the Sheriff's Office (*e.g.,* assaulting an officer while already in jail).  Mr. Shelton represented to the County that Tyler had already created a "fix" whereby the County would be able to open a new separate and distinct booking for such individuals, as opposed to Odyssey's out of the box configuration that only permitted the County to create a single booking for such individuals.  Mr. Shelton confirmed to Ms. Hixson that it would be fixed and not to worry about it because Tyler already had a solution.  However, Mr. Shelton's representation was knowingly false, as confirmed by Stephen Leduc, Mr. Shelton's replacement after Mr. Shelton abruptly left the project, on or about March 20, 2017.  According to Leduc, no such "fix" ever existed.

- On May 31, 2017, Brian Williams orally and in writing represented to the County (including, without limitation, Nancy Lawson, Brent Currie, Ron Nakagawa, and Lee Ann Herron) that Odyssey would Go Live on October 31, 2017.  Teresa Perry subsequently made the same representation orally and in writing to the County (including, without limitation, Brent Currie, Ron Nakagawa, and Lee Ann Herron) on

June 2, 2017.  At the time that these representations were made, Mr. Williams and Ms. Perry knew they were false.  At the time that these representations were made, Mr. Williams, Mr. Miles and Ms. Perry believed that Tyler had already "gone beyond what we were contracted to do with Kern" such that Tyler did not intend to complete its performance under the Agreement absent a commitment by the County to enlarge the amount of money due to Tyler under the Agreement.  This was subsequently disclosed to the County (orally and in writing) by Ms. Sewell and Ms. Perry on August 15, 2017.

- Further, Brian Williams of Tyler frequently misrepresented both the status of the Project and Tyler's possession of "fixes" or "solutions" for issues faced by the County with Odyssey.  For instance, in early to mid-2017, Mr. Williams represented to Scott Royer of the County that, in situations involving multiple bookings for an individual, Odyssey could track the calculation of custody credits by charge and by case.  This representation was knowingly false, as Odyssey never had the ability to track the calculation of custody credits by case, as subsequently admitted to the County by Teresa Perry.  Similarly, in mid-2017, Brian Williams represented to Scott Royer that Tyler knew how to operationalize Odyssey such that it would track information pertaining to juveniles in the Probation Department's system confidentially due to applicable privacy laws.  Brian Williams represented to Scott Royer that Tyler had *already developed* the solution for the County.  Again, this representation was knowingly false, as Tyler never had the ability to track information pertaining to juveniles confidentially, as subsequently admitted to the County by Teresa Perry.  Likewise, in early 2017, Brian Williams represented to Scott Royer that he (on behalf of Tyler) had been in contact with Noble, which creates the software used by the County for purposes of determining the risk that an individual will reoffend if released on probation, and that Tyler had operationalized Odyssey with input from Noble to ensure the compatibility of Noble with Odyssey.  This representation was false.  Subsequently, when the County learned that Noble could not work within Odyssey, Scott Royer contacted Noble to inquire if Brian Williams or anyone from Tyler had ever been in touch with them.  Noble confirmed that there had been no contact or

outreach from Brian Williams or anyone at Tyler.  Based on Brian Williams' repeated misrepresentations to the County, Brian Williams was removed from the Project in Summer 2017.  At the time that Brian Williams was removed from the Project, Teresa Perry confirmed to Scott Royer that "***Brian Williams is a liar.***"  Even though one admitted liar was removed from the Project, that did not stop Tyler's misrepresentations and inducement of the County to remain contracted with Tyler and to enter into an Amendment for the purpose of increasing the value of the contract in favor of Tyler.

- On August 15, 2017, Gina Sewell orally and in writing represented to the County (including, without limitation, Nancy Lawson, Geoffrey Hill, Brent Currie, and Lee Ann Herron) that Tyler had corrected 82% of reported issues with Odyssey.  At the time of this representation, Ms. Sewell knew it was false.  Specifically, Tyler had not corrected reported issues that Ms. Sewell represented had been corrected, including issues pertaining to converting legacy data to Odyssey, issues pertaining to operationalizing Odyssey such that it displayed accurate and complete offender information for individuals within the County's criminal justice system to the Justice Partners, and operationalizing Odyssey such that it accurately docketed and updated case information.  Tyler (through Ms. Sewell) orally and in writing represented that each of these issues was corrected, as reflected within their 82% correction rate, when this was in fact false because these issues had not been corrected (and, in fact, were never corrected).

- On or about August 15, 2017, Ms. Sewell orally represented to the County (including Lee Ann Heron) that Tyler had the ability to create "permission settings" so that the Justice Partners would be shielded from accessing information that was confidential and, by law, only intended to be accessed by a specific Justice Partner (*e.g.,* permission settings so that the District Attorney or Sheriff's Office could not access information from the Public Defender's Office).  Prior to that time, Tyler had been unable to create such permission settings and, instead, everything in Odyssey was accessible and viewable by every other Justice Partner.  This was a significant concern for the County, as it would have violated applicable law if implemented.  Ms. Sewell and Mr. Miles, on August 15, 2017,

reaffirmed that Odyssey already had the ability to operationalize the permission settings that the County required and that "everything will be fine."  However, this representation was false, as evidenced by Tyler's subsequent inability and failure to operationalize any permission settings in spite of the County's repeated requests that Tyler implement them.

- On August 15, 2017, Ms. Sewell orally and in writing represented to the County (including, without limitation, Nancy Lawson, Geoffrey Hill, Brent Currie, and Lee Ann Herron) that Odyssey would Go Live by March 26, 2018.  At the time that this representation was made, Ms. Sewell knew it was false because Tyler had already decided to "reduce[] Tyler personnel… on this project" such that Tyler's three senior team members were "reassigned to other Tyler projects and… not available to Kern [subject matter experts] via email or phone."  Tyler knew that it would leave the County with an inexperienced and small staff that did not possess the resources or expertise needed to complete the operationalization and integration of Odyssey in order to force County employees to "turn to each other for support" if they wanted Odyssey operationalized and integrated as a result of Tyler's abandonment of the project.

- Further, as of August 15, 2017, Ms. Sewell knew that both she and the remaining Tyler staff would actively work to obstruct the operationalization and integration of Odyssey. For example, from at least August 15, 2017 onward, Ms. Perry routinely instructed Tyler employees to delay or simply not respond to inquiries from County employees who were devoting their time and resources to performing the services that the County had originally contracted with Tyler to perform.  For instance, on October 3, 2017, Ms. Perry directed Tyler employee Stephen Leduc in writing not to respond to urgent inquiries from County employees and personnel regarding next steps for the operationalization and integration of Odyssey.  The County subsequently became aware of this after Mr. Leduc inadvertently copied the County in an email attaching Ms. Perry's written direction to Mr. Leduc that he not respond to inquiries from County employees working on operationalizing Odyssey.

- By September 5, 2017, Tyler (through Teresa Perry) informed the County (including Lee

Ann Herron, Ron Nakagawa, and Brent Currie) that Tyler had instructed its internal staff orally and in writing that there would be a "conversion freeze" on the County project so that the necessary coding to complete trouble tickets would be held for the final "push" determining that "more than 90%" of the open action items identified by the County "required no action on the part of Tyler at this time." By internally determining that the vast majority of open tickets would not be acted on by Tyler's personnel, Tyler essentially abandoned the project and left it to the County to attempt to address the system problems. In so doing, Tyler contradicted its previous oral and written representations that it would support the Odyssey project as reflected by the Agreement and Tyler's consistent invoicing to the County for maintenance and support (*see*, *generally* Exs. A-B; Invoice Nos. 020-12510, 020-15224, 020-16180).

- On October 17, 2017 Tyler (through Teresa Perry) orally and in writing confirmed that it (through Dave Fallwell, Implementation Specialist) had uploaded probation financial disbursement information for review and testing of the Odyssey system by the County (including Lee Ann Herron, Brandon D. Hankins (Technology Services Supervisor Kern County Probation Department), Scott Royer (Assistant Adult Services Division Director Kern County Probation Department), Cyndi Paredes (Fiscal Support Supervisor), and Ron Nakagawa). However, when the County attempted to run the tests they were unable to do so because Tyler (through Mr. Fallwell) had cleared out all escrow accounts (over 10,880 pages) such that no testing or validation could process regarding the original data. Instead of reloading the deleted information, Tyler (through Teresa Perry and Mr. Fallwell) represented orally and in writing that the system worked and marked it as resolved even though the County (nor Tyler) could confirm the issue was resolved because data was removed such that there could be no validation.

- In addition, beginning on September 13, 2018, Ken Miles orally and in writing informed the County (including, without limitation, Mac Avancena, and Scott Royer) that Tyler had determined that, contrary to Tyler's previous oral and written representations (as described in the parties' contract and, in part, in the above examples), Tyler's Odyssey

system could not achieve an integrated solution to the Kern County Justice Partners and, in particular, regarding the needs of the County's Probation Department.  Mr. Miles further represented orally and in writing to the County (including, without limitation, Mac Avancena, and Scott Royer) that Tyler had recently acquired a product called CaseloadPRO that Tyler believed would address the remaining issues (assuming the parties would enter a further agreement for this new product).  In advocating orally and in writing that the County agree to switch directions and adopt CaseloadPRO, Mr. Miles admitted that Tyler's Odyssey system could never provide the fully integrated system to the County's Justice Partners as originally promised and represented at the time of contracting and frequently repeated orally and in writing during the course of the project (as described, in part, by the examples above).  Further, Mr. Miles knew his oral and written representations to the County regarding CaseloadPRO were false in that Tyler had never previously incorporated CaseloadPRO with Odyssey to create a fully integrated system such as that promised to the County by Tyler.

13.   The County relied on Tyler's representations in (1) allowing Tyler to continue to purportedly work on installing and implementing Odyssey, (2) paying Tyler's bills for work that did not support the implementation of Odyssey in an integrated, operational and useable form, (3) paying Tyler's bills for work that Tyler did not perform or complete, and (4) agreeing to increase the amount payable to Tyler for the project through a subsequent amendment to the Agreement.

14.   On or about September 12, 2017, the County entered into Amendment No. 1 to the Software License and Professional Services Agreement (the "Amendment").  A true and correct copy of the Amendment is attached hereto as **Exhibit B** and incorporated herein by reference.

15.   Under the Amendment, Tyler agreed to complete "additional project components for the successful implementation of an integrated criminal justice system."  [Ex. B at ¶ (a).].  The Amendment also increased the "maximum reimbursable amount" under the Agreement in exchange for Tyler's promise to deliver an integrated, operational and useable information system to the County's criminal justice divisions.  [*Id*. at ¶ 4.]

16.   After the execution of the Amendment, Tyler continued to make the same representations

summarized above to the County.  However, Tyler's representations were false, and Tyler made them for the purpose of defrauding the County out of taxpayer dollars that should have been used to support essential governmental functions.

17.     Further, between May 2015 and the present, Tyler invoiced and demanded payment from the County for the purported "completion" of essential work supporting the installation, implementation and servicing of Odyssey and the delivery of an integrated, operational and useable information system for the County's criminal justice divisions.  In so doing, Tyler falsely represented to the County that the invoices and demands were (1) accurate and correct, (2) reflected services and work that was completed, and (3) reflected work that was intended to result in the implementation of Odyssey.  None of these representations were true, and the County relied on them to its detriment by paying over $4.2 million to Tyler and devoting over $9 million worth of County employee time to the project.  For instance, Tyler invoiced, and was paid by, the County for the purported "completion" of data conversion milestones, integration milestones, training provided by Tyler and maintenance provided by Tyler that were not, in fact, completed or intended to result in the implementation of Odyssey.

18.     Representative examples follow:

- Tyler billed, and the County paid, $138,425 for annual maintenance of the Odyssey system for November 5, 2016 through March 31, 2017, $332,220 in annual maintenance of the Odyssey system for April 1, 2017 through March 31, 2018, and $342,186.60 in annual maintenance between April 1, 2018 and March 31, 2019 (Invoice Nos. 020-12510, 020-15224 and 020-16180).  In billing the maintenance fees to the County, Tyler falsely represented that Odyssey would "Go Live" during each billing period referenced above (November 28, 2016, then October 31, 2017, then March 26, 2018) such that there would be a system to maintain in the first instance (as demonstrated by the representations of Mr. Miles, Ms. Perry, Ms. Sewell and Mr. Williams described above).  Because the payment of annual maintenance fees was predicated on Tyler's knowingly false representation to the County that Odyssey would Go Live within each maintenance period, the County paid the annual maintenance fees demanded by Tyler.

- Tyler billed, and the County paid, five invoices in the amount of $316,400 in licensing fees for Odyssey.  The invoices totaled $1,582,000 (Invoice Nos. 020-9823, 020-10256, 020-11238, 020-12166 and 020-13357).  In billing the licensing fees to the County, Tyler falsely represented that Odyssey would "Go Live" on November 28, 2016, then October 31, 2017, then March 26, 2018 such that there would be a functioning system on which to run Tyler software (as demonstrated by the representations of Mr. Miles, Ms. Perry, Ms. Sewell and Mr. Williams described above).  Because the payment of the licensing fees was predicated on Tyler's knowingly false representation to the County that Odyssey would Go Live on the dates set forth above, the County paid the licensing fees demanded by Tyler.

- Tyler billed, and the County paid, one invoice (Invoice No. 020-13356) for three sets of "Training Plans and Materials" totaling $168,300.  In billing the training plans and materials to the County, Tyler falsely represented that Odyssey would "Go Live" on specified dates (November 28, 2016, then October 31, 2017, then March 26, 2018) such that Tyler would complete a training program for the County employees on an operational and integrated system.  Because the payment of the invoice for training plans and materials was predicated on Tyler's knowingly false representation to the County that Odyssey would Go Live within on the dates set forth above, the County paid the invoice for the training plans and materials demanded by Tyler.  Because Tyler never went "Live" with Odyssey for the County, Tyler never performed the trainings paid for by the County.

- Tyler billed, and the County paid, one invoice (Invoice No. 020-11271) in the amount of $61,200 for a Project Management Plan that was tailored to the specific needs of the County.  While Tyler delivered a Project Management Plan that purported to be tailored to the needs of the County, the County subsequently learned and understood—following Tyler's abandonment of the Project in 2018—that Tyler provided the County with a generic, standardized project management plan that did not contain any customized elements specific to the County.  This was because Tyler,

as detailed above, never intended—and never possessed the skills, experience or expertise necessary—to operationalize Odyssey to be tailored to the County's needs despite Tyler's repeated representations to the contrary.

- Tyler billed, and the County paid, one invoice (Invoice No. 020-11021) in the amount of $76,500 for "CPD Documents," which were comprised of manuals for Odyssey specific to the Justice Partners. The manuals were intended and purported by Tyler to be customized to the specific needs of the Justice Partners. While Tyler delivered manuals to the County, the County subsequently learned—following Tyler's abandonment of the Project in 2018—that Tyler provided the County with manuals that reflected the out of the box application of Odyssey and did not include any customization or configuration specific to the County's processes that Tyler was contractually obligated to deliver. This was because Tyler, as detailed above, never intended—and never possessed the skills, experience or expertise necessary—to operationalize Odyssey to be tailored to the County's needs despite Tyler's repeated representations to the contrary.

- Tyler billed, and the County paid, one invoice (Invoice No. 020-10637) in the amount of $34,000 for an "Integration Toolkit Workshop." The workshop was intended and purported by Tyler to be customized to the specific needs of the Justice Partners. While Tyler delivered a workshop to the County, the County subsequently learned—following Tyler's abandonment of the Project in 2018—that Tyler provided the County with a workshop an out of the box workshop for Odyssey that was not tailored to the specific needs of the County. This was because Tyler, as detailed above, never intended—and never possessed the skills, experience or expertise necessary—to operationalize Odyssey to be tailored to the County's needs despite Tyler's repeated representations to the contrary. Indeed, in September 2017, Shayne Boyd (Project Executive at Tyler) confirmed to the County (including Lee Ann Harmon) that the workshop did not provide the County with what it needed or what the County expected Tyler to deliver because the workshop was neither tailored or

customized to the implementation of Odyssey at the County.

- Tyler billed, and the County paid, one invoice encompassing two Configuration Plans and two Configuration Tracking Spreadsheet (Invoice Nos. 020-10831) in the total amount of $193,800, which were deliverables purportedly corresponding to Odyssey's "end state," operational form for the County.  In billing the Configuration Plan and Configuration Tracking Spreadsheet to the County, Tyler falsely represented that Odyssey would "Go Live" on November 28, 2016, then October 31, 2017, then March 26, 2018 such that there would be a functioning and operational system addressed by the Configuration Plan and the Configuration Tracking Spreadsheet (as demonstrated by the representations of Mr. Miles, Ms. Perry, Ms. Sewell and Mr. Williams described above).  Because the payment of the licensing fees was predicated on Tyler's knowingly false representation to the County that Odyssey would Go Live on the dates set forth above, the County paid the invoice as demanded by Tyler.

- Tyler billed, and the County paid, an invoices for the "Load of Legacy Data into Staging Database" (Invoice Nos. 020-10831 for $149,600), which were deliverables purportedly corresponding to Tyler's importation of the County's existing data to Odyssey in a clean and useable form.  In spite of invoice's representation to the County that they had imported the County's existing data to Odyssey in a clean and useable form, that representation was not true because Tyler never imported the County's existing data to Odyssey in a clean and useable form.

- Tyler routinely billed for services and products that were either not provided or were not functional.  For example, Tyler issued Invoice No. 020-20078 on May 16, 2019 to the County for "Completion of Operational Use" in the amount of $500,342.00 with an identified "due date" of June 15, 2019.  However, at no time was the Odyssey System ever fully operational nor was the project ever completed by Tyler.  Yet, Tyler had no problem with issuing knowingly false claims to the County with the intent of inducing payment.

///

FIRST AMENDED COMPLAINT AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

**C.     Tyler's Failure to Deliver an Integrated and Operational Information System.**

19.     To date, Tyler has failed to deliver or implement an integrated, operational and useable information system to the County for its criminal justice divisions and, in fact, the County has had to continue to rely upon its legacy system.   Tyler's failure to deliver or implement an integrated, operational and useable information system to the County for its criminal justice divisions has disrupted the County's operations and enriched Tyler at the expense of the County, the public and taxpayers.

20.     Odyssey failed to function in an operational or integrated manner in countless, foundational ways.  By way of a relatively small number of high-level examples:

- Tyler failed to operationalize Odyssey such that it would accomplish the basic task of containing and displaying accurate information.   Instead, Odyssey was replete with inaccurate and incorrect information, ranging from showing the wrong release date for individuals serving sentences in jail—which subjects the County to significant exposure due to the risk of incarcerating someone for longer than their sentence or releasing them too early—to wrong information regarding an individual's criminal charges, enhancements, bail amounts, warrants and criminal history.

- Tyler failed to operationalize Odyssey such that it would accomplish the basic task of containing updated and complete information.  For example, after a court ordered an individual released from Jail, the Sheriff's Office and Jail had no way of knowing which individual to release.  This created a significant risk of releasing the wrong individual or keeping someone in jail when they should have been released.

- Tyler failed to connect the County's criminal justice divisions and precluded them from exchanging accurate information with, and accessing accurate information from, one another through Odyssey in real-time, which the County's criminal justice divisions depend on to fulfill their duties and protect the rights of individuals within the criminal justice system.

- Tyler failed to operationalize Odyssey such that it could track and report the disposition of an individual's charges and enhancements as they moved through the Court system or the ultimate disposition of those charges and enhancements.

- Tyler failed to convert critical information and data in the County's legacy system to Odyssey, including information as basic as the criminal history of individuals that have been arrested for committing a crime or that were already in the criminal justice system. Tyler represented that data integration between the legacy information system and Odyssey could be accomplished "with just one click," when in fact, it would require hundreds of thousands of hours of manual data entry by County employees.  In many instances, Tyler could not operationalize Odyssey to even allow for the manual input of this basic information by County employees in the first instance.

- Tyler failed to operationalize Odyssey's booking function, which exposed the County to significant risk because it could result in the booking of the same individual twice on the same charge and result in the system displaying inaccurate information as basic as the amount of time served on a jail sentence.

- Tyler failed to operationalize Odyssey's warrant and good cause declaration functions, which prevented the County from timely obtaining warrants, catching criminals, and obtaining admissible evidence.

- Tyler failed to operationalize any process for allowing the County's criminal justice divisions to exchange information without revealing, and instead protecting, confidential, protected and privileged information.

- Tyler failed to operationalize Odyssey's promised functionality of supporting mandatory reporting obligations to various state agencies, including the Department of Justice, which would have cut off critical funding and exposed the County's criminal justice divisions to sanctions.

- Tyler failed to operationalize Odyssey's pleading functions for criminal charges and filings in connection with criminal cases.  For instance, when the District Attorney's Office tried to file an initial accusatory pleading for criminal charges, they encountered error messages, and Odyssey's complete failure to transmit pleadings to the Court and the Public Defender's Office and case-related discovery to the Public Defender's Office.

- Tyler also failed to operationalize Odyssey such that a department other than the District

Attorney's Office could create and transmit case-initiating documents.   While the District Attorney's Office initiates cases for adults, the Probation Department is responsible for initiating cases for juveniles, which it did not have the ability to do in Odyssey.

- Tyler failed to operationalize Odyssey's docketing function, which resulted in its failure to update critical calendaring dates set by the Court.   For instance, if the Court set a significant hearing date, there would be no way for the County's criminal justice divisions to know about it through Odyssey.

- Tyler failed to operationalize Odyssey in a manner that would allow the Sheriff's Office and Probation Department to see the status of charges against individuals, which, among other concerning failures, interferes with the ability of dispatchers to provide accurate information to law enforcement officers in the field about the individuals with whom they are interacting and thereby placing officer safety at risk.

- Tyler failed to operationalize Odyssey such that the Public Defender's Office, which has an ethical and legal obligation to provide effective assistance of counsel, had the ability to determine who they represented in criminal proceedings and access to their information, including information as central as the charges that were filed against them.

- Tyler failed to operationalize Odyssey to accurately track and display information as basic as offense dates for violations of probation for the Probation Department.

- Tyler failed to integrate Odyssey with Noble, which is the risk assessment tool used by the Probation Department to create risk assessment reports on individuals within the criminal justice system that is used for essential functions such as sentencing.   Tyler failed to operationalize Odyssey such that it could populate the tool with accurate information, such as criminal history data, from County records or support the promised functionality of allowing the County to manually input information from other jurisdictions.

21.   In short, the relatively small handful of examples above demonstrate Tyler's complete failure to deliver anything resembling an integrated and functioning information system, and Tyler's

ongoing failure to correct even the most basic and glaring issues with Odyssey.  Instead, Tyler left the County with a dysfunctional, disconnected, and misfiring collection of parts that are not capable of supporting the most basic needs of the County's individual criminal justice divisions—let alone an integrated criminal justice system.

22.     The County reported the issues identified above to Tyler through Tyler's SharePoint system.  Tyler acknowledged these issues by assigning them an "ODY" number.  For instance, Tyler assigned ODY-235556 and ODY-258509 to the failed integration of NOBLE for the Probation Department.  Tyler acknowledged its failure to operationalize Odyssey such that it could display accurate criminal charges and enhancements under ODY-257942.  Tyler acknowledged its failure to operationalize Odyssey such that it would enable the County to comply with its mandatory state reporting obligations under ODY-235470.  Tyler acknowledged its failure to operationalize Odyssey such that it could accurately track credit for time served on a jail sentence under ODY-258411.  In spite of the County notifying Tyler of critical issues with Odyssey, Tyler never corrected them.  Further, Tyler locked the County out of the SharePoint system so that the County would no longer have the ability to report issues with Odyssey to Tyler.

23.     Tyler also sought to deceive, and did in fact deceive, the County by claiming that it was "fixing" or had "fixed" the problems identified by the County.  In fact, Tyler never made any effort to fix the problems and did not actually correct them at any point in time.  When the County reported a problem to Tyler, Tyler would ask the County to send it specific examples caused by the issue, which the County would do.  Tyler would then "spot fix" the example sent by the County by manipulating Odyssey to simulate a correction without attempting to fix the actual issue and without actually correcting the underlying issue.  As a result, the example issues identified by the County would reappear, the underlying issue would persist, and additional issues would arise attributable to Tyler's manipulation of the system to temporarily simulate a non-existent "fix."  In other instances, Tyler would simply delete open issues that it had previously assigned an ODY" number and claim that no reported problem existed.  Representative examples include issues reported by the County to Tyler under ODY Nos. 250237, 258656, 258825, 251993, 260764, 228122, 237696, 238832 and 258792, which Ken Miles falsely represented (in writing) to the County (including Mac Avancena, Lee Ann Herron, and Brent

Currie) on December 4, 2018 that the issues were "Resolved" even though the issues were either knowingly subject to temporary, "Band-Aid" fixes or no fix at all.

24.     Tyler also, and without authorization, used the login credentials of County employees to access the system without the County's knowledge, authorization or permission.  Tyler then completed work flow processes and tasks while logged in as an employee of the County using a simulated, non-existent "fix."  When the County would inform Tyler that the issues that it had previously reported had not been fixed, Tyler would deny that any issue remained and point to reports that it generated from the system showing the completion of work flow processes and tasks by County employees.  However, these work flow processes and tasks were completed by Tyler employees, including Stephen Leduc on or about early December 2017, that had used the login credentials of County employees, including Shannon Hixson, without their knowledge, authorization or permission for the purpose of manipulating the County's system to simulate the prior completion of work flow processes.  Tyler employees, including Stephen Leduc and Teresa Perry, would then falsely claim that the reported issue was "fixed" and close the reported issue, contending that the system showed that County employees, including Shannon Hixson, had completed the work flow tasks.  Because the system thereby falsely reflected that the reported issue had been cleared by a County representative (when, in fact, it had not) the "issues list" falsely represented the state of the project.  This deception was effective in persuading the County that Tyler had resolved reported issues until, in early December 2017, Shannon Hixson began to suspect that Mr. Leduc had accessed her account without her permission when she noticed that the last login time reflected in the system did not correspond with her actual last login time.  When Ms. Hixson attempted to complete the tasks and workflow processes that Mr. Leduc claimed were fixed, Ms. Hixson and other County employees could not be recreate or repeat them in the system.  When Ms. Hixson reported the unauthorized access and system manipulation to Ms. Perry approximately one week later on December 13, 2017, Ms. Perry concealed Mr. Leduc's false representation and unauthorized access to the system by claiming that "it didn't happen and had never happened."   Ms. Perry, within a week of this discussion, subsequently orally admitted to Ms. Hixson that neither Ms. Perry's nor Mr. Leduc's representations were truthful and that Mr. Leduc had, in fact, accessed Ms. Hixson's account without her authorization.

25.     The County also provided Tyler with resources to assist with correcting the issues with Odyssey.  For example, with respect to the County's state reporting obligations, the County obtained approval from subject matter experts at the State of California to assist Tyler with operationalizing Odyssey so that it could support the County's mandatory reporting obligations to various state agencies, including the Department of Justice.  In January 2017, Tyler (through Stephen Leduc and Katrina Garcia) told the County (including Scott Royer) that it had contacted and worked with the State of California to correct the reporting issues when, in fact, Tyler had not done so.  Even when the County provided Tyler with the appropriate contacts that it needed to work with to correct the issues with Odyssey, Tyler made no effort to actually contact the appropriate subject matter experts or otherwise pursue a solution to correct the issues.

26.     In addition to the more than $4.2 million that the County paid to Tyler without receiving any useable work product from Tyler, the County deployed over 100 employees to work on the implementation of Odyssey.  Over the course of several years, these employees worked—and ultimately wasted—tens of thousands of hours on the project due to Tyler's breach of the Agreement and Amendment.  The value of the time spent by the County's employees on the implementation of Odyssey exceeds $9 million.

### D.     Tyler's Admission that It Could Not Deliver Odyssey as an Integrated and Operational Information System.

27.     On August 28, 2018, the County informed Tyler that should Tyler not resolve all incomplete items necessary for the implementation of Odyssey in a functional and operational form by November 28, 2018, the County would invoke the termination provisions of the Agreement as a result of Tyler's breach of the Agreement and Amendment.  Following that correspondence, Tyler (through Ken Miles) informed the County (through Mac Avancena, and Scott Royer) on September 25, 2018 that it was abandoning its plan to use Odyssey—at all—for the Probation Department.  Instead, Tyler insisted on replacing Odyssey with a new information system that it acquired on or about July 2018, called CaseloadPRO. Tyler (through Ken Miles) orally and in writing informed the County (including, without limitation, Mac Avancena, and Scott Royer) that CaseloadPRO would only be used by the Probation Department and that it would take Tyler *two additional years* to implement CaseloadPRO for the

21

Probation Department only.

28.    Further, CaseloadPRO was not integrated with Odyssey and could not be integrated with Odyssey at all.   This would mean that the Probation Department would have been completely disconnected from the District Attorney's Office, Public Defender's Office, Sheriff's Office and Jail and that Tyler would never be able to deliver an integrated information system using Odyssey.

29.    Tyler acquired CaseloadPRO for the specific purpose of replacing Odyssey because Tyler knew that it could not implement or operationalize Odyssey for use by probation departments across the country, including the County's Probation Department.   Indeed, Tyler knew that it could not operationalize Odyssey and integrate the Justice Partners using Odyssey in 2015—a reality that became even more evident to Tyler throughout 2016 and into 2017.   On information and belief, the County alleges that Tyler began pursuing the acquisition of CaseloadPRO in early-2017 in an attempt at purchasing a solution to cover up the fatal and undisclosed defects in Odyssey.   Tyler targeted CaseloadPRO for acquisition because Tyler knew that it would never be able to operationalize Odyssey for use by probation departments.   In spite of this, Tyler (including Teresa Perry and Ken Miles) never disclosed—and instead actively concealed—that it could not implement and operationalize Odyssey for the County's Probation Department even though Tyler purchased CaseloadPRO for this very reason. During the time that it was negotiating the acquisition of CaseloadPRO, Tyler continued to "work" on implementing Odyssey for the Probation Department and the Justice Partners more broadly (in spite of the fact that Tyler knew that it could never deliver an integrated system) and billed the County for the purported "work" (including, *e.g.,* Invoice Nos. 020-20060-020-20081, dated May 16, 2019 with a due dates of June 15, 2019) even though Tyler knew that it was impossible to implement and would unilaterally decide to replace Odyssey with CaseloadPRO as soon as the acquisition was complete. Indeed, Tyler subsequently renamed CaseloadPRO "Tyler Supervision," mimicking the name of and ultimately displacing the fatally defective Odyssey Supervisor platform that Tyler finally admitted it could not operationalize for the Count in September 2018.

30.    Tyler's abandonment of Odyssey for the Probation Department and acknowledgment that it could not deliver an integrated information system across all of the County's criminal justice divisions using Odyssey was also a repudiation of Tyler's original and repeated representations of what it would

deliver to the County and ultimately led the County to terminate the Agreement.

**E.      The County's Termination of the Agreement, and Tyler's Continued Demands for Payment.**

31.      On March 1, 2019, the County issued a "Notice of Breach" pursuant to the termination provision of the Agreement.  On March 12, 2019, the County also issued a "stop work order" to Tyler consistent with the Agreement.

32.      In spite of this, Tyler continues to invoice the County for services that it has not and will not perform for the County.  For instance, as recently as March 1, 2020, Tyler invoiced the County for "Standard Annual Maintenance" in the amount of $342,186.60 when, in fact, no maintenance work has or will be performed by Tyler because Tyler never delivered or operationalized Odyssey.

## FIRST CAUSE OF ACTION

### (Breach Of Contract)

33.      The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 32 above.

34.      The County has performed all obligations required under the Agreement and the Amendment, except those that it was prevented or excused from performing.

35.      Under the Agreement and Amendment, Tyler agreed, *inter alia*, Tyler agreed to install, implement, and service an integrated information system throughout the County's criminal justice divisions and to grant a license for the use of the same to the County.  Specifically, Tyler agreed to deliver an integrated, functional, and operational information system to the County's Sheriff's Office, Probation Department, Jail, District Attorney's office, and Public Defender's Office.

36.      As set forth in detail above, Tyler has breached the Agreement and Amendment by, *inter alia*, not delivering an integrated, functional, and operational information system to the County's criminal justice divisions.  Further, Tyler has admitted that it cannot deliver an integrated and operational information system using Odyssey.

37.      As a result of Tyler's breach of the Agreement and Amendment, the County has paid Tyler over $4.2 million for a non-integrated, non-operational, non-functional and unusable information system and lost over $9 million dollars of County employee time on the project.  The County has been

forced to use its legacy system as the Odyssey system is not operational.  Tyler has caused the County injury and damages in an amount to be proven at trial.  Further, Tyler is liable to pay for the County's attorney's fees, costs and interest related to the prosecution of its claims.

## SECOND CAUSE OF ACTION

### (Fraud And Deceit – Intentional Misrepresentation)

38.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 37 above.

39.     Between November 28, 2016 and the present, Tyler repeatedly represented to the County that, *inter alia*, (1) Tyler would ultimately deliver Odyssey in an integrated, operational and useable form, (2) Tyler possessed the expertise, staff and skills necessary to deliver Odyssey in an integrated, operational and useable form, (3) Tyler was on track to complete the installation and implementation of Odyssey, (4) Tyler was in the process of correcting, and had corrected, issues and problems experienced by the County with Odyssey's functionality and integration, and (5) Odyssey had the technical capacity and ability to accommodate the needs of the County's criminal justice divisions.  Representative examples of Tyler's misrepresentations are set forth above, including in paragraphs 11-13, 23-26 and 29 above.

40.     The County relied on Tyler's representations in (1) allowing Tyler to continue to purportedly work on installing and implementing Odyssey, (2) paying Tyler's bills for work that did not support the implementation of Odyssey in an integrated, operational and useable form, (3) paying Tyler's bills for work that Tyler did not perform or complete, and (4) agreeing to increase the amount payable to Tyler for the project through a subsequent amendment to the Agreement.

41.     However, Tyler's representations were not truthful.  In fact, Tyler knew that it would never be able to deliver Odyssey in an integrated, operational and useable form for the County's criminal justice divisions.  At the time that it made the above-referenced representations to the County, Tyler did not, *inter alia*, (1) intend to install and complete the implementation of Odyssey in an integrated, operational and useable form, (2) possess the expertise, staff and skills necessary to deliver Odyssey in an integrated, operational and useable form, (3) intend to fix any issues and problems experienced by the County with Odyssey's functionality and integration, and (4) intend to perform in

full under the Agreement and Amendment, and (5) operationalize Odyssey such that it had the technical capacity and ability to meet the needs of the County's criminal justice divisions.

42.     Tyler's misrepresentations and knowledge of their falsity are confirmed by Tyler's acquisition of CaseloadPRO and unilateral decision to replace Odyssey with CaseloadPRO for the Probation Department.  Even though Tyler was negotiating the acquisition of CaseloadPRO for the specific purpose of replacing Odyssey with it and knew that it would abandon Odyssey at the County as soon as the acquisition was complete, Tyler continued to make the above-referenced misrepresentations to the County.

43.     Tyler made the above-referenced misrepresentations with the intent of inducing the County to, *inter alia*, (1) enter into the Amendment, (2) allow Tyler to continue to work and bill the County for work allegedly performed under the Agreement and the Amendment, (3) pay for work that was not essential to and did not support the delivery of Odyssey in an integrated, operational and useable form, and (4) increase the value of the Agreement in favor of Tyler.

44.     Further, Tyler submitted (and continues to submit) invoices and demands for payment to the County.  In so doing, Tyler falsely represented to the County that the invoices and demands were (1) accurate and correct, (2) reflected services and work that was completed, and (3) reflected work that was intended to result in the implementation of Odyssey.  None of these representations were true, and the County relied on them to its detriment by paying over $4.2 million to Tyler and devoting over $9 million worth of County employee time to the project.  Had the County known the actual and true facts regarding the fraudulent requests for payment, it would not have made the payments to Tyler.

45.     The County is informed and believes, and thereon alleges, that Tyler committed the acts averred above maliciously, fraudulently and oppressively, with the wrongful intention of injuring the County and its constituents and benefitting Tyler's sole purposes.

46.     Accordingly, as a result of Tyler's intentional and fraudulent misrepresentations of material facts, the County has been damaged in an amount according to proof at trial.  Further, Tyler is liable to pay for the County's attorney's fees, costs and interest related to the prosecution of its claims. Moreover, because Tyler acted maliciously, fraudulently and oppressively as those terms are defined in Civil Code § 3294, the County is entitled to recover punitive damages from Tyler.

### THIRD CAUSE OF ACTION

### (Fraud And Deceit – Concealment)

47.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 46 above.

48.     Between November 28, 2016 and the present, Tyler repeatedly represented to the County that, *inter alia*, (1) Tyler would ultimately deliver Odyssey in an integrated, operational and useable form, (2) Tyler possessed the expertise, staff and skills necessary to deliver Odyssey in an integrated, operational and useable form, (3) Tyler was on track to complete the installation and implementation of Odyssey, (4) Tyler was in the process of correcting, and had corrected, issues and problems experienced by the County with Odyssey's functionality and integration, and (5) Odyssey had the technical capacity and ability to meet the needs of the County's criminal justice divisions.  Representative examples of Tyler's misrepresentations are set forth above, including in paragraphs 11-13, 23-26 and 29 above.

49.     However, Tyler's representations were not truthful.  In fact, Tyler knew that it would never be able to deliver Odyssey in an integrated, operational and useable form for the County's criminal justice divisions.  At the time that it made the above-referenced representations to the County, Tyler did not, *inter alia*, (1) intend to install and complete the implementation of Odyssey in an integrated, operational and useable form, (2) possess the expertise, staff and skills necessary to deliver Odyssey in an integrated, operational and useable form, (3) intend to fix any issues and problems experienced by the County with Odyssey's functionality and integration, (4) intend to perform in full under the Agreement and Amendment, and (5) operationalize Odyssey such that it had the technical capacity and ability to meet the needs of the County's criminal justice divisions.

50.     Further, Tyler submitted (and continues to submit) invoices and demands for payment to the County.  In so doing, Tyler represented to the County that the invoices and demands were (1) accurate and correct, (2) reflected services and work that was completed, and (3) reflected work that was intended to result in the implementation of Odyssey.  None of these representations were true, and the County relied on them to its detriment by paying over $4.2 million to Tyler and devoting over $9 million worth of County employee time to the project.

51.     Tyler never disclosed the falsehood of each of the above-referenced representations to the

County.  Instead, Tyler actively concealed the above-referenced falsehoods from the County with the intent of inducing the County to, *inter alia*, (1) enter into the Amendment, (2) allow Tyler to continue to work and bill the County for work allegedly performed under the Agreement and the Amendment, (3) pay for work that was not essential to and did not support the delivery of Odyssey in an integrated, operational and useable form, and (4) increase the value of the Agreement in favor of Tyler.

52.     Tyler concealed the truth regarding the above-referenced falsehoods in spite of the fact that Tyler was negotiating the acquisition of CaseloadPRO for the specific purpose of replacing Odyssey with it and knew that it would abandon Odyssey at the County as soon as the acquisition was complete.

53.     Had the County known the truth, it would not have entered into the Amendment, paid for work that was not completed or was not integral to the delivery of Odyssey in an integrated, operational and useable form, and would not have incurred the cost, expense and disruption caused by Tyler's failure to implement an integrated, operational and useable information technology system for the County's criminal justice divisions.

54.     The County is informed and believes, and thereon alleges, that Tyler committed the acts averred above maliciously, fraudulently and oppressively, with the wrongful intention of injuring the County and benefitting Tyler's sole purposes.

55.     Accordingly, as a result of Tyler's concealment of material facts, the County has been damaged in an amount according to proof at trial.  Further, Tyler is liable to pay for the County's attorney's fees, costs and interest related to the prosecution of its claims.  Moreover, because Tyler acted maliciously, fraudulently and oppressively as those terms are defined in Civil Code § 3294, the County is entitled to recover punitive damages from Tyler.

## FOURTH CAUSE OF ACTION

### (Violations of Bus. & Prof. Code § 17200, *et seq.*)

56.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 55 above.

57.     California Business and Professions Code § 17200 *et seq*. prohibits any unlawful, unfair or fraudulent business practice or act.

58.     The business practices alleged above demonstrate Tyler's pattern and practice of

unlawful, unfair and fraudulent conduct in its business operations.  In sum, Tyler induced the County to enter into and remain in the Agreement and Amendment by repeatedly misrepresenting, *inter alia*, its ability and intent to implement Odyssey in an integrated, operational and useable form at the County's criminal justice divisions.  Tyler's scheme was predicated on deceit.  Tyler knew that it could not deliver and integrate Odyssey as promised, yet Tyler repeatedly assured the County that it could.  Tyler knew that there were rampant, unresolvable issues with Odyssey, yet Tyler manipulated the system to simulate temporary "fixes" without actually correcting any of the underlying issues with Odyssey.  Tyler knew that it intended to abandon Odyssey for the Probation Department as soon as it acquired CaseloadPRO, yet Tyler continued to assure the County that Odyssey would be delivered as promised and continued to bill and receive payment from the County for work that Tyler knew would not result in the successful implementation and integration of Odyssey for the Probation Department.

59.     Tyler devised and implemented the scheme set forth herein for the sole purpose of increasing the amount of work and time that it would spend on the project, thereby artificially inflating its billings and the value of the project for Tyler's sole benefit.  The County has paid Tyler in excess of $4.2 million and devoted over $9 million in County employee time to the project as a result of Tyler's scheme.  To date, however, Tyler has failed to implement an integrated, operational and useable information system for the County's criminal justice divisions, which has disrupted the County's operations and enriched Tyler at the expense of the County and its taxpayers.

60.     Further, the County is informed and believes, and thereon alleges, that Tyler has engaged in the same conduct with respect to other counties, municipalities and/or local governments seeking an integrated operating system for their criminal justice divisions.

61.     Tyler's conduct constitutes unlawful, unfair and fraudulent acts in violation of California Business and Professions Code § 17200, *et seq*.

62.     As a result, the County is entitled to restitution from Tyler and an order instructing Tyler to disgorge the ill-gotten gains resulting from its unlawful, unfair and fraudulent business practices.  Further, the general public will garner a significant benefit from the prosecution of this action in that public funds have been expended as a result of the wrongful acts of Defendant.  Accordingly, under California Code of Civil Procedure Section 1021.5, Defendant must reimburse the County for the

attorneys' fees and costs expended in this matter.

## FIFTH CAUSE OF ACTION

### (Violation Of The California False Claims Act)

63.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 62 above.

64.     As alleged above, Tyler submitted numerous invoices and demands for payment to the County.  In so doing, Tyler represented to the County that it had "completed" essential work supporting the implementation of an integrated, operational and useable information system for the County's criminal justice divisions.

65.     In submitting the invoices and demands for payment to the County, Tyler represented to the County that the invoices and demands were (1) accurate and correct, (2) reflected services and work that was completed, and (3) reflected work that was intended to result in the implementation of Odyssey.

66.     The County is informed and believes, and on that basis alleges, that invoices and demands submitted by Tyler were (1) not accurate or correct, (2) reflected services and work that was not completed, and (3) reflected work that was not intended to result in the implementation of Odyssey.  Further, the County is informed and believes, and on that basis alleges, that Tyler did not complete essential work supporting the implementation of an integrated, operational and useable information system for its criminal justice divisions.  Representative examples of Tyler's misrepresentations are set forth above, including in paragraphs 17-18, 23-26 and 29 above.

67.     The above-referenced invoices and demands for payment constitute false claims for payment under Government Code § 12651.

68.     The above-referenced invoices were presented by Tyler to the County with either actual knowledge of their falsity or deliberate ignorance or reckless disregard of their falsity.

69.     The County, at the time the false and fraudulent demands for payment in the invoices were made, was ignorant of the falsity of the representations and believed them to be true.  In reliance on the above-referenced representations, the County paid the invoices submitted by Tyler in an amount in excess of $4.2 million.  Had the County known the actual and true facts regarding the fraudulent requests for payment, it would not have made said payments.

70.     Tyler's acts constitute a violation of Government Code § 12651 and warrant an award to the County for treble damages in an amount according to proof and civil penalties up to the maximum permitted under the California False Claims Act for each false claim.  Further, Tyler is liable to pay for the County's attorney's fees, costs and interest related to the prosecution of its claims.

## SIXTH CAUSE OF ACTION

### (Declaratory Relief)

71.     The County realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 70 above.

72.     As set forth above, Tyler has not completed, and indeed cannot complete, the installation, implementation and delivery of an integrated information system for its criminal justice divisions in an operational or useable form.  In essence, the County has expended an amount in excess of $4.2 million for a non-integrated, non-operational, non-functional and unusable information system.

73.     In spite of the County's demands for repayment of its considerable expenditure for a non-integrated, non-operational, non-functional and unusable information system, Tyler has refused to return the payments.

74.     Further, Tyler has demanded, and continues to demand, that it is entitled to additional payment from the County under the Agreement and Amendment.  The County denies this claim.

75.     Therefore, an actual controversy and dispute has arisen between the County and Tyler concerning their respective rights under the terms and conditions of the Agreement and Amendment.  A judicial declaration is necessary and desirable at this time so that the parties may know their respective rights, duties and obligations with respect to the amounts paid by the County to Tyler for a non-integrated, non-operational, non-functional and unusable information system and the County's demands for additional payment from the County under the Agreement.

76.     For the reasons set forth in this Complaint, the County is entitled to declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, the County prays for judgment against Tyler as follows:

1.     For compensatory damages, according to proof at trial;

2.     For consequential damages, according to proof at trial;

3.       For restitution, according to proof at trial;

4.       For a declaration of the rights and duties of the County and Tyler;

5.       For punitive damages;

6.       For treble damages;

7.       For imposition of civil penalties at the maximum permitted under the California False Claims Act for each false claim;

8.       For attorneys' fees under the Agreement and Amendment, according to proof;

9.       For attorneys' fees to the extent provided under the law, according to proof;

10.      For costs, according to proof;

11.      Interest at the legal rate; and

12.      All other relief as the Court may deem just and proper.

DATED:  March 5, 2021

**FOLEY & LARDNER LLP**
EILEEN R. RIDLEY
ALAN R. OUELLETTE
JAIME DORENBAUM

By:*/s/ Eileen R. Ridley*
EILEEN R. RIDLEY

MARGO A. RAISON, COUNTY COUNSEL
MARSHALL S. FONTES, CHIEF DEPUTY
Attorneys for Plaintiff and Counter-Defendant
COUNTY OF KERN

31

FIRST AMENDED COMPLAINT AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.

## DEMAND FOR JURY TRIAL

The County demands a jury trial on all claims so triable and an advisory jury for a factual determination on all equitable claims.

DATED:  March 5, 2021

**FOLEY & LARDNER LLP**
EILEEN R. RIDLEY
ALAN R. OUELLETTE
JAIME DORENBAUM


By:*/s/ Eileen R. Ridley*
EILEEN R. RIDLEY

MARGO A. RAISON, COUNTY COUNSEL
MARSHALL S. FONTES, CHIEF DEPUTY
Attorneys for Plaintiff and Counter-Defendant
COUNTY OF KERN

FIRST AMENDED COMPLAINT AGAINST DEFENDANT TYLER TECHNOLOGIES, INC.